Jonathan O. Hafen (6096) (jhafen@parrbrown.com)
Victoria R. Luman (16092) (vluman@parrbrown.com)
Daniel J. Nelson (19030) (dnelson@parrbrown.com)
PARR BROWN GEE & LOVELESS
101 South, 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750

LaShel Shaw (13862) (lshaw@zbappeals.com)
Caroline A. Olsen (18070) (colsen@zbappeals.com)
ZIMMERMAN BOOHER
Felt Building
341 South Main Street
Salt Lake City, Utah 84111
Telephone: (801) 924-0200
Facsimile: (385) 420-5576

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE FEDERAL DISTRICT OF UTAH

| | |
|---|---|
| **MICHAEL ROBERT TILLEMAN**, an individual,<br><br>                    Plaintiff,<br>vs.<br>**JODI HILDEBRANDT**, an individual, **RUBY FRANKE**, an individual, **CONNEXIONS CLASSROOM, LLC,** a Utah limited liability company, **MICHAL WASHBURN**, an individual, and **DOES I-X**, individuals,<br><br>                    Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Civil No: 2:25-cv-00049<br><br>Judge: |

Plaintiff Michael Robert Tilleman ("Plaintiff") hereby files this Complaint against

Defendants Jodi Hildebrandt ("Hildebrandt"), Ruby Franke ("Franke"), ConneXions Classroom,

LLC ("ConneXions"), and Michal Washburn ("Savage") (collectively, "Defendants") and for his

claims, alleges as follows:

## INTRODUCTION

1.      In August 2023, the world was shocked to learn that Ruby Franke, a parenting social media influencer, and her business partner Jodi Hildebrandt, a former therapist, had been torturing two of Franke's small children at Hildebrandt's residence outside of St. George, Utah. Both women pleaded guilty to four counts of felony aggravated child abuse after Franke's 12-year-old emaciated son escaped and asked a neighbor for help. As serious and troubling as these facts are, they are part of a larger scheme spanning nearly two decades whereby Franke, Hildebrandt, and others known and unknown have been engaging in a widespread racketeering enterprise in pursuit of power and profit through the advertisement, sale, and provision of fraudulent services and products designed to prey on vulnerable individuals, and encourage victims to perpetuate illegal acts onto others (the "Enterprise"). Plaintiff Michael Tilleman brings this action for damages and injunctive relief as one of the victims of this racketeering scheme.

2.      Hildebrandt and several other individuals, known and unknown, including Franke, Pam Bodtcher, and Savage comprised an organized criminal enterprise within the meaning of Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce.

3.      Hildebrandt is the founder of several entities: ConneXions, ConneXions Mental Fitness Trainers, LLC and the ConneXions Foundation. ConneXions, and potentially ConneXions Mental Fitness Trainers, LLC and the Connections Foundation, form the business conduit of the Enterprise. In leading ConneXions and her other various entities, Hildebrandt relied on several individuals, including Franke, to recruit other members to ConneXions and the Enterprise and carry out her directives. Through ConneXions and the Enterprise, Defendants

purport to offer valuable marital, self-improvement, and group-session counseling, classes, workshops, and digital and written materials in exchange for lucrative fees.

4.      But these counseling services, classes, workshops, lessons, and digital and written materials are fraudulent; through the Enterprise, Hildebrandt and other members of the Enterprise, including Defendants, prey on individuals in vulnerable positions who are seeking legitimate mental health services and indoctrinate members into the Enterprise—instructing her associates to perpetuate child abuse, child torture, and psychological abuse on any individual in their lives not deemed to be in what Hildebrandt has coined "Truth," i.e., aligning with Hildebrandt's will.

5.      Under the guise of providing help to those in need, ConneXions' fraudulent services are intended to bring individuals under the Enterprise's financial and psychological control, entice victims to spend money on fraudulently advertised services which perpetuate and promote child abuse and other illegal acts, encourage psychological abuse, and ultimately break families, all while financially enriching the Defendants and further perpetuating the Enterprise.

6.      Hildebrandt teaches her associates that when they are in the "Truth," they should perpetuate horrific acts on anyone in "distortion." In reality, Hildebrandt indoctrinates her victims with the false mentality that anyone who disagrees with the "Truth" is in "distortion," and is the enemy. Hildebrandt teaches her associates and Enterprise members to inflict pain, often taking the form of physical abuse and torture, on individuals in "distortion" to bring them into "Truth."

7.      After representing that ConneXions offers run of the mill counseling and self-help services to entice victims already in a mentally vulnerable position, the Enterprise then

incrementally introduces Hildebrandt's methodology through a series of workshops and counseling sessions conducted through ConneXions—familiarizing Enterprise victims with Hildebrandt's identity as a thought leader to gain trust, and then eventually demanding that victims accept that only Hildebrandt herself can help them achieve betterment of their lives through inflicting pain, punishment, and even physical torture onto others.

8.      The Enterprise demands that its victims accept Hildebrandt's authority as absolute. If Enterprise victims, who sought out ConneXions seeking routine counseling, refuse to submit to Hildebrandt's control, the Enterprise turns and punishes them as someone in "distortion."

9.      As evidenced by the despicable and widely publicized torture of Franke's children, Hildebrandt, Franke, and other members of the Enterprise, are encouraged to punish those in "distortion" by any means necessary. And, as demonstrated by the tragic and criminal treatment of Franke's children, the Enterprise encourages its members to punish individuals to the brink of death if necessary to remediate someone from "distortion" into "Truth."

10.     The horrific nature of the Enterprise was meticulously described by Franke at her criminal-aggravated-child-abuse sentencing hearing. Franke, who initially sought out Hildebrandt merely for counseling services, revealed that Hildebrandt's teachings then led Franke into "a dark delusion," a "distorted version of reality"; Hildebrandt taught Franke to "isolate anyone who challenged [Franke]," and to believe that "this world [is] an evil place filled with cops who control, hospitals who injure, government agencies that brainwash, and church leaders who lie and lust, husbands who refuse to protect, and children who need abuse." Per Franke, Hildebrandt's grooming of her associates results in "paranoia," "criminal activity,"

"brainwashing", and offering "unconditional contempt" to family who try to help. In short, "tragedy." Hildebrandt's methodology leads children into extreme danger, "knowingly" leads children to darkness, "believ[ing] dark was light and light was wrong," and takes from children "all that [is] soft and safe and good".

11.    Hildebrandt's methodology has led to the commission of countless crimes and torts by Hildebrandt and Enterprise members, all of which did not come to light until the arrests and subsequent sentencing of Hildebrandt and Franke in August 2023 and February 2024, respectively. Once Franke and Hildebrandt's criminal activity was exposed, thousands of individuals reported that the Enterprise destroyed their lives and their families. Many even contemplated suicide at the hands of the Enterprise.

12.    Plaintiff is one such individual severely harmed by the Enterprise. Plaintiff and Savage were formerly married. During their marriage, Savage sought Hildebrandt for routine counseling. Shortly thereafter, Savage eagerly accepted Hildebrandt as her guide and joined the Enterprise. Savage and Hildebrandt immediately identified Plaintiff as an individual in "distortion" upon whom they needed to inflict severe psychological abuse to be brought into "Truth."

13.    Savage masterfully implemented the Enterprise's dark teachings to physically abuse and endanger the minor child of Savage and Plaintiff and destroy Plaintiff's life. Savage's current husband, J Washburn ("Washburn"), now also implements the Enterprise's destructive practices to harm Plaintiff.

14.    Even after Hildebrandt's and Franke's arrests and convictions, Savage remains a devoted associate of Hildebrandt and the Enterprise. Savage has staunchly refused to stop

implementing Hildebrandt's warped teachings to discipline and abuse Savage and Plaintiff's

daughter. Immediately after the arrests and subsequent convictions of Hildebrandt and Franke,

and after the horrific nature of Hildebrandt's methodology came to light, Plaintiff pleaded

multiple times with Savage to discontinue Savage's implementation of Hildebrandt's

methodology with Savage and Plaintiff's minor child. Savage refused. Savage continues to

engage in criminal and tortious behavior against her minor daughter and Plaintiff, demonstrating

through her words and actions that she willfully does so under the dark delusion, falsehoods, and

dangerous and false methodologies promulgated by Hildebrandt.

15.     As part of Savage's implementation of the Enterprise, she attempted to destroy

Plaintiff's life in domestic proceedings by disparaging him and advocating for positions she

knew violated Utah law. Plaintiff prevailed on appeal, reversing the trial court's custody,

attorney's fees, and child support awards. *See Tilleman v. Tilleman*, 2024 UT App 54, 549 P.3d

65.

16.     This suit addresses the racketeering and personal injuries Plaintiff has suffered as

a direct result of Savage, Hildebrandt, and other members of the Enterprise's violations of

federal racketeering ("RICO") and Utah law.

17.     The Enterprise continues to function even while Hildebrandt and Franke are

incarcerated. Plaintiff brings this suit for declaratory and injunctive relief to enjoin the Enterprise

from causing harm, as well as for monetary damages caused by Defendants through the

Enterprise.

## PARTIES

18.      Plaintiff Michael Tilleman is an individual domiciled in Utah.

19.      Upon information and belief, Hildebrandt is an individual domiciled in Utah and currently incarcerated in the Utah State Correctional Facility.

20.      Upon information and belief, Franke is an individual domiciled in Utah and currently incarcerated in the Utah State Correctional Facility.

21.      Upon information and belief, ConneXions Classroom, LLC is a Utah limited liability company created by Hildebrandt to further the Enterprise's fraudulent scheme. Its last address of record is 1400 Chapel Street, P.O. Box 782, Santa Clara, UT 84765.

22.      Upon information and belief, Defendant Michal Washburn, also known as Michal Savage, is domiciled in Cedar Hills, Utah.

23.      Upon information and belief, Does I-X are other individuals that have committed acts or omissions that are the subject of this Complaint, including other members of the Enterprise. Plaintiff may seek to amend this Complaint to identify Does I-X as soon as their identities are known.

## JURISDICTION AND VENUE

24.      This Court has subject matter jurisdiction over Plaintiff's RICO claim under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

25.      This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because the claims arise out of a common nucleus of operative facts as Plaintiff's RICO claim.

26.    Venue is proper in this District under 28 U.S.C. § 1391(b) because all defendants reside in this District and a substantial number of events giving rise to this action occurred in this district. Venue is also proper in this District under 18 U.S.C. § 1965(a) because all the defendants reside, are found, have agents, and transact affairs in this District.

## FACTUAL ALLEGATIONS

A.    *Defendants Offer Fraudulent Services Purporting to Help Individuals and Families which Utilize Abuse to Amass a Fortune*

27.    The Enterprise created a scheme to defraud individuals of their money and property which extensively utilized interstate wires (and likely U.S. mailings) to further that scheme.

28.    The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

29.    The principal purpose of the Enterprise was to obtain financial gain and promulgate Hildebrandt's psychological thought paradigm by promoting Hildebrandt and by recruiting new members into ConneXions for the financial benefit of the Enterprise. By promoting Hildebrandt and recruiting others into ConneXions, the members of the Enterprise expected to receive financial opportunities through ConneXions, increased power and status within the Enterprise, and control over victims and/or their families through implementation of Hildebrandt's methodology to ultimately keep victims within the Enterprise for its financial gain.

30.    The Enterprise operated within the Southern District of Utah and elsewhere, including Idaho and Arizona.

31.    Among the means and methods by which Hildebrandt, Franke, Savage, and others participated in the conduct of the affairs of the Enterprise were the following:

8

      a.      Promoting, enhancing, and protecting the Enterprise by committing, attempting, and conspiring to commit crimes, including but not limited to wire fraud, monetary transactions involving racketeering proceeds, forced labor, and potential money laundering;

      b.      Demanding absolute commitment to Hildebrandt, including by promulgating Hildebrandt's methodology of abuse and control and promoting and accepting Hildebrandt's status as an unquestionable authority within ConneXions and the Enterprise;

      c.      Promoting and implementing Hildebrandt's methodology of perpetuating aggravated child abuse and child torture on minor victims of the Enterprise;

      d.      Encouraging members and others to purchase expensive services and products from ConneXions as a means of exerting control over them and to obtain financial benefits for the members of the Enterprise.

32.     Defendants entice victims to join the Enterprise by falsely representing that Hildebrandt's teachings via ConneXions will bring peace in users' lives, joy in their relationships and otherwise improve themselves as individuals.

33.     Not only does ConneXions purport to provide counseling and other self-help services, but it also advertises that Hildebrandt can solve *any* undesirable behavior; in fact, the Enterprise represents that ConneXions is the *only way* to resolve said behaviors. For years, Hildebrandt represented the following on the now defunct ConneXions website:

> My style is … what is *necessary* to *fully change, and champion any addictive or self-destructive behavior*, whether it be ravenous addictions, feelings of worthlessness or inadequacy, conflicts in relationships, intimacy problems, communication breakdowns, *and frankly any block that prevents having and creating peace and joy*.

(emphasis added).

34.     However, rather than provide legitimate counseling and self-help services, ConneXions uses pretextual front companies which actively mislead potential clients to believe and understand that ConneXions and Hildebrandt provide actual services. Hildebrandt also emphasized her background as a licensed therapist in advertising ConneXions in order to build trust with potential ConneXions customers and members.

35.     Hildebrandt categorized her personal services through ConneXions as "life coaching" to evade the legal, ethical, and professional responsibilities imposed on therapists. This intentionally misleading advertising is another method by which the Enterprise induced people to pay for the fraudulent services offered through ConneXions.

36.     In addition to Hildebrandt's fraudulent "life coaching" counseling services, ConneXions also provides a number of instructional courses, workshops, retreats, and digital and written materials for purchase by customers and members of ConneXions.

37.     The Enterprise's fraudulent scheme also involved a ranking and advancement system within a multi-level marketing structure, whereby individuals work through the sales structure of the Enterprise to achieve the rank of "Mental Fitness Trainer."

38.     The Enterprise's primary purposes, now fully revealed in Hildebrandt and Franke's criminal child abuse proceedings, are to control individuals, punish those who refuse the Enterprise, promote and perpetuate child abuse and child torture, inflict pain and abuse on "distorted" individuals, and destroy individuals and families—all to fraudulently derive millions of dollars globally while doing so.

39.    Hildebrandt's and the Enterprise's methodology establish Hildebrandt as the source of "Truth."

40.    That methodology rests on one central imperative: that to bring those around them into "Truth" and out of "distortion," members of the Enterprise must act by any means necessary, including through unlawful and criminal activities such as physical abuse, torture, psychological abuse, and brainwashing, even when these actions culminate in murder, as demonstrated by Franke's implementation of the Enterprise's teachings through the torture and near murder of her children.

41.    While these tactics were uncovered to the public in August 2023 in the Hildebrandt and Franke aggravated child abuse proceedings, the Enterprise has aggressively sought implementation of Hildebrandt's methodology through these tactics for nearly two decades.

42.    Savage has been enthusiastically employing Hildebrandt's methods against Plaintiff and his daughter for nearly a decade.

43.    The core path to indoctrination into the Enterprise by Hildebrandt was illuminated during Franke's December 18, 2023, plea hearing by explanation of her attorneys: "Initially, Ms. Franke believed that Jodi Hildebrandt had the insight to offer a path to continually improvement. Ms. Hildebrandt took advantage of this quest and twisted it into something heinous" and "[Hildebrandt] systematically isolated Ruby Franke from her extended family, older children, and her husband, Kevin Franke. This prolonged isolation resulted in Ms. Franke being subjected to a distorted sense of morality, shaped by Ms. Hildebrandt's influence."

44.     Hildebrandt and the Enterprise perpetuated this same indoctrination with Savage; Savage initially sought Hildebrandt for counseling, only to then decide to join the Enterprise and implement its teachings, including through physical abuse of her and Plaintiff's daughter, in her attempts to isolate Plaintiff from his daughter, parents, and siblings to coerce him to reject "distortion," embrace "Truth," and submit to Hildebrandt's absolute authority.

B.      *The Enterprise's Methodology: Truth, Distortion, Pain, and Boundaries*

45.      As commonly implemented in cults which aim for thought control, mind control, and brainwashing, the Enterprise developed unique vernacular that is not understandable to outsiders.

46.     Specifically, the Enterprise uses the terms: "Truth," "distortion," "pain," and "boundaries" to describe its core methodologies.

47.     As described above, per the Enterprise, "Truth" encompasses all aspects of Hildebrandt' teachings. Similarly, when an associate accepts Hildebrandt as their "Truth," then whatever that associate does or believes also constitutes "Truth," even if that belief or action is criminal or violates societal norms.

48.     Under Hildebrandt's methodology, the terms "Reality" and "Principles" are used interchangeably with the term "Truth": if one espouses Hildebrandt's methodology, they are in "Reality" and one follows "Principles" when they follow Hildebrandt.

49.     According to the Enterprise, one lives in "Truth" when he or she lives the principles of (1) honesty; (2) humility and (3) responsibility. Members of the Enterprise use these terms to manipulate their victims (i.e., a victim is not honest nor accepting responsibility if

they disagree with a false accusation by a member of the Enterprise; one is not humble if they are not willing to accept the Enterprise's methodology and submit to Hildebrandt's will).

50.    Similarly, and as described further below, rather than exhibiting honesty, humility, and responsibility in the traditional sense of the words, members of the Enterprise engage in criminally dishonest behavior including perjury and obstruction of justice, and do not take responsibility for the criminal and tortious behavior in which they engage.

51.    Per Hildebrandt's methodology, anyone who disagrees with her teachings or the Enterprise's objectives is in "distortion" and is ripe for punishment, including torture at the hands of the Enterprise's members.

52.    Defendants and members of the Enterprise use the "Truth" and "distortion" in all facets of life, as demonstrated by Hildebrandt's representations on the ConneXions now-defunct website:

> I have spent over 25 years working with people just like you to help facilitate positive and powerful change. I began practicing in the psychotherapy world, and my patients were not healing. When I began empowering people by educating them with principles of Truth (learning to be honest, responsible, and humble), I saw my patients radically change right in front of me!
>
> You don't have to be a victim to your circumstances or the people around you. You CAN have the life you want, but you must dispose of distortion's ugly lies in order to live in Truth, connection, and freedom.
>
> Start your training with ConneXions to work on the foundations necessary to uncover the TRUTH: you have the power to make positive and long-lasting changes that can transform your life and completely change the path that you're on.

53.    Hildebrandt and Franke transmitted Hildebrandt's dangerous and harmful methodology through the ConneXions podcast, which was broadcast through ConneXions, and

episodes of which were hosted either by Hildebrandt or Franke. A description for one podcast mentions "Truth," "Reality," or "distortion" eight times:

> What does it take to live in Truth? The answer is it takes a person's willingness to stay in reality, use your choices and choose Truth.

> Why is Truth/Reality so uncomfortable that many people run from it? The answer is, there's pain in reality. There's pain, inevitable pain inside reality from things like loss, death, hurt, disappointments, loneliness, anger, greed, rage.

> And most people think that they can run from it, that they can hide from those things. The truth is when you attempt to leave reality, you run right into the arms of distortion and now you really will have pain.

> Listen to how not to be deceived.

54.     Hildebrandt teaches her associates that they do not need to adhere to the law because the law itself can be a "distortion." An example of this occurred in a video in which Hildebrandt instructs a woman—and by implication all women and mothers—to violate a father's parental rights. In the video, despite recognizing a father's legal right to be with his child, Hildebrandt instructs this woman to cut her ex-romantic partner off from their child because the law is in distortion: "I understand why the law does this, because there's so much deception going on that 'the law' quote unquote, they don't know what the Truth is. They don't know who's telling the Truth."

55.     Another key piece of vernacular for the Enterprise is "pain." The Enterprise teaches that "pain" is the mechanism by which individuals leave "distortion" and come into "Truth." Defendants and the Enterprise fixate on pain in their teachings (including Hildebrandt's methodology) which are communicated through, among other mediums, social media posts, podcasts, and webpages.

56.     Defendants and the Enterprise use Hildebrandt's methodology to justify engaging in criminal and tortious behavior against their victims because, as the Enterprise teaches, these actions cause the pain necessary for victims to leave "distortion" and come into "Truth."

57.     Another piece of Enterprise vernacular is "boundaries." Defendants further justify their actions by describing their criminal and tortious actions as "boundaries," which victims of the Enterprise are required to respect by an "invitation" from a member of the Enterprise.

58.     For example, Hildebrandt and Franke would "invite" the minor children to come into "Truth" by providing them with a "boundary" of following Hildebrandt's methodology (also known as being "boundaried").

59.     The consequence of failure to follow a "boundary" of Hildebrandt and Franke was torture, as demonstrated by the criminal acts of child torture perpetuated by Hildebrandt, Franke, and other members of the Enterprise.

60.     This destructive scheme is designed to brainwash individuals to recruit them into the Enterprise and to fraudulently make significant amounts of money by coercing victims to pay for services and products through ConneXions that both cause significant and ongoing pain and manipulate victims into believing they need additional services and products sold by ConneXions to rehabilitate themselves, thereby increasing the financial gain of the Enterprise.

C.     *Fabricating Pathologies to Isolate, Punish, and Manipulate Victims into "Truth"*

61.     Another fraudulent aspect of the Enterprise's scheme is to fabricate pathologies in psychologically healthy individuals to manipulate them into purchasing services and products from ConneXions to "cure" these false pathologies, all to the financial benefit of the Enterprise.

62. Examples of false pathologies that members of the Enterprise attach to victims include non-existent pornography addictions, sex addictions, lying addictions and "control" addictions.

63. To "treat" these phantom pathologies, the Enterprise requires victims to pay for lengthy and expensive 12-step addiction programs sold by the Enterprise, counseling services labeled as "life coaching" services, self-help retreats, workshops, classes, and various digital and written materials.

64. Similarly, the Enterprise uses false pathologies as rationale to separate individuals from their spouses, families, or other individuals who could otherwise help victims from being lured in and manipulated by the Enterprise. The Enterprise teaches that any outside individuals who are not members of the Enterprise are in "distortion" and will impede the victim's journey into "Truth."

65. Through an interview with NBC News, former patients indicated that a primary focus of the Enterprise, specifically for men under Hildebrandt's control, was programming designed to target pornography and sex addictions.

66. To manipulate victims into purchasing services and products from ConneXions, Hildebrandt diagnosed victims with pornography and/or sex addictions when the victims did not exhibit signs or symptoms of either.

67. Upon information and belief, Hildebrandt also instructed so-called Mental Fitness Trainers affiliated with and/or employed by ConneXions to induce victims into purchasing services and products from ConneXions by falsely diagnosing victims with nonexistent mental health disorders.

68.     Five former patients disclosed to NBC News that Hildebrandt diagnosed them with pornography and/or sex addictions, even though none of them exhibited abnormal issues with either.

69.     The five men said that Hildebrandt assigned them into men's counseling groups that focused on porn, sex and lust.

70.     These victims later described how they were kicked out of their homes, separated from their families, and prevented from having an intimate relationship with their spouse for months or even years due to Hildebrandt's false diagnoses.

71.     Stephanie Jones, a former patient of Hildebrandt, described similar tactics in an interview with ABC News, revealing that most women in Hildebrandt's women's group were separated from their husbands, or at least sleeping in separate rooms.

D.      *The Outrageous Fees Charged by ConneXions to Financially Benefit the Enterprise*

72.     The Enterprise has become a multi-million-dollar operation by fraudulently luring individuals to the Enterprise through ConneXions and then charging them exorbitant amounts of money under the threat of pain, abuse, and destruction of one's family if the individuals do not fully invest in ConneXions services and products and the Enterprise itself.

73.     ConneXions and Hildebrandt charge the following fees for fraudulent services that financially benefit the Enterprise:

    a.      The Individual Leadership Training program ($795), which includes six individual sessions with a "trainer," a workbook, podcasts, online trainings, and phone support;

b.      The Team Leadership Training Program ($4,995), which includes six team sessions, group trainings, podcasts, online trainers, phone call support, and pre- and post-assessment surveys;

c.      The Company Leadership Training ($14,985), which includes six team sessions, six manager sessions, six company-wide sessions, eighteen group trainings, podcasts, access to online trainings, phone call support, and pre- and post-assessment surveys;

d.      "1-on-1 Training" with Jodi ($181 per every 50-minute session with Hildebrandt);

e.      Men / women's teams for $300 per month, with a minimum three-month ($900) commitment, which includes meeting with a group of men or women for ninety minutes each week with Hildebrandt moderating the meeting;

f.      The six-week "Masterclass" ($218), which includes digital videos and a physical workbook;

g.      The five-week Parenting class ($218), which includes digital videos and a physical workbook;

h.      Membership in the "Empowering Joy" community ($84 per month), which includes a weekly Zoom meeting and access to the ConneXions digital library; and

i.      Membership in the "ConneXions Insiders" which allows users to post video questions to Hildebrandt and/or Franke ($84 per month or $21 for 20 minutes of direct video messaging).

74.    ConneXions also sold the following fraudulent products online for shipment via U.S. mail, which both furthered the scheme of the Enterprise and perpetuated Hildebrandt's methodology[1]:

    a.    Addiction Cycle & Shame vs. Guilt workbook and DVD ($26);

    b.    Anger, Fear, & Triggers workbook and DVD ($37);

    c.    Boundaries workbook and DVD ($26);

    d.    ConneXions Culture Business Empowerment workbook ($11);

    e.    Control vs. Surrender workbook and DVD ($37);

    f.    Co-Dependency & Care-Taking workbook and DVD ($37);

    g.    Distraction & Fantasy workbook ($37);

    h.    Drama workbook and DVD ($26);

    i.    Empathy, Vulnerability, Validation, & Risk workbook and DVD ($31);

    j.    ConneXions Classroom Connecting Families workbook ($16);

    k.    Faulty Core Beliefs & Denial workbook and DVD ($26);

    l.    Forgiveness & Humility workbook and DVD ($42);

    m.    Healthy Sexuality & Connection workbook and DVD ($37);

    n.    Love vs. Lust workbook and DVD ($42);

    o.    Parenting: Empowering Children to Become Responsible workbook ($11);

    p.    Perceptions, Motives, & Agendas workbook and DVD ($26);

    q.    Safety & Recovery workbook and DVD ($37);

---

[1] Plaintiff anticipates that discovery will reveal that the sale and shipment of these items via United States mail systems constituted mail fraud pursuant to 18 U.S.C. section 1341.

r.      Self-Love & Self-Care ($37);

s.      Arming the Next Generation with Weapons of Truth workbook ($13.54);

t.      ConneXions 202: Parenting, The Long Lost Guide to R.A.I.S.E.ing

Children workbook ($42)

u.      ConneXions Masterclass workbook ($42);

v.      The ConneXions Classroom Glossary ($11); and

w.      You are Not "Not Enough" book, which "invites people to engage the

principles of connection, what distortion is, and how to choose the foundational

principles of Honest, Responsible, and Humble in order to battle the lie of distortion"

($19).

E.      *The Expansive Breadth of the Enterprise and its Significant Effect on Interstate Commerce*

75.      Defendants primarily executed the Enterprise via the internet, social media, video

conferencing, U.S. mail, and other interstate wires.

76.      Defendants admit that their Enterprise uses wires in interstate and foreign

commerce. Specifically, on the "Meet the Founder" page of the ConneXions website,

Hildebrandt represented the following:

> Over 100 free podcasts have been produced in 2 years and there have been over 1,000,000,000+ downloads **in 23 different countries** simply by word of mouth. With the creation of ConneXionsClassroom.com the facilitation of knowledge has never been easier for people to self-educate about these core Truths.

77.      As further evidence of Defendants' impact on interstate and foreign commerce, as

of January 19, 2023, the following hashtags have millions, and some *billions*, of views on

TikTok alone:

- #connexions: nearly 243 million views (https://www.tiktok.com/tag/connexions);

- #jodihildebrandt: over 445 million views

  (https://www.tiktok.com/tag/jodihildebrant);

- #rubyfranke: 2.2 *billion* views (https://www.tiktok.com/tag/rubyfranke); and

- #momsoftruth (referring to Hildebrandt and Franke's Instagram and Facebook

  accounts, "Moms of Truth"): over 188 million views

  (https://www.tiktok.com/tag/momsoftruth).

F.    *The August 2023 Arrests of Hildebrandt and Franke for Torturing Franke's Two Small Children Exposed the Enterprise as Dangerous and Dark Brainwashing*

78.    The true nature of the Enterprise's fraudulent scheme was revealed in August 2023 when one of Franke's small children—whom Hildebrandt and Franke tortured at Hildebrandt's multi-million-dollar Southern Utah residence—escaped and sought help from a neighbor.

79.    On August 30, 2023, Franke's twelve-year-old son ("Victim 1") climbed out of a window in Hildebrandt's compound and ran to a neighbor's house.

80.    Victim 1 knocked on the door requesting food and water.

81.    Victim 1 also requested to be taken to a police station so he could be taken to jail; he made this request because Hildebrandt and Franke had abused and brainwashed him into believing that if he escaped, he would go to jail.

82.    The neighbor observed duct tape on Victim 1's wounded ankles and called 911.

83.    Upon arrival, law enforcement observed Victim 1's wounds and malnourishment to be severe and he was transported to a local hospital for treatment.

84.    Victim 1 was placed on medical hold due to his deep lacerations from being tied up with rope and from his malnourishment.

85.    A treating physician at the St. George Regional Hospital said that if Victim 1 was returned to Hildebrandt or Franke, it may result in death.

86.    Franke's ten-year-old daughter ("Victim 2") was subsequently found at Hildebrandt's compound.

87.    It was immediately clear that like Victim 1, Victim 2 was extremely malnourished.

88.    Victim 2 initially refused medical attention but after four hours, finally consented. She was transported to a hospital, where medical professionals found her to be extremely malnourished.

89.    To facilitate this torture, Hildebrandt and Franke isolated the children from all individuals, including their own father and other siblings, for many months.

90.    The children had also been isolated from each other for over a month.

91.    Law enforcement determined that Hildebrandt committed felony child abuse against Victims 1 and 2.

92.    Law enforcement also determined Franke to have direct knowledge of the children's intentional abuse given a YouTube video posted two days prior to the arrests showing Franke in the residence where the abuse occurred.

93.    When the police arrested Hildebrandt, she continued to deny any wrongdoing and remarkably told the arresting officer that Victims 1 and 2 "should never be allowed around any other kids."

94.    In other words, per Hildebrandt, her torture of the Victims 1 and 2 was justified because she was bringing them into "Truth."

95.    In Hildebrandt's multi-million-dollar compound, first responders found what was described to them as a "panic room," with a large "Fort Knox" vault door— in reality, a torture chamber.

96.    First responders believed that Franke's children could be trapped in the torture chamber.

97.    On August 30, 2023, police arrested Hildebrandt and Franke and prosecutors charged them each with two counts of felony intentional, aggravated child abuse, later increased to six counts of felony, aggravated child abuse each.

98.    By December 18, 2023, Franke reached a plea agreement with the State, in which she pled guilty to four counts of felony intentional, aggravated child abuse; the State dismissed the other two charges in exchange for her truthful testimony against Hildebrandt.

99.    On December 27, 2023, Hildebrandt also pled guilty to four counts of felony intentional aggravated child abuse, with the State dismissing the other two charges.

100.    In their plea agreements, Hildebrandt and Franke admitted that their actions involved the physical torture of Victim 1. In coercing Victim 1 into the "Truth", the women confessed that they:

    a.    Isolated the child from all other people, electronics, and any entertainment;

    b.    Forced labor on this same child by making him perform physical tasks for hours and days at a time, including wall sits, carrying boxes full of books up and down

23

stairs, and performing manual labor outside without shoes and in the intense summer heat;

       c.     Forced Victim 1 to stay outside day and night to labor without shoes in the direct sunlight and intense summer heat of Southern Utah for extended periods and stand in the direct sunlight for several days—resulting in severe sun burns and damage to his skin;

       d.     Denied Victim 1 adequate water for several of the days he was required to remain in the summer heat and punished him when he secretly consumed water; and

       e.     Denied Victim 1 sufficient food, and when given food he was given very plain meals (e.g. rice and chicken) while others in the house ate regular and more flavorful meals.

101.    Franke admitted to kicking Victim 1 while she wore boots, holding Victim 1's head underwater, and cutting off oxygen by placing her hands over his nose and mouth. This horrendous torture is a straightforward implementation of the Enterprise's accepted methodology imposed on hundreds if not thousands of victims.

102.    Upon information and belief, after multiple escape attempts, Victim 1 finally succeeded.

103.    Before Victim 1 escaped, Hildebrandt and Franke admitted to sadistic, intense torture, including:

       a.     Regularly binding Victim 1's hands and feet. The child was tied to Franke and to weights.  Many times, the binding included using two sets of handcuffs, one on the child's wrists and one on his ankles.

b.    At times the child was forced to lie on his stomach; ropes were used to tie the two sets of handcuffs together so that his arms and lower legs were lifted off the ground.

c.    The bindings resulted in injuries to Victim 1's wrists and ankles where the handcuffs cut through the skin and damaged the muscle/tissue. Then the wounds were covered with duct tape.

104.    Hildebrandt and Franke admitted that the actions described above caused severe emotional harm to Victim 1 because they began in May and escalated throughout the summer months. Additionally, Hildebrandt and Franke regularly sought to "indoctrinate [Victim 1] and convince him that he was evil and possessed. And that he needed to willingly be obedient to avoid punishments. And while Hildebrandt and Franke told [Victim 1] that these punishments were necessary for him to repent, he also needed to go to jail for his 'sins.' He was also told that everything that was done to him were acts of love."

105.    Hildebrandt's and Franke's torture of Victim 1 represents Hildebrandt's methodology espoused by the Enterprise implemented to its most fundamental degree.

106.    Hildebrandt and Franke admitted to similar offenses against Victim 2.

107.    Franke's journal entries reveal that this horrendous criminal behavior was not separated from Hildebrandt's teachings and the Enterprise, but in reality, Hildebrandt's methodology implemented to the highest degree possible (emphases added unless indicated):

a.    "If [Victim 1] wants to emulate the Savior, he needs to be 100% obedient with exactness.  No wavering.  No hiding."

b.    "I told [Victim 1] he needs God. I *invited* him to fast & pray."

c.    "*The devil doesn't like when you get your subject to agree to Truth.*"

d.      "I let [Victim 2] know she has hardened her heart & will do one more day of fasting [i.e., starvation] to *invite* her to be *humble*. [Victim 2] flips out & begins ranting … *dishonest* chants… 'My mom starves me & calls it fasting.'"

e.      "*Oppositional force* [i.e., pain] is required for growth, development, maturity. [Victims 1 and 2] have never experienced oppositional force."

f.       "*Boundaries will show you how much [demonic] possession a soul has.* The more boundaries, the more the soul will reveal itself."

g.      "Back to sending evil away—articulating Truth drives evil way. This is a power intervention for the possessed.  Even if you can start by agreeing to something Truthful."

h.      "Following up on articulating a desire for evil with a <u>demonstration</u> of obedience is powerful.  Demonstrating a willingness to follow Truth is a pattern the Savior used in His interactions." (Emphasis in original).

i.       "[Victims 1 and 2] <u>need</u> natural outcomes [i.e., pain]." (Emphasis in original).

j.      "One might ask, as I myself have, what if we had taken this slower? Would the children have been on board if we hadn't *boundaried them* so quickly & clearly? … *They needed things to get hard fast. Intense. Shocking change.  Immediate discomfort.* They could have confessed in Truth, taking personal responsibility for the discomfort they were causing."

k.      "[Victim 2] would choose to be shot & die rather than to be *humble* & do what she is told.  There is no *pain point* where she will turn."

l.      "Mom to [Victim 1]: … You would rather be uncomfortable [i.e., in pain] than to be *obedient. This isn't really about being uncomfortable. This is about adamantly refusing obedience. You would rather be uncomfortable than obedient*."

m.      "Ruby to [Victim 1]: you cannot manipulate your way *out of pain*! The only way out of *pain* is to *humble yourself*."

n.      "For the human who is *not humble* (today this constitutes the vast majority) you have to get to your breaking point."

o.      "[Victim 1] never would have disclosed his sins had he not had a hope that confessing would bring a sense of relief. His motive, because he was/is *not humble* was to feel better."

p.      "The world we live in today does not support children being uncomfortable [i.e. in pain]… And so children are comforted, entertained, distracted from the <u>need</u> to confess & change. Stripping down a child's world to the basics of beans & rice & hard work would be considered abuse." (Emphasis in original).

q.      "It has been three months of consistent *boundaries* & putting up w/ his terrorizing to get [Victim 1's] confessions out. Who would do this in a real world? I don't know of anyone who would feed their kid, in America, beans, lentil, rice & chicken for 3 months straight & refuse all distractions. And this is why Americans are so full of sin & are ready for destruction."

r.      "[Victim 1's] body is full of evil, puffy, infection & he won't participate in the *responsibility* of flushing it out."

108.    From May 22, 2023, through August 30, 2023, the time in which Hildebrandt and Franke admitted to this secret torture and abuse of children at Hildebrandt's mansion, they broadcast at least 75 interstate wire communications in the form of podcasts and social media posts from Hildebrandt's compound.

109.    The podcasts that Hildebrandt and Franke communicated to the public from May 2023 through August 2023 constitute nearly ten percent of the ConneXions podcasts made available to the public.

110.    In these interstate wire communications, Hildebrandt and Franke represent that by following them, an individual will come into "Truth" by learning to be honest, humble, and responsible.

111.    Hildebrandt and Franke fraudulently advertised ConneXions' services by, among other things, omitting that Hildebrandt's methodology requires the torture and physical abuse of children to bring children into "Truth" and that the torture of two children was occurring in the room next door in Hildebrandt's Southern Utah residence while Hildebrandt and Franke instructed people in their podcast to be honest and humble.

G.    *The Longevity of the Enterprise and the Number of its Victims Demonstrate that Defendants Knew Their Actions Were Unlawful, Vile, and Dangerous*

112.    After Hildebrandt and Franke's arrests, many individuals have publicly explained how the Enterprise victimized them as well. These reports are strikingly similar to the torture Hildebrandt and Franke inflicted upon Victims 1 and 2, and similarly, Savage's abuse of Plaintiff and their minor daughter.

113.    The Enterprise has been continuously defrauding and abusing individuals for at least 15 years.

114. Known victims of the Enterprise include Plaintiff, Jessi Hildebrandt, Adam Steed, David Bateman and Spencer Tibbits.

  i.    Jessi Hildebrandt

115. Upon information and belief, shortly after Hildebrandt's arrest, Jessi Hildebrandt ("Jessi") described to the media the extreme abuse and torture they endured as a minor child fifteen years ago at the hands of Hildebrandt, which is strikingly similar in nature to the torture of Victims 1 and 2.

116. Upon information and belief, Hildebrandt abused and tortured Jessi (who is known to use they-them pronouns) to bring them into "Truth."

117. Upon information and belief, Hildebrandt's abuse and torture of Jessi included: restraining them with duct tape; blindfolding them; isolating them for up to 12 hours per day; forcing them to sleep outside in the snow; physically pushing them; telling Jessi that it was dangerous for them to speak with other people; telling Jessi that Hildebrandt would recruit agents who would report back if Jessi had broken any of Hildebrandt's rules; Hildebrandt falsely accusing Jessi of being addicted to sex, pornography, and masturbation; Hildebrandt not giving Jessi privacy, including in the bathroom, because Hildebrandt falsely alleged that Jessi would masturbate; etc.

118. Upon information and belief, on one occasion, after an instance in which Jessi attempted to escape, Hildebrandt pulled Jessi out of bed by the hair, blindfolded them, tied their wrists and legs, and started driving. After arriving at an unknown location, Hildebrandt began screaming at Jessi and accusing them of manipulating other people to think that something was wrong.

119.    Upon information and belief, after this incident, Hildebrandt drove her vehicle into a mountain with Jessi on the floor of the vehicle and coerced Jessi to run up and down the mountain for six hours.

120.    Upon information and belief, Hildebrandt placed individuals at the bottom of the mountain to surveil Jessi to ensure that they did not escape.

121.    Upon information and belief, typically, during the day, Hildebrandt would take Jessi to work with her and required Jessi to stay isolated in a small closet the entire day.

122.     Upon information and belief, on one such occasion, Jessi had an opportunity to escape; Jessi did so and sought protection for a time at a homeless shelter.

123.    Upon information and belief, Hildebrandt did not report Jessi as a missing child or make any other attempt to locate her minor family member.

124.    Jessi's experience is highly similar to Victims 1 and 2.

ii.    <u>Adam Steed</u>

125.    Upon information and belief, Adam Steed ("Steed") is a victim of the Enterprise.

126.    Hildebrandt was professionally disciplined in 2012 for abuse she inflicted on Steed, her former patient.

127.    In 2012, Hildebrandt was professionally disciplined by the Utah Division of Professional Licensing ("DOPL") for unlawfully disclosing information about a patient.

128.    The individual is identified as "John Doe" in DOPL documents.

129.    Upon information and belief, Steed identified himself as the individual who reported Hildebrandt's professional misconduct.

130.    Upon information and belief, NBC News confirmed Steed's disclosure by reviewing a DOPL complaint naming Steed, reviewing therapy notes from Steed's sessions with Hildebrandt, and reviewing other documents relevant to the professional misconduct.

131.    Upon information and belief, Steed and his now ex-wife saw Hildebrandt for counseling services through ConneXions for nine months in 2008.

132.    Steed's experience is yet another example of the Enterprise's fraudulent and unlawful scheme involving the provision of fraudulent services through ConneXions: Steed said, "We came there for marriage counseling, and she pulled us into her porn marathon."

133.    Upon information and belief, instead of providing legitimate counseling services, Hildebrandt immediately diagnosed Steed with a sex and pornography addiction, even after Steed stated he did not have issues with either.

134.    Upon information and belief, Hildebrandt also insisted that the Steeds needed to "triple down" on the amount of therapy sessions they were purchasing through ConneXions for the financial gain of the Enterprise.

135.    Upon information and belief, Steed indicated Hildebrandt's charges were as high as $2,000 a month.

136.    Upon information and belief, after Steed refused, Hildebrandt provided false accounts of Steed's confidential counseling information without his permission to leaders in his church, to honor-code officials at the university he was attending, and to two other therapists.

137.    Hildebrandt's actions toward Steed were typical of the Enterprise's strategy to keep individuals within the Enterprise: Hildebrandt and other members of the Enterprise would coordinate with a victim's spouse (often also a member of the Enterprise) to disseminate false

31

allegations and information about a victim's mental health diagnoses to embarrass, harass, and subsequently coerce victims to stay within the Enterprise for fear of facing additional public shaming.

138.     As described by Steed, "When I chose to leave this like, cult-like group, uh, Jodi tried to punish me. And she worked through [Steed's university's] Honor Code Office and legal measures to try to hurt me. And I have, um the emails between my ex-wife and [Hildebrandt] planning out all this stuff, talking about what the real issues in our marriage were and them evolving that into something drastically different with allegations that would totally destroy a life… I had to come forward because when I heard they were doing the same thing to those little kids that they did to me to hide their crimes, it was totally predictable."

139.     Upon information and belief, when Steed refused to continue paying Hildebrandt exorbitant services fees through ConneXions for the benefit of the Enterprise and to treat non-existent mental health issues, Hildebrandt conspired with Steed's now ex-wife to falsely accuse him of sexually abusing their small child.

140.     Upon information and belief, Hildebrandt instructed Steed's ex-wife to send an email with a list of demands of what Steed had to do to avoid divorce, which included remaining in the Enterprise, paying the Enterprise thousands of dollars per month for fraudulent, unnecessary services, and a requirement that Steed could not see other therapists.

141.     Upon information and belief, as a result of Hildebrandt's false claims to these organizations and his ex-wife, Steed lost church privileges, was temporarily suspended from his university, and suffered a divorce.

142.     Steed stated, "My family got destroyed. My life got destroyed."

143.     Upon information and belief, Hildebrandt also attempted to restrict Steed's access to his children.

144.     Steed reported that once Hildebrandt began meeting with his now ex-wife, Hildebrandt made her falsely believe that she needed to "protect" the children from him.

145.     In her stipulation with DOPL, Hildebrandt admitted that her "disclosure of [Adam Steed's confidential] information was detrimental to [Adam Steed] and not in [his] best interests."

146.     Hildebrandt also admitted that her conduct was unprofessional as defined by Utah law and violated her ethical responsibilities.

147.     Among other professional sanctions, Hildebrandt stipulated to having her license placed on probation for 18 months for her ethical violations relating to Steed.

   iii.   <u>Dave Bateman</u>

148.     Upon information and belief, Dave Bateman ("Bateman") is another victim of the Enterprise.

149.     Upon information and belief, in 2019, Bateman sued Hildebrandt in excess of $300,000 in damages. *See* Second Amended Complaint and Jury Demand, *Bateman v. Hildebrandt* (Utah 4th Dist. Case No. 190300170) (hereinafter, "Bateman Complaint").

150.     Upon information and belief, Bateman was CEO and majority shareholder of a large software company in Utah. *Id.* at ¶ 8.

151.     Upon information and belief, Bateman and his now ex-wife sought marriage counseling through Hildebrandt. *Id.* at ¶¶ 10–11.

152.    Upon information and belief, unsurprisingly, after Bateman realized that Hildebrandt was not assisting the marriage, he ended counseling with Hildebrandt and divorce proceedings followed shortly thereafter. *Id.* at ¶¶ 17, 19.

153.    As with what happened with Steed and Plaintiff, Hildebrandt attempted to destroy Bateman's life because he would not accept the Enterprise and Hildebrandt's methodology.

154.    Upon information and belief, the conspiracies between Hildebrandt and Bateman's ex-wife include: Hildebrandt assisting Bateman's ex-wife to fabricate false and defamatory claims against Bateman in divorce proceedings; Hildebrandt instructing the ex-wife to falsely allege to the court that Bateman was abusive to their children in order to gain advantage in custody proceedings; Hildebrandt instructing the ex-wife to file a false report of child abuse with law enforcement; and Hildebrandt herself falsely reporting Bateman to authorities for child abuse. *Id.* at ¶¶ 21–23.

155.    Upon information and belief, Hildebrandt's behavior towards Bateman was criminal under Utah Code sections 76-9-404 (2017), 76-8-506, and 76-4-201.

156.    Upon information and belief, Hildebrandt also met with Bateman's business partners to strategize how to take control of Bateman's company. *See* Bateman Complaint at ¶ 24.

157.    Upon information and belief, in these meetings, Hildebrandt unlawfully disclosed confidential information regarding Bateman, tracking Hildebrandt's pattern of previous ethical violations, including those with Steed. *See id.*

158.    Upon information and belief, Hildebrandt's unlawful disclosures caused significant legal issues for Bateman in addition to his divorce. *Id.* at ¶ 26.

159.    As occurred with Plaintiff and nearly every father who has spoken publicly about his experience with Hildebrandt, Hildebrandt worked to cut off Bateman from his children. *Id.* at ¶ 29.

160.    Upon information and belief, at one point, due to Hildebrandt's unlawful actions, Bateman was completely cut off from his children for three weeks. *Id.*

    iv.    <u>Spencer Tibbits</u>

161.    Upon information and belief, Spencer Tibbits ("Tibbits") is another victim of the Enterprise.

162.    Upon information and belief, Tibbits spoke with the media last year. His now-divorced parents sought counseling from Hildebrandt in 2018 when Tibbits was a minor.

163.    Upon information and belief, even though Tibbits had never viewed pornography and at the time didn't know what it was, Hildebrandt placed him in an **adult** men's counseling group that delved into pornography, sex addiction, and lust.

164.    Upon information and belief, Tibbits reported that in one therapy call mandated by Hildebrant, a group member described incest fantasies to him.

165.    Forcing a minor child to participate in sexually explicit conversations constitutes aggravated child abuse. *See* Utah Code §§ 76-5-109.2; 76-5-109(1)(iii)(B)(VII).

    v.    <u>Additional Victims</u>

166.    The Enterprise's social media pages contain "hundreds of comments [that] have accumulated from people saying the program caused harm to the couples who sought their counseling services."

167.    On the ConneXions website, Hildebrandt stated that she "ha[s] counseled thousands of individuals and families of all ages and situations with my unique style."

H.    *The Enterprise Has Damaged Hundreds of Individuals and Families*

168.    Hildebrandt's methodology is destructive to families and marriages; indeed, such destruction is a primary objective of the Enterprise.

169.    By fabricating false diagnoses and manipulating victims into believing they need additional services that can only be provided by Hildebrandt, Hildebrandt and members of the Enterprise furthered the scheme by enticing victims into spending exorbitant amounts of money on Hildebrandt's and the Enterprise's services.

170.    As described above, ConneXions represents that purchasing its products and services and following Hildebrandt's methodology will bring peace in individuals' lives and joy in their relationships and families.

171.    Rather than doing improving victims' lives, the Enterprise causes divorce and destruction in the vast majority of families who fall victim to it as a direct result of Hildebrandt's actions to falsely diagnose victims with fabricated conditions to entice them to purchase services and products from ConneXions.

172.    Regarding Hildebrandt's teachings, a former client explained: "The narrative was very much like, 'If your husband is not perfect, it is your job to leave him and he is undeserving and if he was to be living honest, responsible, humble, you know, these values, then he would be deserving.'" The former client explained that at the time this former client was meeting with Hildebrandt, she told a friend that "If I had been married entering [Hildebrandt's] group, I would

be exiting the group as divorced"; and that Hildebrandt "definitely wasn't an advocate for" marriage or men.

173.    Upon information and belief, Stephanie Jones, another former client of Hildebrandt, reported that most women receiving services from Hildebrandt were separated from their husbands or were at least sleeping in separate rooms.

174.    Unsurprisingly, the vast majority of Hildebrandt's former clients who have shared their experiences publicly are now divorced. This includes Kevin Franke, Spencer Tibbits' parents, Adam Steed, Stephanie Jones, Dave Bateman, and Plaintiff.

175.    Similarly, as explained above, hundreds of individuals commented on ConneXions social media pages disclosing Hildebrandt's destruction of their families using the Enterprise's fraudulent tactics.

I.    *Defendants Admit Knowledge of the Harmful Nature of the Enterprise*

176.    Members of the Enterprise disclosed numerous times that they knew of the fraudulent and harmful nature of the services and products sold by ConneXions and the Enterprise's scheme.

177.    Hildebrandt posted a video in which she admits that she read reviews for her services.

178.    In the video, Hildebrandt angrily stated that the majority of individuals (approximately fifty to seventy-five people) gave her the lowest reviews, and only five individuals left five-star reviews.

179.    In the video, Hildebrandt angrily related how individuals are "mad" with her services and then leave a one-star review.

180.    Hildebrandt mandated that her customers and followers leave 5-star reviews.

181.    A similar response is seen on the ConneXions podcast, where on Spotify the podcasts have a 1.3 out of 5 rating and on Apple Podcasts they have a 2.5 out of 5 rating.

182.    The Apple Podcast platform allows comments, which explain in detail the harmful nature of the Enterprise.

183.    In a shocking video in which Hildebrandt compares herself and Franke to Rosa Parks, Hildebrandt and Franke explain that they "get attacked" "every day" for the falsehoods they perpetrate.

184.    In summary, the Enterprise is fraudulent in multiple ways. After using misleading vernacular that Hildebrandt and ConneXions offer counseling and "life coaching" products and services and even that they can resolve any negative issue, members of the Enterprise then falsely diagnose victims with pathologies to further manipulate them and entice victims to spend money on unnecessary services and products; brainwash victims; encourage and mandate that victims engage in severe psychological and physical abuse, including physical torture; encourage members and victims to cut fathers off from their children; actively destroy marriages and families; and demand that victims submit to Hildebrandt's will.

185.    Upon information and belief, members of the Enterprise know of the fraudulent nature of their scheme because Hildebrandt has been open with members about her torture and physical abuse of minors and victimization of clients and other individuals for at least fifteen years.

186.    In multiple videos disseminated over interstate wires, members of the Enterprise make statements demonstrating that the Enterprise was aware that its scheme and the services and products sold by ConneXions were fraudulent.

J.    *Savage Implements Hildebrandt's Methodology to Damage Plaintiff*

187.    In an interview, Steed described individuals who implement Hildebrandt's methodology: "Clients that are close to her that are probably not very good people in the first place, but [Hildebrandt] enhances their abilities under her guidance to do incredibly criminal things."

188.    This accurately describes Savage and her implementation of Hildebrandt's methodology to victimize and abuse Plaintiff and his daughter for the past decade.

i.    Savage Has Been an Ardent Hildebrandt Associate for Years and Inflicted Hildebrandt's Brainwashing Tactics on Plaintiff and His Minor Daughter.

189.    Savage has used interstate wires, including, without limitation, telephone communications, emails, and text messages, repeatedly to recruit Plaintiff and others to the Enterprise and to implement Hildebrandt's methodology of abuse.

190.    Savage has furthered the objectives and fraudulent scheme of the Enterprise for close to a decade, all to extreme financial and emotional harm to Plaintiff and his daughter ("EJT"), who is currently ten years old.

191.    Savage is Plaintiff's ex-wife and the mother of EJT.

192.    Savage became involved with Hildebrandt in 2015 when she sought Hildebrandt out for counseling services.

193.    Shortly thereafter, Savage became a loyal associate of Hildebrandt.

194.    As is typical of the Enterprise's fraudulent scheme, Savage initially sought Hildebrandt's services simply for personal and marital counseling. Thereafter Savage quickly and eagerly accepted Hildebrandt's methodology and became a member of the Enterprise.

195.    Shortly after Savage's indoctrination into the Enterprise, Savage began implementing Hildebrandt's methodology into her parenting and marital affairs with EJT and Plaintiff.

196.    Upon information and belief, Hildebrandt and Savage conspired to create the appearance of marital problems with Plaintiff that did not exist to recruit Plaintiff to the Enterprise and induce him to spend money on ConneXions' services and products.

197.    Savage's conspiracy with Hildebrandt to manufacture marital problems is demonstrated by Savage's sworn testimony that the "most abusive thing" Plaintiff ever did to her was extend a family vacation in Canada by one week in July 2016 because he was too ill to travel (suffering from a respiratory infection); at the same time Savage was punishing him by telling him that because he was in "distortion" she threatened to leave him without a residence upon returning.

198.    During the time that Hildebrandt was "treating" Savage, in or around July 2016 Plaintiff told Savage that the most important thing to him was to live their religion together.

199.    Savage immediately responded, "The most important thing to me is to be married to someone who lives Jodi's [Hildebrandt's] principles."

200.    In 2016, Plaintiff objected to the amount of the couple's money Savage was spending on the Enterprise's services and products through personal counseling and related written materials with Hildebrandt and ConneXions.

201.    Savage responded that she was willing to spend all their money on the Enterprise.

202.    This willingness to contribute endless funding to the Enterprise is consistent among Enterprise members.

203.    During the course of their marriage, Savage spent approximately $5,000 of marital funds on services through ConneXions, including without limitation counseling sessions with Hildebrandt, which were around $200 per individual session and $100 per month for group sessions.

204.    Savage met with Hildebrandt individually weekly or bi-weekly.

205.    Upon information and belief, Savage has at times directly influenced the ConneXions Coaching Instagram page, at least on one occasion providing her inaccurate account of a situation with Plaintiff in order to further the efforts Enterprise to induce victims and members to spend money on ConneXions services and products to the financial benefit of the Enterprise.

206.    Savage pressured Plaintiff to attend and pay for instruction at ConneXions with the Enterprise.

207.    At this time, Hildebrandt and ConneXions established a direct relationship with Plaintiff, which in turn established a duty for Hildebrandt and ConneXions to inform Plaintiff of material facts that would impact their relationship and the advice provided to Plaintiff and Savage by Hildebrandt and ConneXions.

208.    Plaintiff felt he was being led into a cult, and upon researching ConneXions, discovered Hildebrandt's prior professional and illegal misconduct.

209.    At all relevant times, Savage was, and is, aware of the illegitimacy and fraudulent nature of the Enterprise and of ConneXions' services and products.

210.    As Plaintiff's spouse, Savage had a duty to inform Plaintiff of the illegitimacy and fraudulent nature of the Enterprise and of ConneXions' services and products.

211.    Given the drastic and destructive impact the Enterprise had on Plaintiff's and EJT's life, detailed herein, the illegitimacy and fraudulent nature of the Enterprise and of ConneXions' services and products was a then-existing material fact.

212.    At no time did Savage inform Plaintiff of the illegitimacy and fraudulent nature of the Enterprise and of ConneXions' services and products. Savage knew of this illegitimacy in part because, being so involved with ConneXions for months, she personally observed almost every family who used the program be destroyed by the Enterprise and because Savage also observed the psychological torture inflicted victims of the Enterprise.

213.    At all relevant times, Hildebrandt, acting individually and on behalf of ConneXions, was, and is, aware of the illegitimacy and fraudulent nature of the Enterprise and of ConneXions' services and products.

214.    At no point did Hildebrandt, acting either individually or on behalf of ConneXions, inform Plaintiff of the illegitimacy and fraudulent nature of the Enterprise and of ConneXions' services and products.

215.    Plaintiff did not become aware of the illegitimacy or fraudulent nature of the Enterprise until the arrests and subsequent sentencing of Hildebrandt and Franke in August 2023 and February 2024, respectively.

216.    Given the depravity of the actions that resulted from Hildebrandt's and ConneXions' failure to disclose the material fact of the illegitimacy and fraudulent nature of the Enterprise and ConneXions' services and products, as detailed in paragraphs 218 through 371 herein, Hildebrandt, acting individually and on behalf of ConneXions, did engage in actions that were willful, malicious, and intentionally fraudulent or at the very least constitute a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiff and EJT.

217.    Further, given the depravity of Savage's actions that resulted from her failure to disclose the material fact of the illegitimacy and fraudulent nature of the Enterprise and ConneXions' services and products, as detailed in paragraphs 218 through 371 herein, Savage did engage in actions that were willful, malicious, and intentionally fraudulent or at the very least constitute a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiff and EJT.

218.    Plaintiff repeatedly protested Savage's subservience to Hildebrandt, membership in the Enterprise, and attempts to coerce Plaintiff to accept Hildebrandt's methodology and to participate in the Enterprise.

219.    On numerous occasions, including in writing, Plaintiff informed Savage that Hildebrandt was destroying their marriage and pleaded with Savage that she see any other counselor besides Hildebrandt.

220.    Plaintiff also expressed his fear that Hildebrandt would destroy his reputation through public, defamatory allegations, as she had done to Steed.

221.    Despite Plaintiff's protestations, Savage declared she would spend all of the couple's money on the Enterprise and ConneXions' services and products and would stay

married to Plaintiff only if he declared unwavering allegiance to Hildebrandt's methodology, precisely what Steed's ex-wife did to him at Hildebrandt's instruction.

222.    Savage admitted to Plaintiff that Hildebrandt told her that Plaintiff was addicted to pornography, despite Hildebrandt never having met Plaintiff or spoken to him.

223.    Upon information and belief, Hildebrandt instructed Savage to scan Plaintiff's laptop without his knowledge to find pornography.

224.    Around February 2016, Savage searched Plaintiff's laptop without his knowledge in an effort to interfere and/or interrupt Plaintiff's lawful use of his computer technology, implicating criminal conduct under Utah Code section 76-6-703.

225.    Plaintiff's computer was not marital property. Plaintiff purchased the computer before the parties were married.

226.    Savage admitted under oath: "I did scan [Plaintiff's] laptop."

227.    Savage did not find any evidence of pornography.

228.    Even with no evidence Plaintiff had viewed pornography or otherwise had a pornography addiction, Savage insisted that Plaintiff pay for and attend Hildebrandt's twelve-step program for addiction through ConneXions, or she would divorce him.

229.    These types of ultimatums—to pay money to ConneXions for the financial benefit of the Enterprise for fraudulent unnecessary services—are a typical manipulation tactic of Enterprise members to further the objectives of the Enterprise and financially benefit Enterprise.

230.    Savage claimed that if Plaintiff was not addicted to pornography, he must be addicted to something else.

231.    Savage knowingly implemented Hildebrandt's abusive methodology by assigning a false pathology to Plaintiff to manipulate him into paying exorbitant fees to the Enterprise for unnecessary services under the threat of immediate divorce.

232.    Savage's intentional actions detailed in paragraphs 189 through 231 herein constitutes willful, malicious, and intentional behavior or at the very least constitutes a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiff.

           ii.     <u>Savage Unlawfully Restricted Plaintiff's Access to EJT Under the Ultimatum that Plaintiff Submit to Enterprise Membership or Face Divorce and Loss of Custody.</u>

233.    In May 2016, at the direction of Hildebrandt, Savage demanded that the couple separate.

234.    At this time, Savage also unilaterally and unlawfully dictated Plaintiff's visitation with EJT, who at the time was around eighteen months old.

235.    The time Savage afforded to Plaintiff with EJT was substantially less than the statutory minimum parent-time guaranteed under Utah Code section 81-9-304.

236.    Savage initially allowed Plaintiff only two hours of parent-time every other day, with Plaintiff bearing the responsibility for all transportation and expense.

237.    Later, she only allowed around six hours every Saturday, again all at Plaintiff's expense and transportation.

238.    In May 2016, when Savage unlawfully restricted Plaintiff's time with EJT and then demanded that she and Plaintiff separate, Savage provided Plaintiff with ultimatums (designed to either financially enrich or further the objectives of the Enterprise) to comply with or otherwise face divorce.

239.    Savage's actions demonstrate her commitment to the Enterprise and her implementation of Hildebrandt's methodology.

240.    Specifically, Savage made the following demands on Plaintiff, all aimed to either financially benefit the Enterprise or coerce Plaintiff to join the Enterprise:

a.    "Attend the ConneXions 101 class to learn principles of Truth in a group setting." Here, Savage attempts to coerce Plaintiff into spending money on the Enterprise's fraudulent services, thereby attempting to financially enrich the Enterprise.

b.    "Experience Godly sorrow for every neglecting and abusive behavior. Be able to articulate what godly sorry means and describe what your godly sorry has felt like for every abusive behavior." Hildebrandt and other members of the Enterprise conspire to coerce husbands to falsely confess to abuse in order to cut them off from their children. Here, Savage conspired with Hildebrandt to coerce Plaintiff to falsely confess to abuse so that he could see his daughter and avoid divorce.

c.    "Find and utilize a sponsor" and "Be able to identify and eliminate pride, manipulation, codependent and controlling tendencies." Here, Savage utilizes Hildebrandt manipulation techniques to ascribe Plaintiff with a non-existent pathology to coerce him into spending money on fraudulent Enterprise services. Such pathologies include addictions and alleged abuse that Plaintiff never exhibited or engaged in, including a "control" addiction.

d.    "Identify the harmful behaviors you experienced in your family of origin and emotionally damaging behaviors which are current within that family. Also prove to me by your actions you will sever yourself from these behaviors and lifestyles." Here,

Savage implemented Hildebrandt's methodology to isolate Plaintiff from his family and thereby make it easier for Savage to manipulate Plaintiff into Enterprise membership.

241.    In July 2016, in one of the many instances in which Savage used interstate and/or foreign wires to further the Enterprise's fraudulent objectives, Savage demonstrates her commitment to the Enterprise in an email to Plaintiff:

> Mike, What I hear you say is . . . The bad Mike is dead and the good Mike is in full swing. I will hold you accountable for your behaviors to align with what you are saying. If you are where you say you are, you will be willing to step into the Truth and stay there. . . . Partnered with God, I will be the judge of where you are. And although I am so hopeful about what you say, your behaviors will be the real manifestation of it.  When you come home, I hope you are prepared to SHOW me in your actions you are in real recovery.

242.    Savage's communication demonstrates her adherence to Hildebrandt's methodology and her implementation of the Enterprise's tactics to manipulate victims into Enterprise membership to further the fraudulent financial scheme of the Enterprise: Savage implies that Plaintiff must be saved from "distortion" through punishment to be in "Truth" as defined by Hildebrandt; Savage alleged that Plaintiff had a nonexistent "addiction" that could only be absolved by purchasing services and products through ConneXions; and Savage instructed that Plaintiff can only remediate his relationship with Savage by adhering to Hildebrandt's methodology, purchasing services and products through ConneXions, and pursuing membership in the Enterprise for the Enterprise's financial benefit.

243.    On or around September 5, 2016, Plaintiff's mother invited him to Arizona for her birthday and Labor Day.

244.    Utilizing a tactic of the Hildebrandt methodology, Savage told Plaintiff that seeing his mother "would be abusive" and that he could see EJT if he did not see his mother.

245.     Plaintiff decided to stay in Utah to see EJT, and Savage told Plaintiff that she was proud that Plaintiff did not see his family.

246.     Ultimately, Savage did not allow Plaintiff to see EJT and ignored his communications and requests to see his daughter.

247.     Savage unlawfully dictated limited parent time between Plaintiff and EJT until mid-September 2016, when she unlawfully and completely deprived Plaintiff access to EJT.

248.     Specifically, on September 17, 2016, Savage illegally and completely restricted Plaintiff's access to EJT.

249.     Over the next week, Plaintiff texted Savage multiple times asking to see EJT, repeatedly informing her that her behavior violated his and EJT's legal rights. Savage nonetheless continued to completely restrict Plaintiff's access to EJT.

250.     As a result of Savage's unlawful behavior, Plaintiff was unable to be with EJT for weeks, necessitating Plaintiff seeking emergency legal relief to regain access to his daughter.

251.     At one point during this time, around September 17, 2016, Savage texted Plaintiff the following, in yet another implementation of Hildebrandt's methodology necessitating the infliction of "pain": "Michael. I can imagine how hard this is. It must be very frustrating and painful."

252.      In October 2016, after Savage unlawfully prohibited Plaintiff's access to EJT, Plaintiff filed for divorce and an emergency injunction to protect his parental rights.

253.     When Savage learned that Plaintiff was preparing for divorce, she again weaponized Hildebrandt's methodology and manipulation tactics against Plaintiff.

254.    Specifically, Savage pled with him multiple times saying she would do anything to save the marriage.

255.    Wanting the best life for his daughter, Plaintiff took Savage at her word. Plaintiff informed her that he was willing to reconcile if, among other things, the couple looked to their church leadership for guidance instead of Hildebrandt and the Enterprise. Savage agreed.

256.    The next morning, Savage, after meeting with Hildebrandt and at Hildebrandt's instruction, rescinded her agreement.

257.    Savage claimed she would not meet Plaintiff's reasonable requests about eliminating the Enterprise's influence on their lives, including discontinuing financial payments to ConneXions for the financial benefit of the Enterprise, because her "girls need[ed] her," meaning she could not abandon her fellow female Enterprise members.

258.    Through Savage's walk-back of their agreement, Savage demonstrated unwavering commitment and loyalty to Hildebrandt, the Enterprise, and its fraudulent scheme.

259.    Around this time, Savage had also coerced Plaintiff to meet with a social worker, Ted Gerun ("Gerun"), under the threat of divorce.

260.    Savage confirmed under oath that she threatened Plaintiff with divorce if he did not attend counseling with Gerun.

261.    At Savage's insistence, on September 22, 2016, Plaintiff met with Gerun.

262.    Shortly thereafter, on or around September 28, 2016, Savage threatened Plaintiff that if Plaintiff did not consent to the disclosure of his records from his meeting with Gerun to Savage, she would not permit Plaintiff to see EJT.

263.    Upon information and belief, Hildebrant instructed Savage to utilize this manipulation tactic to keep Plaintiff attached to the Enterprise through Savage and EJT.

264.    Plaintiff did not consent to the disclosure of his records from his meeting with Gerun.

265.    Notwithstanding the lack of consent, Gerun knowingly violated Plaintiff's HIPAA rights after this meeting, calling Savage and reporting false information to her despite Plaintiff informing Gerun repeatedly that he was not authorized to discuss Plaintiff's confidential information with anyone.

266.    Gerun provided all of Plaintiff's records to Savage despite Plaintiff telling him he was not authorized to do so.

267.    Gerun also falsified Plaintiff's records to make it appear that Plaintiff had given consent to this disclosure.

268.    Savage later released these confidential records in her divorce proceedings with Plaintiff, even after Plaintiff informed Savage multiple times that she had obtained the records unlawfully.

269.    As described above in relation to Steed and Bateman, encouraging Enterprise members to unlawfully disclose private counseling information and misrepresenting that information to defame Enterprise victims is a tactic employed by the Enterprise to keep control of its members and victims.

270.    Savage further underscored her commitment to Hildebrandt and the Enterprise in a message to Plaintiff after he filed for divorce on October 6, 2016.

271.    Savage texted the following message, in what she described as her "dying

declaration" to Plaintiff:

> I know there is no way to change if you avoid the pain, or shut down from feeling
> it.  People who enable you to not feel the consequence of your actions don't really
> love [you]. That is what I did when we lived together. The most loving thing I've
> ever done for you is to separate and no longer enable you. The pain is what makes
> us strong enough to never commit the sin again. I know we will never have that
> strength to change unless we feel the pain. I give it as my personal opinion that I
> believe you haven't really felt that because I've seen you shut down from feeling
> pain and I haven't seen that you felt the joy of repentance. That makes me sad. I
> know what joy is waiting for you that you have chosen not to enjoy.

272.    This message again demonstrates Savage's commitment to Hildebrandt's

methodology, particularly through use of Enterprise vernacular, and her implementation of the

Enterprise's tactics to manipulate victims into Enterprise membership to further the fraudulent

financial scheme of the Enterprise: Savage implements the Enterprise's (i) belief in the infliction

of pain to achieve manipulation of Enterprise victims into financially enriching the Enterprise;

and (ii) use of isolation as a form of victimization and coercion.

273.    Plaintiff and Savage were awarded a bifurcated decree of divorce on March 13,

2018.

274.    After their divorce was finalized, Savage's commitment to the Enterprise only

deepened, and Savage began implementing the Enterprise's objectives of child abuse and child

torture with EJT.

275.    Through her implementation of the Hildebrandt's methodology, Savage actively

and intentionally commits aggravated child abuse against EJT.

276.    Savage's intentional actions detailed in paragraphs 233 through 275 herein constitute willful, malicious, and intentional behavior or at the very least constitute a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiff.

iii.    Savage's Implements the Enterprise's Tactics of Child Abuse.

277.    EJT has experienced aggravated child abuse while under Savage's care—Savage has abused and tortured EJT, resulting in severe injuries to EJT.

278.    Infliction of aggravated child abuse and child torture is a central tactic of Hildebrandt's methodology and a main objective of the Enterprise.

279.    In 2017, shortly after Plaintiff filed for divorce in October 2016, EJT began returning from Savage with unusual injuries, including, without limitation: a laceration spanning EJT's entire right hamstring; a large, dark bruise inside her thigh; a dark purple bruise over a whole toenail; and long lacerations on her chin and neck.

280.    For Plaintiff's and EJT's safety, Plaintiff and Savage's parent-time exchanges occurred at a police station, by court order

281.    On September 30, 2017, EJT returned from Savage with a large bruise next to her left eye.

282.    Concerned about such a drastic injury, Plaintiff sought police intervention immediately following Savage's drop off of EJT at the police station where Savage and Plaintiff conducted their parent-time exchange.

283.    When asked what happened, EJT told multiple police officers that **"Mommy did it**." Responding officers were concerned enough that they called the on-call DCFS worker to investigate.

284.    After this, Savage instructed EJT not to talk about EJT's injuries lest Savage be investigated by the police.

285.    Savage ignored a court order that required her to discuss with Plaintiff any injuries to EJT within 48 hours and later confirmed under oath she violated this order.

286.    In Savage's abuse of EJT, she exhibited adherence to the Hildebrandt methodology: physically abuse her child, then refuse to provide any information to Plaintiff about the abuse and then punish Plaintiff for attempting to protect his child from abuse.

287.    Like Victims 1 and 2, EJT exhibited evidence of malnourishment, which Plaintiff addressed with Savage.

288.    On February 2, 2018, Plaintiff communicated to Savage: "The past 5 or 6 times I've picked up [EJT] from you, the first time she goes to the bathroom, her urine has been very dark. Could you please make sure she is sufficiently hydrated when she is with you?"

289.    Savage did not respond.

290.    In the fall of 2018, EJT sustained bruising under her right eye while in Savage's care.

291.    Savage told police that EJT fell on a banister while unsupervised.

292.    Dr. Jeffrey Penman, a board-certified pediatrician who later treated EJT, indicated that children are not normally injured near their eye.

293.    In November 2018, after being with Savage, EJT had a large bruise on her hip with a laceration through it.

294.    Later, on November 17, 2018, EJT video-called Plaintiff from Savage's residence in extreme distress.

295.    During the call, Plaintiff observed that EJT had large bruises around her right eye, on her right cheek, underneath her left eye, and underneath her lip.

296.    Plaintiff immediately requested that Savage allow him to take EJT to seek medical attention to determine if she had sustained a brain injury.

297.    Savage refused to allow EJT to see a medical provider, claiming the injuries were not serious.

298.    Savage later testified in custody proceedings she "may have" instructed EJT to tell Plaintiff that a mirror fell on EJT.

299.    Refusing to allow victims of child abuse to seek medical attention for their injuries is another tactic of the Hildebrandt methodology, and it is akin to the abuse Franke and Hildebrandt perpetuated on Victims 1 and 2.

300.    Plaintiff took EJT to see Dr. Penman immediately after EJT returned to him. Dr. Penman observed the injuries on EJT's face, and Plaintiff showed Dr. Penman pictures of the recent injuries to EJT's hip.

301.    EJT told Dr. Penman that she injured her hip falling on a sidewalk, and she injured her face when a mirror fell on her. Dr. Penman reported EJT's face and hip injuries to DCFS because the explanations were inconsistent with the injuries.

302.    Upon information and belief, DCFS contacted Savage about EJT's injuries.

303.    There were numerous inconsistencies between Savage's explanations of EJT's injuries and Dr. Penman's professional assessment of EJT:

a.      Savage told DCFS that the cut underneath EJT's lip was a rash; Dr. Penman "said that the rash on [EJT's] chin was too linear to be a rash." He said it was an "abrasion."

b.      Savage told DCFS that EJT only had one bruise on the right side of her face; Dr. Penman said "that the right eye actually had a bruise above and below it."

c.      Savage told DCFS that EJT received the cut on her hip by falling from an ottoman onto a jewelry box; Dr. Penman said that "the bruise on her hip could not have happened from falling off an ottoman," adding that "she would have had to fall a long ways to get a bruise of that size." This was also inconsistent with EJT's account of falling on a sidewalk.

d.      Savage told DCFS a mirror fell on EJT while she was unsupervised. Dr. Penman said it was "unlikely that a flat surface would cause a bruise above and below the eye."

e.      Savage told DCFS that the mirror weighed twenty pounds, but later testified that it weighed sixty pounds. Dr. Penman testified that the allegation that this mirror caused the injuries was inconsistent with what he observed.

f.      Dr. Penman told DCFS that "he has been [a pediatrician] for a long time and none of [EJT's] injuries were in typical areas that a child gets hurt" and "so many [injuries] at one time was very concerning."

304.    Only weeks later, EJT returned from Savage with a welt on her forehead, which Savage covered with the largest type of Band-aid-type adhesive bandage when she sent EJT to Plaintiff.

305.    Dr. Penman's colleague, Dr. Benjamin Greenfield, treated EJT.

306.    Dr. Greenfield told Plaintiff that whenever Plaintiff is concerned about abuse, he should contact DCFS and have EJT seen by a physician.

307.    In November 2019, EJT returned from Savage with a goose egg on her forehead and a laceration through it.

308.    Plaintiff immediately took EJT to the emergency room. The ER physician recorded that EJT "state[d] that she was playing on some large rocks and she fell forward and bumped her head. She is unable to tell me what happened."

309.    In February 2020, EJT returned from Savage with a large, dark bruise covering nearly her entire upper right hamstring. Plaintiff took EJT to the emergency room. The emergency room physicians contacted the Children's Justice Center who instructed the hospital to report the injury to DCFS "given [its] size and location."

310.    Medical providers could not determine if "[EJT] has a recollection or is inventing a story" about her injuries, saying "bruising is not consistent with what [EJT] is saying" and "bruising on [EJT's] upper buttocks or lower back is not consistent with falling on sidewalk."

311.    Savage never denied that the injuries occurred while under Savage's care. Under Utah code sections 76-5-109.2 and 76-5-109, Savage has committed aggravated child abuse against EJT.

312.    Savage's physical abuse of EJT continues to the present.

313.    Specifically, Savage has returned EJT to Plaintiff after being in Savage's care with dark bruises and cuts on EJT's thigh, wrist, cheek and temple.

314.    Savage also returned EJT to Plaintiff after being in Savage's care with a severe sunburn, which is particularly relevant and alarming given Franke and Hildebrandt's torture Victims 1 and 2 involving prolonged and forced sun exposure resulting in severe sunburns.

315.    Further, immediately after Plaintiff informed the domestic court post-appeal of Savage's egregious domestic conduct, Savage returned EJT returned to Plaintiff after being in Savage's care with a large bruise on EJT's cheek. Upon return from being in Savage's care, EJT was acting strangely, including hiding in her room and crying while not providing a credible account to Plaintiff regarding why EJT was sad.

316.    Plaintiff later discovered that Savage physically assaulted EJT after Savage's domestic conduct was revealed and blamed EJT for its disclosure.

317.    Because of this emotional and physical abuse of EJT by Savage, for years EJT adamantly objected to returning to Savage from Plaintiff.

318.    EJT would cry, scream and hide in Plaintiff's home in order to not return to Savage. EJT would claim that she hates seeing Savage.

319.    When EJT was a toddler, she would cry and be so inconsolable that at times, Savage either called Plaintiff asking him to talk to EJT or return to the drop-off location for him to calm EJT down.

320.    At other times, EJT would attempt to hit Savage and scream at Savage at the top of EJT's lungs demanding that Savage leave.

321.    This reaction by EJT is similar to the reactions recorded in Franke's journal of Victims 1 and 2 and correlate to the Enterprise' instructions to its followers to physically and emotionally abuse children.

322.    Plaintiff did not understand at the time the injuries occurred that physical abuse and torture of children are encouraged by Hildebrandt and the Enterprise (including Savage) and are just two of many ways that Savage conducts the affairs of the Enterprise.

323.    Plaintiff was unaware of the illegitimate, fraudulent, and harmful nature of the Enterprise until the arrests and subsequent sentencing of Hildebrandt and Franke in August 2023 and February 2024, respectively.

324.    Savage's intentional abuse of EJT and Plaintiff detailed in paragraphs 277 through 323 herein constitutes willful, malicious, and intentional behavior or at the very least constitutes a knowing and reckless indifference toward, and a disregard of, the rights of EJT and Plaintiff.

        iv.    <u>Savage Uses Interstate and/or Foreign Wires to Further the Enterprise's Fraudulent Scheme.</u>

325.    In addition to implementing Hildebrandt's methodology and the Enterprise's objectives into her own life, Savage is a principal recruiter for the Enterprise and Savage often uses interstate and foreign wires to recruit membership into the Enterprise and further its fraudulent financial scheme through a pattern of racketeering.

326.    In addition to using abusive tactics to coerce Plaintiff to join the Enterprise, from at least May 2016 through July 2016, Savage used interstate wires to recruit Jessica Blanch, Plaintiff's brother's ex-wife, into the Enterprise.

327.    During this time, Savage lived in Utah and Blanch lived in Idaho, during which Savage used interstate wires to call Blanch over the telephone at least twenty times to recruit her to the Enterprise.

328.     Savage told Plaintiff that she was provided by God to save Blanch and Plaintiff's brother's marriage.

329.     Blanch joined the Enterprise and defended Hildebrandt publicly. Blanch posted the following on an online review site:

> The principles Jodi taught helped me through a really difficult situation. If applied, they can bless your life too. Jodi is an emotional personal trainer. To some she can come off as intense, but truth is what she is teaching works and she is passionate about the truth. Go in knowing you are going to emotionally work but also know if you do your part you can find so much peace and joy in your life.

330.     Savage instructed Blanch that Plaintiff's brother was in "distortion" and that Blanch resultantly needed to inflict "pain" (i.e., abuse) on him.

331.     After Blanch became a member of the Enterprise, and in a direct implementation of Hildebrandt's methodology, Blanch repeatedly physically beat Plaintiff's brother.

332.     On one occasion, Blanch ripped off Plaintiff's brother's shirt and attempted to attack him with a knife. Blanch had severely bruised, bitten and scratched Plaintiff's brother all over his body. Blanch was charged with domestic battery. No charges were brought against Plaintiff's brother.

333.     Savage encouraged Blanch (before and after the attack) that Blanch was justified in criminally assaulting Plaintiff's brother because he was in "distortion" and that "pain" will bring him to "Truth."

334.     Savage's instruction and encouragement of this assault is criminal under Utah Code sections 76-4-202; and 76-2-202; *see also* Idaho Statutes §§ 18-4107, 18-1701 and 18-918.

335.     In a clear demonstration of the Enterprise's manipulation and gaslighting tactics, Savage later contacted Plaintiff to explain that Plaintiff's brother was in fact at fault for his own

assault because Plaintiff's brother was in "distortion," and needed "pain" to bring him to "Truth."

336.    Accordingly, Blanch's review of Hildebrandt identified in paragraph 329, an instance in which she furthered the financial interest of the Enterprise by attempting to solicit further business for the Enterprise, is fraudulent.

337.    Savage later attempted to recruit another romantic interest of Plaintiff's brother via interstate wires and thus, furthered the objectives of the Enterprise through a pattern of racketeering.

338.    Around February 2017, Savage sent a message over interstate wires to the woman Plaintiff's brother was romantically involved with (Savage was in Utah, the woman was in Idaho).

339.    Savage criminally stalked this woman and Plaintiff's brother over interstate wires to learn they were dating. *See* Utah Code § 76-5-106.5.

340.    Specifically, Savage monitored and surveilled the personal affairs of Plaintiff's brother and this romantic partner through regularly monitoring their activities, dating life, social media posts, and the progression of their private relationships, including ascertaining that they were a romantic couple, which resulted in Plaintiff's brother and his romantic partner fearing for their safety after determining that an individual unknown to this romantic partner constantly monitored their personal affairs as described above.

341.    Without ever meeting this romantic partner, Savage then sent her a Facebook message, telling her multiple times that God had told Savage that Plaintiff's brother would kill this woman and that God would tell this woman the same thing if she listened.

342.     Savage falsely communicated about Plaintiff's brother, thereby disseminating information about Plaintiff's brother to his romantic partner, causing both Plaintiff's brother and his romantic partner to fear for their safety after determining that an individual unknown to this romantic partner was monitoring their private affairs and sending them unwanted communications.

343.     Savage's message constitutes *per se* defamation against Plaintiff's brother, which at the time of her message was also criminal in Utah. *See* Utah Code § 76-9-404 (2017).

344.     Savage again attempted to recruit Plaintiff's brother's new romantic interest to the Enterprise in the hopes to gain another Enterprise member to garner fraudulent revenue for the Enterprise.

345.     As explained above, Savage was both a recruiter and a leader in the Enterprise over many women, as seen in her declaration that she could not accept Plaintiff's reasonable reconciliation attempt because her "girls need [her]."

      vi.     <u>Savage Remains Committed to the Enterprise.</u>

346.     Savage remains a devoted protégé of Hildebrandt and staunchly refuses to reject the Hildebrandt methodology of abuse, torture, and "pain," even after Hildebrandt and Franke's arrests brought the barbaric nature of the Enterprise's fraudulent services to light.

347.     After Hildebrandt's and Franke's torture of Victims 1 and 2 (Franke's children), Plaintiff gave Savage at least *seven* opportunities to distance herself from Hildebrandt and disavow her methodology and tactics.

348.     Savage refused.

349.    First, on September 1, 2023, Plaintiff (who was then in Arizona) sent Savage (in Utah) the following text message, "Ms. Hildebrandt was arrested on two counts of intentional aggravated child abuse. With that, I think that it's in [EJT's] best interests to not utilize her teaching with [EJT] in any way."

350.    Savage responded by text to Plaintiff the same day by suggesting that it was Plaintiff's reporting of Savage's child abuse against EJT that was the issue, not Hildebrandt.

351.    Savage thereby continues to actively participate in, and conducts the affairs of, the Enterprise by implementing Hildebrandt's methodology with EJT over Plaintiff's vigorous objections.

352.    Later that day, Plaintiff (in Arizona) replied to Savage's startling response (from Utah) with the simple request: "Can you confirm that you will not utilize Ms. Hildebrandt's teachings with [EJT]? Using her teachings would be concerning seeing she has been charged with two counts of intentional aggravated child abuse (the most severe type of child abuse per statute), a pediatrician indicated injuries to [EJT] could only be explained by abuse and the pediatrician indicated you were untruthful with DCFS multiple times in the investigation."

353.    Savage did not respond and refused to disavow her commitment to the Enterprise and Hildebrandt's methodology, despite Plaintiff's repeated requests for her to do so.

354.    On September 4, 2023, Plaintiff (in Arizona) sent the following text message to Savage (in Utah), "Ms. Hildebrandt has now been charged with 6, instead of 2, counts of intentional aggravated child abuse. Because she encourages intentional aggravated child abuse in her teachings, could you let me know if you still consider that one must accept her teachings to be in the Truth and if you will continue to utilize her teachings with [EJT]?"

355.    Savage again only responded suggesting that Plaintiff reporting Savage's child abuse was the issue, not Hildebrandt.

356.    On December 27, 2023, after Hildebrandt's guilty plea, Plaintiff sent the following text to Savage:

> Hildebrandt and Franke pled guilty to 4 counts of 2nd degree felony child abuse, admitting to "physically torturing" Franke's [12]-year-old son and 'indoctrinating' two of Franke's children (both under [12] years old). I believe [EJT] is unsafe with you if you maintain your commitment to Hildebrandt and her teachings.  If you continue to refuse to disavow Hildebrandt, we need to come to a custodial arrangement where [EJT] is not in further danger of physical harm and indoctrination from you".

(Cleaned up).

357.    Savage again did not respond.

358.    On February 20, 2024, after Franke described the destructive nature of Hildebrandt's teachings, Plaintiff sent the following message to Savage, "At her sentencing hearing, Franke described that the principles that you are using with [EJT] (Hildebrandt's teachings) as dark and dangerous."

359.    Plaintiff later sent a similar message asking, "Are you willing to stop using these dangerous principles / teachings with [EJT] and in our co-parenting?"

360.    Savage again did not respond.

361.    On March 22, 2024, when prosecutors in St. George, Utah made public many documents in Hildebrandt's and Franke's criminal proceedings, Plaintiff sent Savage the following message: "The body cam video of when Franke's children were rescued was released today and was heartbreaking. [EJT] and I have suffered from these same tactics for years from you following Hildebrandt. Am I correct in understanding that you are unwilling to disavow Hildebrandt's teachings with [EJT] and in our co-parenting even after seeing this child abuse?"

362.    Savage again did not respond.

363.    On March 25, 2024, after reviewing even more of the prosecutor's documents, Plaintiff sent the following message to Savage, "Hildebrandt's jail calls show she still believes the torture of children is normal parenting. This concerns me with how religiously you look to her in treating me and [EJT]. Can you please confirm you will not use Hildebrandt's abusive teachings with [EJT] and in our co-parenting?"

364.    Savage yet again did not respond.

365.    Savage teaches and employs the abusive tactics of the Enterprise on EJT, despite knowing Hildebrandt's methodology is abusive and harmful.

366.    Savage and Washburn have also secretly communicated to EJT, over Plaintiff's protests, instructing EJT to live by Hildebrandt's methodology, even after Hildebrandt had been arrested and her case gained international attention.

367.    Beginning in July 2023, Savage and Washburn created a secret email account and coerced EJT to communicate with them during Plaintiff's parent-time with EJT.

368.    EJT later reported that Savage coerced EJT to say false negative things about Plaintiff and false positive things about Savage in these messages.

369.    Upon information and belief, Savage also coerced EJT to tell Plaintiff's now wife that Plaintiff abuses women.

370.    Upon information and belief, Savage manipulated EJT to ensure that EJT was living under the Hildebrandt methodology even while in Plaintiff's care, at one time instructing EJT to implement Hildebrandt's tactic of "boundaries" with EJT's family.

371.    Savage also instructs EJT to invade Plaintiff's privacy, including without limitation by requesting detailed accounts of EJT's parent time with Plaintiff and instructing EJT to retrieve a confidential financial document from Plaintiff's home and provide it to Savage.

372.    Savage's actions towards EJT and Plaintiff, as alleged in paragraphs 189 through 371 herein were willful and malicious or at the very least constitute a knowing and reckless indifference toward, and a disregard of, Plaintiff and EJT.

K.    *Relationships Within the Enterprise*

373.    The Enterprise includes a union or group of individuals and entities, including without limitation Hildebrant, Franke, Savage, and ConneXions, associated in fact for the common purpose of engaging in a course of conduct furthering the Enterprise's fraudulent scheme described herein.

374.    Upon information and belief, the association-in-fact enterprise in this case involves at least Defendants ConneXions Classroom, Hildebrandt, Franke, and Savage, as well as ConneXions Mental Fitness Trainers, The ConneXions Foundation, and Pam Bodtcher.

375.    Upon information and belief, there are lasting relationships among members of the Enterprise.

376.    Upon information and belief, Hildebrandt was the leader of the Enterprise; she developed the methodologies through which members of the Enterprise controlled its victims.

377.    Upon information and belief, Franke worked most closely with Hildebrandt and was second-in-command in the Enterprise.

378.    Hildebrandt purposefully used Franke's social media presence to massively disseminate the Enterprise's fraudulent scheme, including without limitation through the advertisement of

ConneXions' fraudulent services and products on Franke's various social media channels and accounts.

379.    Upon information and belief, many individuals were given the rank of Mental Fitness Trainer within the Enterprise.

380.    Upon information and belief, this title signified that these individuals understood Hildebrandt methodology and, under the supervision of Hildebrandt, disseminated this methodology via the Enterprise's various fraudulent services and/or products.

381.    Upon information and belief, other members, including without limitation Savage, managed and controlled the Enterprise's affairs directly with specific victims at the Hildebrandt's instruction and direction.

382.    Upon information and belief, Savage and Hildebrandt agreed to carry out the affairs of the Enterprise beginning in at least 2015 when Savage joined the Enterprise and began attempting to induce Plaintiff and others, including Blanch, to purchase fraudulent services and/or products from ConneXions.

383.    Upon information and belief, Savage has in fact carried out the affairs of the Enterprise by encouraging Plaintiff, Blanch, and others to purchase fraudulent services and/or products from ConneXions.

384.    Upon information and belief, Savage was and is aware of the fraudulent nature of the Enterprise and of ConneXions' services and products because Plaintiff informed her of their fraudulent nature and of Hildebrandt's prior misconduct.

385.    Despite this knowledge, Savage willingly joined the Enterprise and agreed to carry out its affairs through the promotion of ConneXions' fraudulent services and/or products and through the commission of numerous acts of wire fraud as alleged herein.

L.    *The Enterprise's Pattern of Racketeering Activity*

i.    Wire Fraud

386.    Each Defendant has engaged in a pattern of wire fraud and therefore a pattern of racketeering activity.

387.    Under 18 U.S.C. section 1961, "racketeering activity" includes federal wire fraud, which occurs when a party "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writing, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . ." 18 U.S.C. § 1343.

388.    Further, a defendant commits federal wire fraud when the individual could have reasonably foreseen that a victim would pay with credit and/or debit cards in furtherance of the defendant's fraudulent scheme.

389.    Collectively, Defendants have engaged in thousands of instances of federal wire fraud.

390.    Individually, each Defendant has engaged hundreds of instances of wire fraud.

391.    In furtherance of their scheme, and as described herein, Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including but not limited to, the following:

a.      Thousands, of social media wire transmissions on YouTube, Instagram, Spotify, Acast, Apple Podcasts, Facebook, and Zoom, among others, that furthered the Enterprise by attempting to recruit individuals to the Enterprise and induce them to pay for the Enterprise's fraudulent services;

b.      Using interstate telephone wires to stalk, libel, threaten, and harass Plaintiff and his family to coerce Plaintiff to join the Enterprise and to punish him when he refused to do so.

c.      Thousands of wire transfers via credit and/or debit cards when fraudulently charging victims.

392.    The objective of the Enterprise is to lure members and victims into purchasing services and products from ConneXions to purportedly better one's life. Once in the door, Hildebrandt diagnoses victims with false pathologies and psychological disorders to entice them into purchasing fraudulent and unnecessary coaching, therapy, counseling, and self-help services from the Enterprise.

393.    In furtherance of the objective of the Enterprise, Hildebrandt also instructs members to utilize tactics of manipulation, physical abuse, psychological abuse, and isolation to keep members and victims within the Enterprise and brainwash victims into believing they need to continually invest money into the Enterprise through purchasing services and products from ConneXions to heal themselves and their relationships with others.

394.    Another tactic of the Enterprise is to employ manipulation and abuse against individuals who reject the Enterprise to disincentivize members from leaving the Enterprise.

395.    Hildebrandt furthers the Enterprise's fraudulent scheme by advertising "services" that purport to solve any negative behavior. As described by Hildebrandt:

> My style is … what is necessary to fully change, and champion any addictive or self-destructive behavior, whether it be ravenous addictions, feelings of worthlessness or inadequacy, conflicts in relationships, intimacy problems, communication breakdowns, and frankly any block that prevents having and creating peace and joy.

396.    Hildebrandt claims to be a preeminent mental health expert in her ability to identify and treat any mental illness. In reality, Hildebrandt manufactures pathologies and mental health problems when treating Enterprise victims to entice them to purchase fraudulent and unnecessary services and products from ConneXions.

397.    Hildebrandt's representations regarding the Enterprise's services are false, dangerous, and harmful.

398.    At no point prior to joining the Enterprise does Hildebrandt disclose that if a victim resists her authority and counseling, she and other Enterprise members will seek to destroy a victim's life through defamatory actions, physical and emotional abuse, manipulation, and isolation.

399.    Plaintiff incorporates by reference Exhibit 1, which sets forth instances of wire communications in furtherance of the Enterprise. This exhibit includes which defendant caused the communication to be issued, when the communication was made, how it furthered the scheme and the consequences thereof within the scheme to defraud.

400.    Upon information and belief, Hildebrandt engaged in at least 785 acts of federal wire fraud beginning at least by 2008 and continuing through August 26, 2023, shortly before her arrest. *See generally* Exhibit 1 ¶¶ 1–16.

401.    Specifically, and upon information and belief, Hildebrandt engaged in federal wire fraud on at least 732 occasions when hosting and publishing the ConneXions podcast; at least twenty-seven occasions while hosting and participating in ConneXions couples panels via Zoom; at least fifteen occasions when teaching the ConneXions Masterclass via Zoom; at least seven occasions when teaching and speaking at ConneXions conferences; and at least four occasions through her website, Instagram and/or podcasts. *See id.* ¶¶ 5–7, 11–13, 16.

402.    Upon information and belief, Hildebrandt engaged in thousands of additional acts of federal wire through posts on her multiple social media accounts, many of which are currently unavailable because YouTube deleted the ConneXions channel and Hildebrandt and Franke limit access to their Moms of Truth Facebook page to members only.

403.    Upon information and belief, Hildebrandt engaged in thousands of additional acts of wire fraud because she fraudulently charged Enterprise victims via credit and/or debit cards for services and products sold by ConneXions.

404.    Upon information and belief, Franke engaged in at least 298 acts of federal wire fraud. *See generally id.* ¶¶ 17–26.

405.    Specifically, and upon information and belief, Franke engaged in federal wire fraud on at least 244 occasions while hosting and publishing the ConneXions podcast; on at least fifteen occasions while serving as a panelist on ConneXions panels; on at least thirty-one occasions through advertising ConneXions on Instagram; and on at least four occasions while speaking at ConneXions conferences and retreats. *See id.* ¶¶ 21–24, 26.

406.    Upon information and belief, Franke engaged in thousands of additional acts of federal wire fraud through other social media accounts, many of which are currently unavailable

because YouTube deleted the ConneXions channel, Franke deleted many posts, and because

Hildebrand and Franke limit access to their Moms of Truth Facebook page to members only.

407.    Upon information and belief, Hildebrandt and Franke agreed that each would

perpetrate these acts of wire fraud before doing so.

408.    Upon information and belief, Savage engaged in at least 334 acts of federal wire

fraud. *See generally id.* ¶¶ 27–39.

409.    Specifically, and upon information and belief, Savage engaged in federal wire

fraud on at least thirty-six occasions when she attempted coerce Plaintiff to purchase fraudulent

services and products from ConneXions and to join the Enterprise; when she attempted to recruit

other members to the Enterprise and convince them to purchase fraudulent services and products

from ConneXions; and when she stalked and/or harassed Plaintiff and his family as punishment

for not joining the Enterprise and for refusing to purchase fraudulent services and/or products

from ConneXions. *See id.* ¶¶ 27–38.

410.    Savage also used interstate and/or foreign wires to send at least 296 messages to

EJT, all of which furthered the objectives of the Enterprise by attempting to coerce EJT to live

by the Enterprise's principles under Hildebrandt's methodology. *See id.* ¶ 39.

411.    Upon information and belief, Savage and Hildebrandt agreed that Savage would

perpetrate such acts of wire fraud before doing so.

412.    Upon information and belief, Bodtcher engaged in at least twenty-two acts of

federal wire fraud.

413.    Specifically, and upon information and belief, Bodtcher engaged in federal wire

fraud on at least sixteen occasions while teaching the ConneXions Masterclass; on at least two

occasions when teaching at ConneXions conferences and retreats; and on at least four occasions through the ConneXions Instagram page.

414.    Upon information and belief, Bodtcher engaged in thousands of additional instances of wire fraud because, as the president of the ConneXions Foundation, she almost exclusively and fraudulently charged Enterprise victims via credit and/or debit cards for services and products sold by ConneXions.

415.    Upon information and belief, ConneXions engaged in at least 1,009 instances of federal wire fraud, including 732 instances when Hildebrandt hosted the ConneXions podcast; 244 instances when Franke hosted the ConneXions podcast; twenty seven instances via the ConneXions couples panels; fifteen instances via the ConneXions MasterClass; thirteen at ConneXions conferences; and thousands of additional instances in social media accounts, including those with restricted access or that have been deleted by YouTube as a result of Hildebrandt and Franke violating YouTube's creator guidelines. *See id.* ¶¶ 40–43.

416.    Defendants participated in the scheme or artifice of the Enterprise knowingly, willfully, and with the specific intent to deceive and/or defraud Plaintiff and others.

417.    Defendants knowingly misrepresented the nature and consequences of the Enterprise's objective under Hildebrandt's methodology to gain fraudulent revenue.

418.    Specifically, Defendants induced individuals to obtain services and products from ConneXions for the financial benefit of the Enterprise knowing that Hildebrandt would falsely diagnose victims with nonexistent pathologies and/or mental health disorders to induce victims to spend money on ConneXions' fraudulent services and products to the financial benefit of the Enterprise.

419.    Defendants' fraudulent actions have caused Plaintiff, and likely many others, substantial damage.

420.    Each wire transmission explained above was designed to further the fraudulent scheme of the Enterprise.

421.    Additionally, Defendants make an overwhelming number of fraudulent misrepresentations on the ConneXions website to lure victims to the Enterprise.

422.    Hildebrant has communicated extensively over interstate and/or foreign wires to advertise, promote, and sell fraudulent services and products sold by ConneXions to amass a fortune from thousands of trusting and often vulnerable individuals and families, all to the financial benefit of the Enterprise.

423.    Hildebrandt and Franke make similar false representations on the ConneXions podcast, which is hosted by either Hildebrandt or Franke.

424.    Since at least November 25, 2022, each podcast ends with the following representation:

> Thank you so much for listening to the ConneXions podcast today. Share this podcast with your family and friends. And if you're not already subscribed, please subscribe to this podcast. You can find on-demand and live training at connexionsclassroom.com to help you create joy in your life and in your relationships.

425.    The ConneXions classroom website immediately directed individuals to a variety of ConneXions' fraudulent services and products, which can be accessed only by purchase.

426.    Instead of fulfilling these representations, Defendants coerce and indoctrinate victims to join the Enterprise and then entice members to pay fees for fraudulent services and products sold by ConneXions.

ii.    Monetary Transactions Involving Racketeering Proceeds

427.    Upon information and belief, Hildebrandt engaged in a pattern of engaging in monetary transactions in property derived from specified unlawful activity and therefore a pattern of racketeering activity.

428.    Under 18 U.S.C. section 1961, "racketeering activity" includes engaging in monetary transactions in property derived from specified unlawful activity, which occurs when a party "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a).

429.    Upon information and belief, Hildebrandt engaged in a monetary transaction through a financial institution involving a deposit, transfer, or exchange, which affected interstate commerce, when she purchased a residence in Ivins, Utah (the "Ivins Residence"), which she later used to hold captive and torture Victims 1 and 2.

430.    Upon information and belief, Hildebrandt used criminally derived property to purchase the Ivins Residence, namely, funds that she obtained through specified unlawful activity, namely, a pattern of racketeering activity, including without limitation wire fraud, as alleged in paragraphs 386 through 426 herein.

431.    Upon information and belief, Hildebrandt purchased the residence in or about 2017.

432.    Upon information and belief, Hildebrandt's purchase of the Ivins Residence affects interstate and foreign commerce because (i) Hildebrandt and Franke extensively used the Ivins Residence to film videos and record podcasts for the Enterprise, which are broadcast and

available internationally; (ii) Hildebrandt and Franke used the Ivins Residence to create content for the Enterprise's various fraudulent services and products, including without limitation training videos, classes, and written content, all of which the Enterprise charged members (located across the United States and/or internationally) to purchase.

433.    Upon information and belief, Hildebrandt purchased the Ivins residence for approximately $1,000,000, a sum greater than the $10,000 threshold under 18 U.S.C. section 1957.

iii.    Forced Labor

434.    Upon information and belief, Hildebrandt, Franke, and Bodtcher engaged in a pattern of criminal forced labor and therefore a pattern of racketeering activity.

435.    Although not a predicate act under the RICO claims pleaded below, this pattern of criminal forced labor demonstrates the relatedness and continuity of the Enterprise.

436.    Under 18 U.S.C. section 1961, "racketeering activity" includes offenses related to forced labor, which occurs when an individual "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of [Chapter 77 of the United States Code]." 18 U.S.C. §§ 1589, 1961.

437.    Under 18 U.S.C. section 1584, it is unlawful for an individual to "knowingly and willfully hold[] to involuntary servitude or sell[] into any condition of involuntary servitude, any other person for any term."

438.    Under 18 U.S.C. section 1589, it is unlawful for an individual to "knowingly provide[] or obtain[] the labor or services of a person – (1) by threats of serious harm to, or physical restraint against, that person or another person; (2) by means of any scheme, plan, or

pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or (3) by means of the abuse or threatened abuse of law or the legal process."

439. Upon information and belief, Hildebrandt, Franke, and Bodtcher engaged in this criminal behavior against Victims 1 and 2 and against their two older sisters (who are minors), identified as "A" and "J" in documents released by state prosecutors.

440. Utah prosecutors' summary of the criminal cases of Hildebrandt and Franke accurately describe their violations of 18 U.S.C. sections 1584 and 1589 against Victims 1 and 2: "The ensuing investigation revealed that Ms. Franke and Ms. Hildebrandt held Franke's 12-year-old son and 9-year-old daughter in a work-camp like setting . . . . They were forced to do physical tasks like carrying loaded boxes up and down stairs and sitting against a wall without a chair or stool for hours at a time. The children were also forced to do manual labor outdoors in the extreme summer heat without shoes or socks."

441. Similarly, a prosecutor told reporters the following. "And, and, you know, you, you look at, you look at the images of people that have been stuck in concentration camps and malnourished for a time and you look at the forced labor and the types of injuries they have from that and that's what these kiddos experienced. They, they were, they were held, they were denied food to the point that that is painfully obvious in looking at them… And they were forced to do work in the St. George heat in June and July and August without, without, not, not, not like without gloves, but without shoes—being out in the desert, being forced to do labor. Like, if that's not a concentration camp-setting, I don't know what is."

442.    Utah prosecutors also explain that these slavery conditions imposed by Hildebrandt and Franke were inflicted by actual force, threats of force, or threats of legal coercion: "The children were regularly denied food, water, beds to sleep in, and virtually all forms of entertainment… They were similarly forced to stand outside, on a cement patio, in the summer heat for hours and even days. They were beaten, and the twelve year old was bound hand and foot after a previous attempt at running away."

443.    All the physical and emotional harm actually inflicted upon Victims 1 and 2 and threatened upon J and A constitutes "serious harm" under the federal law. *See* 18 U.S.C. § 1589(c)(2).

444.    Upon information and belief, Hildebrandt and Franke threatened abuse of law or legal process against Victims 1 and 2 by falsely representing to them that if Victims 1 and 2 did not repent, they would be incarcerated. This constitutes "abuse or threatened abuse of law or legal process" under federal law. *See* 18 U.S.C. § 1589(c)(1).

445.    Franke's journal entries explain specific instances of this horrific forced labor, including actions by Victims 1 and 2 showing that they were being held captive against their will and Franke's and Hildebrandt's use of force and threat of force.

446.    Franke's journal entries include the following:

a.    "[Victim 2] refuses to work. Screams. Has hair shaved off."

b.    "I cut more off [Victim 2's] head. We doused her w/ water in the dog wash. [Victim 2] said she wanted to run away. Jodi told [Victim 1] she has no idea what is waiting for her."

c.      "Physically stop the acting out behaving & begin physically doing good.

Farm work. Lifting boxes. Exurting [sic] energy. Exercises. Jump rope. Milking cows.

Weeding a garden. Digging trenches. Satan cannot be where there is good. Begin doing /

sweating for good. Heavy physical intensity. Capture your attention."

d.      The problem for [Victims 1 and 2] is the hard labor is all [unintelligible]

for the sake of lifting does not have meaning or do good. And the kids need a good kick

from a horse & a cactus to run into."

e.      "I reminded [Victim 2] that if she whined, cried or squinted her eyes at me

or soured her face, I would be buzzing her hair. If she is going to act sick, she can look

sick… I told her because she didn't listen the night before, she would do 2 sets of

boxes/stairs w/ a 5 min break… After 5 min of rest she began whimpering. When she got

to the bottom stair she 'slipped' & dropped the box. I put her in the dog wash & shaved

her head. Then back to the boxes."

f.      "[Victim 2] agreed to sit on the park bench & think about her choices. I

made it very clear if she were to move, get up, fidget, talk, take her hat off, she would go

back to work… After an hour on the bench, she began moving & looking around. I pulled

her into the house & gave her more <u>boxes</u>."

g.      "[Victim 2] does 1st set of books decently … [Victim 2] upset to do

boxes. Gets them done… More boxes. She refuses. Goes to sleep on basement floor."

h.      "One might ask, as I myself have, what if we had taken this slower?

Would the children have been on board if we hadn't boundaried them so quickly & so

clearly? What if, instead of a full day of box carrying, we would have done a [sic] hour &

breaks & reading & then back to boxes? My answer is, well… [Victims 1 and 2] would not be repenting. And they would have given the impression they were repenting. They needed things to get hard fast. Intense. Shocking change. Immediate discomfort. Stress in their systems…. Changed the environment of the kids slowly & more 'reasonably' or comfortably, we would have allowed the dumb hypnosis & sleep to stay over the child, we need to wake the child up to the state of reality. Show them where they really are— the pit of hell…. Instead, they hid. They wanted to lie to themselves that what they did wasn't that bad. That they were the victims. That me & Jodi are the persecutors."

i.      "Jodi & I took [Victim 2] out to the desert.  She refused to stay quiet & would scream & scream. Jodi found a reservation cemetery. Chivwitts cemetery. She went out in the heat, barefoot. [Victim 2] still tried to run. She screamed for another family, water, food, care, love…. After a couple of hours of screaming & speaking nonsense, [Victim 2] finally layed [sic] down in the road quiet…. We took [Victims 1 and 2] oot [sic] & [J] the next day, [Victims 1 and 2] barefoot to increase the discomfort & decrease the running away. The task at hand was to weed the cemetary [sic]. Huge sage brush, pokies, thorns, broken glass, garbages over full. We spent a couple hours filling black bags & G Jo's [i.e., Hildebrandt] truck bed…. We went out the next day & again today. 5 hours of weed pulling."

j.      "8:30 AM Ruby takes [Victims 1 and 2 and J] to Chivwitts cemetery. Each child is given a bag to pick up broken glass & weeds."

k.      "[Victim 2] this week perpetually screamed outside. Jodi & I accommodated her & took her to Hell Hole Rd… She was to run on the dirt road. She ran

for a bit & then started manipulating. I told her to run up an incline, on a hill side, touch a tree & return. 100 yds max. She threw herself into a tree…. [Later, Victim 2:]… "Can I have another chance at running the hill?" Yes… "Mother, what would you like me to do?" I instructed her to run to the dead tree & then come back. [Victim 2] replied, "I would rather jump into a cactus." …. This girl would choose to be shot & die than to humble & do what she is told. There is no pain point where she will turn."

  l.  "I whipped [Victim 1] w/ a belt yesterday. [Victim 2] too. She peed all over Jodi's garage floor, screamed at her & lied to her. She is out of control. [Victim 2] seemed to give me her attention after the whipping. She swept the garage w/ some muscle & mopped it."

447. Upon information and belief, Bodtcher was aware of and helped contribute to this forced labor and abuse of Victims 1 and 2.

448. For example, in her journal, Franke indicates Bodtcher came to the Ivins residence during the time of the abuse when Franke writes that "if Pam hadn't volunteered to take [A] to American Fork for her A.C.T. Test, then I would not have been here [to recapture Victim 1 after his first escape attempt]."

449. Similarly, and upon information and belief, Bodtcher previously enforced and encouraged the forced labor of Jessi Hildebrandt when Hildebrandt tortured Jessi, showing she had knowledge of Hildebrandt's tactic of child torture.

450. Additionally, J and A were routinely starved, or witnessed their siblings starved, as a result of their "distortion."

451.     Upon information and belief, Hildebrandt and Franke also violated 18 U.S.C. section 1590 when they harbored or transported the children to thus engage in this forced labor.

452.     Upon information and belief, Hildebrandt and Franke agreed that each would perpetrate such acts of forced labor before doing so.

453.     Upon information and belief, Hildebrandt harbored Victims 1 and 2 in her residence to coerce them into forced labor.

454.     Upon information and belief, Hildebrandt also transported Victim 2 on at least one occasion from Arizona to Hildebrandt's residence in Utah with the purpose of coercing Victim 2 into forced labor.

455.     Upon information and belief, Franke violated 18 section U.S.C.1590 when she transported Victims 1 and 2 from Utah County to Ivins to coerce them to engage in this horrific forced labor.

456.     Upon information and belief, Hildebrandt and Franke agreed that each would perpetrate such acts of forced labor before doing so.

457.     Upon information and belief, Hildebrandt and Franke agreed that each would perpetrate such acts of forced labor in violation of 18 U.S.C. section 1590 before doing so.

iii.     Improper Use of Racketeering Proceeds

458.     Upon information and belief, Hildebrandt and Bodtcher engaged improper transfers of monetary instruments through one or more entities, which likely constituted a pattern of laundering of monetary instruments under 18 U.S.C. section 1956.

459.     Upon information and belief, Hildebrant engaged in interstate travel to attempt to purchase property using racketeering proceeds in violation of 18 U.S.C. section 1952.

460.     Although not predicate acts under Plaintiff's RICO claims pled below, this pattern of behavior which may constitute criminal laundering of monetary instruments and interstate travel to aid in racketeering enterprises demonstrates the relatedness and continuity of the Enterprise.

461.     Upon information and belief, Hildebrandt and Bodtcher transferred Hildebrandt's funds into one or more of Bodtcher's bank accounts.

462.     On January 17, 2024, Utah's Fifth Judicial District Court entered a temporary restraining order to enjoin Hildebrandt from liquidating, concealing, or transferring her personal assets prior to the establishment of criminal restitution for Victims 1 and 2.

463.     In its Order, the Court identified that Bodtcher may be one of the third parties and/or entities through which Hildebrandt is concealing personal property and money.

464.     The Order also identified one or more "ConneXions" entities affiliated with Hildebrandt as one or more of the third parties and/or entities through which Hildebrandt is concealing personal property and money.

465.     Upon information and belief, Hildebrandt received these funds as a result of her racketeering behavior, including without limitation through her pattern of engaging in wire fraud along with members of the Enterprise, including without limitation Franke, Savage, and Bodtcher, as alleged in paragraphs 386 through 426 herein.

466.     Upon information and belief, Hildebrandt and Bodtcher conducted these financial transaction(s) for the purpose of operating the Enterprise's racketeering scheme by allowing Hildebrandt to have sufficient funds after or during her incarceration to continue carrying on the unlawful affairs of the Enterprise.

467.    Upon information and belief, Hildebrant engaged in a pattern of interstate travel to attempt to purchase property using racketeering proceeds, and therefore a pattern of racketeering activity.

468.    As alleged in paragraphs 427 through 433 herein, Hildebrandt engaged in a monetary transaction in property derived from specified unlawful activity; specifically, through her purchase of the Ivins Residence.

469.    Upon information and belief, Hildebrandt, on multiple occasions, traveled from Utah to Arizona and attempted to purchase real property using racketeering proceeds.

470.    Specifically, upon information and belief, Hildebrandt traveled from Utah to Arizona on at least two occasions on or around July 15, 2023, and on or around August 1, 2023.

471.    Upon information and belief, Hildebrandt traveled to Arizona in the search for a new residence in which to (i) torture at least Victims 1 and 2, if not other minor victims, in furtherance of the Enterprise's objective of child abuse and child torture; and/or (ii) create content for the Enterprise's various fraudulent services, including without limitation training videos, classes, and written content, all of which the Enterprise charged members (located across the United States and/or internationally) to purchase.

472.    Upon information and belief, Hildebrandt traveled to Arizona with the intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of unlawful activity, specifically, an attempted monetary transaction in property derived from her racketeering proceeds obtained through wire fraud.

iv.    Relatedness and Continuity

473.    Defendants' racketeering behavior was related. Specifically, all of Defendants' acts of racketeering had the same or similar purpose, results, participants, victims, and methods of commission; are otherwise interrelated by distinguishing characteristics; and are not isolated events.

474.    All of Defendants' acts of racketeering had the purpose and result of furthering the Enterprise, namely, to sell fraudulent services through the Enterprise and to entice individuals to purchase the fraudulent services provided by the Enterprise.

475.    The participants were largely the same, specifically, the named Defendants and other individuals to be named defendants upon discovery of their identities.

476.    The methods of commission were similar, namely using wire fraud to lure individuals to the Enterprise, whereupon Enterprise members induce individuals to join and remain in the Enterprise.

477.    Hildebrandt, Bodtcher, and Franke also engaged in similar RICO predicate acts in the form of forced child labor and child torture for the purpose of keeping minors in the Enterprise.

478.    Defendants' acts of racketeering were not isolated events, but the method by which Hildebrandt, Franke, and Bodtcher ran the ConneXions business.

479.    The duration of Defendants' racketeering activity is continuous and substantial.

480.    Specifically, and upon information and belief, Hildebrandt began ConneXions Classroom LLC in 2007 and has used it as a crucial part of her the Enterprise since its inception.

481.    Hildebrandt and Bodtcher have been engaging their pattern of wire fraud and forced labor for close to two decades in furtherance of the Enterprise.

482.    Franke has been engaging in wire fraud and forced labor and has been a critical leader of the Enterprise since at least 2020.

483.    Savage has been engaging in wire fraud and furthering the Enterprise since 2015 and has been a leader of the Enterprise since at least 2016.

484.    The Enterprise's extensiveness is substantial.

485.    Defendants extended the Enterprise expansively via social media and across different corporations, including ConneXions Classroom, LLC; ConneXions Mental Fitness Trainers, LLC and The ConneXions Foundation.

486.    The ConneXions social media accounts have existed since on or about February 2020.

487.    The Enterprise's social media reach is expansive and includes, without limitation, multiple YouTube channels including the ConneXions YouTube channel and a YouTube channel called "What's Under the Rug" created by Franke and Paige Hanna to further the objectives of the Enterprise; the ConneXions Instagram account; the ConneXions Facebook account; the "Moms of Truth" Instagram account; the Moms of Truth private Facebook group; and Hildebrandt's "Mental Fitness with Jodi" program posted via multiple channels, including without limitation Instagram and the ConneXions website.

488.    The fraudulent scheme of the Enterprise and its services has, as admitted by Defendants, reached at least 23 different countries.

489.    The number of victims of the Enterprise is substantial.

490.    As alleged above in paragraphs 113 through 175 herein, there are hundreds, if not thousands or tens of thousands of victims, several of whom are known, including Plaintiff, EJT, Victims 1 and 2, Jessi Hildebrandt, Spencer Tibbits, Adam Steed, Dave Bateman, Stephanie Jones, Plaintiff's brother, and Plaintiff's brother's current wife.

491.    The instances and types of racketeering committed by Defendants are similarly expansive:

a.    In paragraphs 400 through 412 and 415 herein and in Exhibit 1 hereto, Plaintiff has pleaded with particularity 2,424 collective instances of wire fraud by Defendants and numerous instances of individual wire fraud by each Defendant, all in violation of 18 U.S.C. section 1343.

b.    Upon information and belief, discovery will reveal thousands of instances of federal mail fraud also in violation of 18 U.S.C. section 1343.

c.    As alleged in paragraphs 427 through 433 herein, and upon information and belief, Hildebrandt engaged in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. section 1957.

d.    As alleged in paragraphs 434 through 457 herein, and upon information and belief, Hildebrandt and Franke engaged in forced child labor in violation of 18 U.S.C. sections 1584 and 1589.

e.    As alleged in paragraphs 458 through 466 herein, and upon information and belief, Hildebrandt and Bodtcher facilitated monetary transfers that may implicate 18 U.S.C. section 1956.

f.    As alleged in paragraphs 467 through 472 herein, and upon information and belief, Hildebrandt engaged in interstate travel that may implicate 18 U.S.C. section 1952.

492.    The complexity of the Enterprise's fraudulent scheme is astonishing.

493.    Specifically, and upon information and belief, the Enterprise's fraudulent scheme involved the provision of services across multiple business entities (ConneXions, ConneXions Mental Fitness Trainers, LLC and the ConneXions Foundation).

494.    The Enterprise's entities developed, manufactured, and sold fraudulent books, podcasts, workshops, DVDs, classes, retreats, and panels, among other services and products to entice members and victims to join the Enterprise, spend funds on Enterprise services, recruit others to the Enterprise and falsely add an appearance of legitimacy to the Enterprise.

495.    In furtherance of the Enterprise, Hildebrandt provided counseling services to falsely and fraudulently diagnose victims of the Enterprise with non-existent pathologies and mental health disorders to induce them to purchase unnecessary services and products from ConneXions, which services and products ultimately indoctrinated victims into the Enterprise and promoted the Enterprise's objectives of abuse, including without limitation child abuse and child torture.

496.    So-called Mental Fitness Trainers act to further the objectives of the Enterprise by selling the Enterprise's fraudulent services, indoctrinating members and victims, and promulgating the objectives of the Enterprise, including without limitation the Enterprise's objectives of child abuse and child torture.

497.    The size of the Enterprise is large—multiple Defendants have been identified in this complaint and many other individuals furthered the racket as so-called Mental Fitness Trainers and individual perpetrators, including Savage, Steed's ex-wife, Bateman's ex-wife and Pam Bodtcher.

498.    A main objective of the Enterprise is to perpetuate and implement Hildebrandt's methodology, the primary tactic of which is to inflict "pain" on those in "distortion" to bring them into "Truth" in order to manipulate individuals into joining the Enterprise, retain them as members once indoctrinated, and coerce them into purchasing fraudulent services and/or products from ConneXions for the financial benefit of the Enterprise.

499.    Because Hildebrandt encourages and instructs Enterprise members that they can and should violate the law to bring others out of "distortion," the Enterprise has aided, abetted, and perpetrated numerous criminal acts in addition to the racketeering acts alleged herein, including the following:

a.    Upon information and belief, Hildebrandt and Franke engaged in and were criminally convicted for committing intentional, aggravated child abuse;

b.    Upon information and belief, Hildebrandt and Franke violated 18 U.S.C section 1959 by "commit[ing] assault resulting in serious bodily injury upon, or threaten[ing] to commit a crime of violence against any individual" for the purpose of "maintaining or increasing position in an enterprise engaged in racketeering activity." Specifically, and upon information and belief, Franke perpetrated these acts against Victims 1 and 2 in part to achieve and solidify her position as second-in-command of the Enterprise, living with Hildebrandt during this time and thereby cementing her high

status within the Enterprise. Upon information and belief, Hildebrandt and Franke

perpetrated these acts to maintain their position as leaders of the Enterprise by preventing

Victims 1 and 2 from speaking with law enforcement;

       c.     Upon information and belief, Hildebrandt and Franke engaged in criminal

obstruction of justice in the child abuse investigation involving Victim 1 and 2 in

violation of Utah Code section 76-8-306;

       d.     Savage, in furtherance of the Enterprise's objectives, scanned Plaintiff's

computer for pornography without his knowledge, in violation of Utah Code sections 76-

6-703 and 76-5-106.5;

       e.     Upon information and belief, Blanch engaged in and was charged

criminally with domestic battery against Plaintiff's brother, and relatedly, Savage

engaged in criminal conspiracy and aiding and abetting in Blanch's commission of

domestic battery;

       f.     Upon information and belief, Savage criminally stalked Plaintiff's brother

and his romantic partner and subsequently defamed Plaintiff's brother in violation of

Utah Code section 76-5-106.5; Utah Code section 76-9-404 (2017) and Utah common

law.

       g.     Upon information and belief, Savage engaged in aggravated child abuse

against EJT in furtherance of the Enterprise's objectives in violation of Utah Code

section 76-5-109.2;

h.      Upon information and belief, Savage engaged in criminal obstruction of justice when she lied to DCFS about EJT's the injuries on multiple occasions, in violation of Utah Code section 76-8-306;

i.      Upon information and belief, Savage threatened EJT not to discuss her injuries in violation of Utah Code section 80-2-609(4);

j.      Savage lied under oath and/or lied to DCFS regarding her abuse of EJT in violation of Utah Code section 76-8-306;

500.    Given Hildebrandt and Franke's incarceration along with the deactivation of the ConneXions Classroom website, the ability of Defendants to obtain fraudulent gain at this time has diminished. However, there is still the significant ongoing threat of future harm by Hildebrandt and the Enterprise.

501.    At her sentencing hearing, Hildebrandt claimed that she "sincerely love[s] these children", indicating that she still believes that the torture she inflicted upon Victims 1 and 2 was perpetrated of love and that she does not show remorse for her criminal behavior.

502.    Prosecutors stated that Hildebrandt feels no remorse.

503.    Upon information and belief, in jailhouse phone calls, Hildebrandt made statements such as, "I don't know why I'm here."; "I shouldn't be here. I haven't done anything wrong. I can't believe what I'm being accused of. I just can't believe it. I just can't believe it."; "I'm like, well what's a better example than to go to prison unjustly, like and then go teach the gospel?"; "We didn't do that, those pictures we did not do. [Victim 1] did that to himself, yes. Did we put that on him, and he then rubbed around and cut himself? Yes. But we didn't do

that."; "So now, it's abusive to make a kid sleep on the floor. That's abusive. . . . It's ridiculous. It's ridiculous. You can't even raise your kids anymore."

504.    Upon information and belief, Hildebrandt all but promises to continue the Enterprise and her racketeering behavior upon release, stating: "And I don't know if I'm going to be some kind of example but when I get out of here, I have a story to tell and I'm gonna try to do everything I can to protect the children because that's what's happening, kids are being horribly abused."

505.    The threat of further harm is evident from the fact that Hildebrandt has continued her racketeering behavior, even after legal proceedings exposing her sadistic and criminal behavior.

506.    Specifically, and upon information and belief, after Jessi reported Hildebrandt to the police, Hildebrandt engaged in professional and ethical violations related to Steed.

507.    Additionally, and upon information and belief, after being disciplined by DOPL for her professional and ethical violations related to Steed, Hildebrandt violated Bateman's confidentiality rights.

508.    Upon information and belief, after being sued by Bateman, Hildebrandt tortured Victims 1 and 2.

509.    Hildebrandt's lack of remorse, promise to "tell her story," continued representations that any prosecution against her is unjust, and her previous refusal to discontinue her criminal behavior after legal proceedings demonstrate she presents a substantial risk of continuing the Enterprise and her racketeering behavior upon release from prison.

510.    Upon information and belief, the lack of a therapy license will not prevent Hildebrandt from engaging in future criminal conduct.

511.    In providing services through the Enterprise, Hildebrandt claimed she was not using her therapy license, but rather providing "life coaching." The Individual Training Form, which Hildebrandt required patients and clients to sign before receiving services from Hildebrandt and the Enterprise, states, "This is NOT psychotherapy. This is not therapy and no therapist patient relationship is created."

512.    This disclosure contradicts Hildebrandt's regular advertising of her therapy degree through ConneXions' websites.

513.    Hildebrandt used this "life coach" loophole to avoid the ethical and privacy responsibilities applicable to therapists.

514.    Upon information and belief, she will similarly do so upon release from prison.

515.    Franke is also likely to continue in her racketeering behavior upon release.

516.    Franke used her sentencing hearing to shield Bodtcher and Bodtcher's husband from responsibility for their criminal involvement in the Enterprise, stating "My dear friends, Pam and Roy, I'm so sorry for letting you down. Because of your association with me, your innocence was called into question."

517.    Additionally, all the Enterprise's social media pages are currently active, with the exception of the ConneXions YouTube page.

518.    Furthermore, key members of the Enterprise have not faced criminal liability or prosecution for their racketeering behavior and as such, will continue engaging in criminal acts in furtherance of the Enterprise.

519. Similarly, Savage (and other similarly situated individuals who likewise further the objectives of the Enterprise against its victims) will continue their racketeering behavior in the future.

520. Even after Hildebrandt's and Franke's convictions, Savage refuses to denounce Hildebrandt or the Enterprise, demonstrating that Savage will continue her allegiance to Hildebrandt and membership in the Enterprise.

M.    *Additional Facts Showing Franke's Involvement in the Enterprise*

521. Upon information and belief, Franke is and has been central to the Enterprise.

522. Upon information and belief, the ConneXions Classroom website was active until February 20, 2024 (the day of Franke's and Hildebrandt's sentencing).

523. When the site was active, Hildebrandt was listed as ConneXions Classroom's founder.

524. At that time, the ConneXions Classroom website listed only two other individuals as leading ConneXions: Franke and Bodtcher.

525. The website described Franke as "a certified mental fitness trainer with ConneXions. She is a wife and a mother to 6 wonderful children. She provides content on ConneXions' social media platforms and podcasts that focus on empowering parents and children to live in Truth."

526. Prior to her involvement and leadership in the Enterprise, Franke was a successful YouTuber.

527. Franke and her now-estranged husband, Kevin, ran a family vlog channel that at its peak had over two million subscribers on YouTube.

528.    In 2023, Franke deleted the channel after posting videos depicting her abusing her children on the channel.

529.    Upon information and belief, Franke became involved with the Enterprise in or around late 2018 or early 2019.

530.    At around late 2018 or early 2019, Franke and Hildebrandt entered into an agreement whereby Franke would engage in the racketeering activities identified in paragraphs 386 through 457 herein.

531.    Franke's agreement to engage in the racketeering activities identified in paragraphs 386 through 457 herein is demonstrated by her engagement in those acts and the steps identified herein whereupon Franke took steps to obtain a leadership position within the Enterprise.

532.    Specifically, and upon information and belief, Hildebrandt, seeing Franke's audience on YouTube, attempted to exploit Franke's fame to exponentially expand the Enterprise and thus the Enterprise's fraudulent gain through the advertisement of ConneXions' fraudulent services.

533.    For example, Franke converted her previous Instagram account associated with her successful YouTube channel, 8 Passengers, into the "Moms of Truth" Instagram account and began solely posting material related to the Enterprise.

534.    Upon information and belief, soon after joining the Enterprise, Franke became Hildebrandt's second-in-command.

535.    As identified on the ConneXions' Classroom Business Team page, Franke oversaw and directed ConneXions Classroom's social media presence, the primary way in which

the Enterprise and Defendants furthered their fraudulent scheme, demonstrating that she had full knowledge of the purpose and objectives of the Enterprise.

536.    Franke and Hildebrandt were the primary individuals to appear on the ConneXions YouTube page and videos, which furthered the Enterprise's fraudulent scheme, advertised Hildebrandt's claims, and used interstate wires to lure additional victims of the Enterprise through ConneXions, also demonstrating that she had full knowledge of the purpose and objectives of the Enterprise.

537.    Upon information and belief, Franke intended to and did in fact exert control over the Enterprise by acting as Hildebrandt's second-in-command; coordinating, directing, orchestrating, and executing numerous acts of wire fraud and forced labor on behalf of the Enterprise and in furtherance of its objectives; and by directing the affairs of the Enterprise through the ConneXions business for the financial benefit of the Enterprise.

538.    Shortly after Franke and Hildebrandt's arrests for aggravated child abuse, YouTube terminated the ConneXions page for violating YouTube's creator responsibility guidelines.

539.    Franke and Hildebrandt are the primary individuals who appear on the ConneXions Coaching Instagram page, which similarly furthered the Enterprise's fraudulent scheme via interstate wires through ConneXions. The page remains active.

540.    Upon information and belief, Franke and Hildebrandt run the "Moms of Truth" Instagram page, another key method through which they further the Enterprise's fraudulent scheme by luring additional victims to the Enterprise. This page also remains active.

541.    Upon information and belief, Franke and Hildebrandt run the "Moms of Truth" private Facebook group, yet another principal way through which they further the Enterprise's fraudulent scheme by luring additional victims to the Enterprise.

542.    This group has a particularly large reach, with approximately 12,800 members as of January 17, 2025.

543.    Hildebrandt, Franke, and the ConneXions Facebook account are the administrators of this group. This page also remains active.

544.    Franke and Hildebrandt run and host the ConneXions podcast.

545.    Each episode of the ConneXions podcast featured either Hildebrandt or Franke speaking alone, another means by which they further the Enterprise's fraudulent scheme by luring additional victims to the Enterprise.

546.    Upon information and belief, Franke started hosting the ConneXions podcast on or about November 25, 2022.

547.    Upon information and belief, Franke and Hildebrandt typically alternated hosting podcast episodes.

548.    Upon information and belief, Franke hosted the ConneXions podcast sixty-one times.

549.    Upon information and belief, Franke and Hildebrandt posted the podcasts on at least four websites: the ConneXions website (https://www.connexionsclassroom.com/podcasts), Spotify (https://open.spotify.com/show/4wQNNVvDUehZDByrxUkRmf), Apple Podcasts (https://podcasts.apple.com/us/podcast/connexions/id1372508129) and a site called Acast (https://shows.acast.com/connexions-classroom).

550. Upon information and belief, ConneXions also has many other social media accounts, including Facebook (https://www.facebook.com/connexionscoaching/); Pinterest (https://www.pinterest.com/connexionscoaching/); and LinkedIn (https://www.linkedin.com/company/connexionscoaching/), all of which remain active.

551. Per the ConneXions Business Team page, Franke leads and directs these pages.

552. Franke was also central in furthering the Hildebrandt Enterprise by speaking on various Enterprise Zoom panels and the Enterprise's men's, women's, and couples' retreats.

553. Franke appeared on Enterprise Zoom panels at least 15 times.

554. She also delivered addresses at Enterprise conferences on at least the following dates: August 28 and 29, 2020; January 15 and 16, 2021; and September 24 and 25, 2021.

555. Upon information and belief, she delivered addresses at every ConneXions conference held after August 2020.

N.      *Bodtcher's Involvement in the Enterprise*

556. Bodtcher has attempted to conceal her involvement in the Enterprise, but she is in fact integral to it.

557. Since Hildebrandt's and Franke's arrests, guilty pleas and sentencing, Bodtcher's central role in the Enterprise has come to light.

558. In addition to the facts set forth above in paragraphs 412 through 414, 447 through 449, and 458 through 466 herein, Bodtcher has been involved in the Enterprise in the following ways:

559.    Until the ConneXions website was deactivated, Bodtcher was identified as the president of ConneXions Foundation on the ConneXions' Business Team page and has been identified as such since at least August 2020, one of the earliest iterations of the page.

560.    Upon information and belief, Jessi Hildebrandt told the media that Bodtcher was deeply involved with Hildebrandt's behavior, including that: "she was one of the people that was constantly surveilling, the surveillance of reporting back to Jodi"; that Bodtcher was "always at [Hildebrandt's] house"; and that Bodtcher "was Jodi's best friend."

561.    Bodtcher's close relationship with Franke within the Enterprise is demonstrated by Bodtcher visiting the Ivins Residence during the time that Franke and Hildebrandt were actively torturing Victims 1 and 2 on the premises.

562.    Additionally, Bodtcher picked up J and A when Franke and Hildebrandt were arrested for abusing Victims 1 and 2.

563.    Bodtcher later told police that she "received a call from Ruby Franke who told her that she had a family emergency and asked if Bodtcher could pick up [the kids]."

564.    Bodtcher's involvement in and support of the torture of Victims 1 and 2 is further seen when officers executed a warrant to detain Bodtcher to locate and rescue J and A.

565.    Upon information and belief, when law enforcement came to Bodtcher's residence and inquired about J and A, Bodtcher's husband did not want to allow law enforcement to see the children, and instead wanted to have J and/or A tell officers from behind a door that they were okay, indicating Bodtcher and her husband did not want law enforcement to observe the children while Bodtcher and her husband were forcing them to work at Bodtcher's residence.

566.    The media reported that Kevin Franke's attorney stated that Bodtcher frequently attended ConneXions trips with Hildebrandt and Franke.

567.    As explained above, Bodtcher also actively furthered the Enterprise by teaching ConneXions classes via interstate wires and at ConneXions conferences and by laundering money for Hildebrandt and the Enterprise through The ConneXions Foundation and Bodtcher's personal accounts.

S.     *Plaintiff's Damages*

568.    Plaintiff has incurred damage to his business or property, and specifically, his business relationships, economic prospects, and personal property as a direct result of Defendants' racketeering activities.

569.    After graduating college in 2016, Plaintiff was scheduled to begin his first full-time employment position on September 26, 2016.

570.    Plaintiff was scheduled to begin work the week after Savage denied Plaintiff access to EJT in a direct implementation of Hildebrandt's methodology, and, upon information and belief, at Hildebrandt's instruction.

571.    To protect his relationship with and regain access to EJT, Plaintiff was forced to travel from Utah to Arizona to receive help from his family to regain access to EJT and was therefore unable to begin this employment on his scheduled start date.

572.    On Sunday, September 25, 2016, Plaintiff emailed his new employer informing them that he would be unable to start work as planned the next day due to Savage's unlawful actions.

573.    Plaintiff's employment allowed him to begin work and the training program for the very next group of employees beginning his same position on or about January 9, 2017. As a result, with an annual salary of $40,000 at the time, Plaintiff lost 3 months of employment earnings (a total of $10,000).

574.    The Enterprise is directly responsible for causing the divorce between Plaintiff and Savage and thus is directly responsible for the subsequent custody proceedings.

575.    The Enterprise is directly responsible for Plaintiff's custody proceedings because Savage implemented the Enterprise's tactics and Hildebrandt's methodology to unlawfully restrict Plaintiff's access to EJT, which directly necessitated his filing for divorce.

576.    The Enterprise is directly responsible for the delay in Plaintiff's domestic proceedings because Savage implemented the Enterprise's tactics and Hildebrandt's methodology to unlawfully restrict Plaintiff's access to EJT and implement delay tactics to effectuate familial separation.

577.    As a direct result of Savage's implementation of the Enterprise's tactics and Hildebrandt's methodology to force a delay in Plaintiff and Savage's domestic proceedings, Plaintiff lost his job in 2020, while the domestic trial was taking place.

578.    As a result of Plaintiff's employment termination, Plaintiff incurred damage to his business in the form of lost earning potential because he was forced to take a job that paid Plaintiff less than half of what he had been previously earning.

579.    Plaintiff's earning potential did not recover until 2023, resulting in $90,000 of lost wages between 2020 and 2023.

580.    Plaintiff has been forced to spend hundreds of thousands of dollars in legal fees to protect himself, his reputation, and his relationship to EJT. Since 2022 alone, Plaintiff has incurred at least $105,000 in domestic attorney's fees.

581.    Plaintiff also incurred damage to his property when he was married to Savage.

582.    When Savage began associating with the Enterprise, Plaintiff and Savage were financially reliant solely on Plaintiff's income.

583.    As detailed in paragraph 203 herein, Savage spent approximately $5,000 of Plaintiff's income on services through ConneXions, which directly benefitted the Enterprise, while the parties were married.

584.    Plaintiff repeatedly objected to Savage's contribution of funds to the Enterprise through ConneXions.

585.    As detailed in paragraphs 277 through 322 herein, Savage committed aggravated child abuse numerous times against EJT, as a direct result Savage's implementation of Hildebrandt's methodology of physical abuse and torture of children to bring them into Hildebrandt's "Truth."

586.    Plaintiff incurred damage to his property as a direct result of the Enterprise's implementation of its fraudulent scheme and Hildebrandt's methodology through the payment for emergency medical services to treat physical injuries caused by Savage's implementation of the Hildebrandt methodology of abuse against EJT.

587.    Plaintiff has incurred approximately $2,000 in medical costs for treatment of the injuries EJT sustained as a direct result of Savage's abuse of EJT and implementation of the Hildebrandt methodology.

588.    Plaintiff also incurred monetary damages in the form of lost wages resultant from attending his custody trial.

589.    As explained herein, the Enterprise is directly responsible for Plaintiff's domestic proceedings and the associated costs.

590.    Plaintiff and Savage's domestic trial was 10 days.

591.    At the time, Plaintiff was earning $94,283 per year.

592.    Accordingly, Plaintiff suffered approximately $3,770 in lost wages during the custody trial.

593.    As a direct result of Defendants' criminal racketeering activity, Plaintiff has incurred and currently incurs damage to his business and property through his lost earning potential.

594.    Plaintiff has suffered and currently suffers in his earning potential as a direct result of Defendants' racketeering activity.

595.    At or around the time Savage began her involvement with the Enterprise, Plaintiff had been accepted to multiple prestigious law schools, including the University of Chicago, the University of Michigan and the University of Virginia.

596.    To date, Plaintiff has been unable to attend law school as a direct result of the time and money he has been forced to spend both defending himself in domestic proceedings and protecting his daughter from Savage's implementation of Hildebrandt's methodology and furtherance of the Enterprise.

597.    Accounting for the wages Plaintiff already has earned, the time it would have taken Plaintiff to complete law school, and assuming the median wage of University of Chicago

Law School graduates, Plaintiff has suffered at least $1,066,856 in lost earning potential as a result of the unlawful acts and fraudulent scheme of the Enterprise.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violations of RICO, 18 U.S.C. § 1962(c))
### (All Defendants)

598.    Plaintiff incorporates by reference and realleges paragraphs 27 through 597 as if fully set forth herein.

599.    Plaintiff is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

600.    Each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

601.    At all relevant times, the Enterprise constitutes an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

602.    At all relevant rimes, the Enterprise has been engaged in, and its activities affect, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

603.    At all relevant times, each Defendant conducted the affairs of the Enterprise through a pattern of racketeering activity.

604.    Each Defendant's pattern of racketeering behavior includes violations of 18 U.S.C. section 1343, wire fraud, because, as set forth in paragraphs 386 through 426 herein, each Defendant, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of interstate wire any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

605. Each Defendant has engaged in hundreds of acts of wire fraud.

606. Specifically, Hildebrandt has engaged in at least 785 acts of wire fraud.

607. Specifically, Franke has engaged in at least 298 acts of wire fraud.

608. Specifically, Savage has engaged in at least 334 acts of wire fraud.

609. Specifically, ConneXions has engaged in at least 1,009 acts of wire fraud.

610. Hildebrandt's pattern of racketeering activity includes violations of 18 U.S.C. section 1957, engaging in monetary transactions in property derived from specified unlawful activity, because she knowingly engaged and attempted to engage in monetary transactions in a value greater than $10,000 and which affect interstate commerce with money derived from her racketeering activity.

611. As set forth in paragraphs 473 through 520 herein, Defendants' pattern of racketeering activity is related and continuous.

612. As set forth in paragraphs 479 through 483 herein, Defendants' pattern of racketeering activity has been occurring for close to two decades and there is continued threat of racketeering activity.

613. As set forth in paragraphs 568 through 597 herein, Defendants' pattern of racketeering activity has proximately caused Plaintiff substantial injury to his business and property.

614. Pursuant to 18 U.S.C. section 1964(c), Plaintiff is entitled to recover treble damages plus costs and attorney's fees from Defendants.

## SECOND CLAIM FOR RELIEF
### (Conspiracy to Violate 18 U.S.C. § 1962(c) — Violation of 18 U.S.C. § 1962(d))
### (Defendants Hildebrandt, Franke, and Savage)

615.    Plaintiff incorporates by reference and realleges paragraphs 27 through 597 as if fully set forth herein.

616.    As set forth in paragraphs 373, 378, and 530 through 536 herein, Hildebrandt, Franke, and Savage have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. section 1962(c) in violation of 18 U.S.C. section 1962(d).

617.    As set forth in paragraphs 373, 378, and 530 through 536 herein, Hildebrandt, Franke, and Savage entered a conspiracy or agreement between two or more persons to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity.

618.    As set forth in paragraphs 373, 378, and 530 through 537 herein, Hildebrandt, Franke, and Savage deliberately joined and became a member of the conspiracy or agreement with knowledge of its purpose.

619.    As set forth in paragraphs 196, 407, 411, 452, and 537 herein, Hildebrant, Franke, and Savage agreed that someone, not necessarily a defendant, would commit at least two racketeering acts.

620.    As set forth in paragraphs 568 through 597 herein, Hildebrandt, Franke, and Savage's conspiracy to violate 18 U.S.C. section 1962(c) has proximately caused Plaintiff injury to his business and property.

621.    Pursuant to 18 U.S.C. section 1964(c), Plaintiff is entitled to treble damages plus costs and attorney's fees from Hildebrandt, Franke, and Savage.

### THIRD CLAIM FOR RELIEF
**(Violations of RICO, 18 U.S.C. § 1962(b))**
**(Defendants Hildebrandt and Franke)**

622.    Plaintiff incorporates by reference and realleges paragraphs 27 through 597 as if fully set forth herein.

623.    At all relevant times, both Hildebrandt and Franke each acquired or maintained an interest in or control of the Enterprise (which, as set forth in paragraphs 75 through 77 herein, is engaged in interstate commerce) through a pattern of racketeering activity.

624.    Through their racketeering activity, Hildebrandt and Franke obtained ownership of the Enterprise and an ability to control it.

625.    Hildebrandt's and Franke's pattern of racketeering activity and allegations regarding the Enterprise are described in paragraphs 599 through 614 herein.

626.    As set forth in paragraphs 568 through 597 herein, Hildebrandt's and Franke's pattern of racketeering activity has proximately caused Plaintiff substantial injury to his business and property.

627.    Pursuant to 18 U.S.C. section 1964(c), Plaintiff is entitled to recover treble damages plus costs and attorney's fees from Defendants.

### FOURTH CLAIM FOR RELIEF
**(Conspiracy to Violate 18 U.S.C. § 1962(b) — Violation of 18 U.S.C. § 1962(d))**
**(Defendants Hildebrandt and Franke)**

628.    Plaintiff incorporates by reference and realleges paragraphs 27 through 597 as if fully set forth herein.

106

629.     Hildebrandt and Franke have each unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. section 1962(b) in violation of 18 U.S.C. section 1962(d).

630.     As set forth in paragraphs 373, 381, and 530 through 536 herein, Hildebrandt and Franke entered a conspiracy or agreement between two or more persons to acquire or maintain an interest in or control of an enterprise that affected interstate commerce through a pattern of racketeering activity.

631.     As set forth in paragraphs 373, 381, and 530 through 537 herein, Hildebrandt and Franke deliberately joined and became members of the conspiracy or agreement with knowledge of its purpose.

632.     As set forth in paragraphs 407, 452, and 537 herein, Hildebrandt and Franke agreed that someone, not necessarily a defendant, would commit at least two racketeering acts.

633.     As set forth in paragraphs 568 through 597 herein, Hildebrandt and Franke's conspiracy to violate 18 U.S.C. § 1962(b) has proximately caused Plaintiff injury to his business and property.

634.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages plus costs and attorney's fees from Hildebrandt and Franke.

**FIFTH CLAIM FOR RELIEF**
**(Fraudulent Nondisclosure/ Fraudulent Concealment—Utah Common Law)**
**(Defendants Hildebrandt, Savage, and ConneXions Classroom LLC)**

635.    Plaintiff incorporates by reference and realleges paragraphs 27 through 597 as if fully set forth herein.

636.    As set forth in paragraphs 207 through 217, and 398 herein, Hildebrandt, Savage, and ConneXions each intentionally failed to disclose information and (1) each defendant had a legal duty to communicate the information; (2) each defendant knew of the information she/it failed to disclose; and (3) the nondisclosure was material.

637.    Such failure to disclose constitutes fraudulent nondisclosure and/or fraudulent concealment.

638.    As a direct and proximate consequence of Hildebrandt, Savage, and ConneXions' behavior, Plaintiff suffered monetary damages.

639.    Each of these Defendants' conduct as alleged above constitutes willful, malicious, and intentionally fraudulent conduct. Accordingly, Plaintiff is entitled to an award of punitive damages.

**SIXTH CLAIM FOR RELIEF**
**(Negligent Nondisclosure—Utah Common Law)**
**(Defendants Hildebrandt, Savage and ConneXions Classroom LLC)**

640.    Plaintiff incorporates by reference and realleges paragraphs 27 through 597 as if fully set forth herein.

641.    As set forth in paragraphs 207 through 217, and 398 herein, Defendants Hildebrandt, Savage, and ConneXions each negligently failed to disclose material information known to them when each had a legal duty to communicate the information.

642.    Such failure to disclose constitutes negligent nondisclosure.

643.    As a direct and proximate consequence of Hildebrandt, Savage, and ConneXions' behavior, Plaintiff suffered monetary damages.

644.    This behavior constitutes demonstrates a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiff and EJT. Accordingly, Plaintiff is entitled to an award of punitive damages.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**(Exemplary Punitive Damages)**
**(Against All Defendants)**

645.    Plaintiff incorporates by reference and realleges paragraphs 27 through 597 as if fully set forth herein.

646.    As set forth in paragraphs 216, 217, 232, 276, 324, 372 herein, Hildebrandt, Savage's, and ConneXions' actions alleged above were malicious, willful and wanton, and were made with the specific intent to harm Plaintiff.

647.    Moreover, Defendants' actions violated 18 U.S.C. section 1962(b–d) as alleged in first through fourth claims above.

648.    Moreover, the Hildebrandt, Savage, and ConneXions' actions constitute fraudulent nondisclosure and/or fraudulent concealment as alleged in the fifth claim for relief.

649.    Moreover, Hildebrandt, Savage, and ConneXions' actions constitute negligent nondisclosure as alleged in the sixth claim for relief.

650.    Plaintiff seeks an award of exemplary punitive damages in an amount not less than $5,000,000.

## EIGHTH CLAIM FOR RELIEF
### (Injunctive Relief)

651.    Plaintiff incorporates by reference and realleges paragraphs 27 through 597 as if fully set forth herein.

652.    18 U.S.C. section1964(a) permits injunctions to prevent and restrain violations of 18 U.S.C. section 1962.

653.    Plaintiff requests the following injunctive relief: an order that all assets, capital, tangible property, and documentation in the possession, custody, or control of Defendants shall be frozen pending further order of this court, and that Defendants are hereby enjoined from transferring, selling, or in any way disposing of any and all assets, capital, tangible property, and documentation in their possession, custody, or control pending further order of this court, so that all of Defendants' affairs, assets, capital, tangible property, and documentation will remain in their present state as of the date this Order is entered, to prevent Defendants from avoiding judgment post-trial.

## JURY DEMAND

654.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable that are raised herein or which hereinafter may be raised in this action.

## PRAYER FOR RELIEF

On the First through Fourth Claims for Relief:

1.    For general damages according to proof at trial in an amount no less than $2,250,000 for each claim, trebled according to statute, (18 U.S.C.§1962(c));

2.    For prejudgment interest according to statute; and

110

3.      For Plaintiff's reasonable attorney's fees and costs according to statute (18 U.S.C. § 1962(c)).

On the Fifth through Seventh Claims for Relief:

4.      General damages according to proof at trial; and

5.      Punitive damages in an amount to be proven at trial.

On the Eighth Claim for Relief:

6.      An order that all assets, capital, tangible property, and documentation in the possession, custody, or control of Defendants shall be frozen pending further order of this court, and that Defendants are hereby enjoined from transferring, selling, or in any way disposing of any and all assets, capital, tangible property, and documentation in their possession, custody, or control pending further order of this court, so that all of Defendants' affairs, assets, capital, tangible property, and documentation will remain in their present state as of the date this Order is entered, to prevent Defendants from avoiding judgment post-trial.

On All Claims for Relief:

7.      For general damages according to proof at trial; and

8.      For the preliminary injunctive relief described above

9.      For such other legal and equitable relief as the Court may appropriate.

DATED this 22nd day of January 2025.

PARR BROWN GEE & LOVELESS

*/s/ Jonathan O. Hafen*
Jonathan O. Hafen
Victoria R. Luman
Daniel J. Nelson

ZIMMERMAN BOOHER

*/s/ LaShel Shaw*
LaShel Shaw
Caroline A. Olsen

*Attorneys for Plaintiff*