RICHARD A. VAN WAGONER (9128)
R. SCOTT YOUNG (10695)
MELINDA K. BOWEN (13150)
**SPENCER FANE LLP**
10 Exchange Place, 11th Floor, Salt Lake City, Utah 84111, (801) 521-9000
*Attorneys for Defendant Michal Washburn*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH – CENTRAL DIVISION

| | |
|---|---|
| MICHAEL ROBERT TILLEMAN,<br><br>        Plaintiff,<br><br>vs.<br><br>JODI HILDEBRANDT, RUBY FRANKE,<br>CONNEXIONS CLASSROOM, LLC,<br>MICHAL WASHBURN, and DOES I-X,<br><br>        Defendants. | **DEFENDANT MICHAL WASHBURN'S<br>MOTION TO DISMISS**<br><br>Civil No: 2:25CV49<br><br>Judge Howard C. Nielsen, Jr.<br><br>**(ORAL ARGUMENT REQUESTED)** |

## <u>RELIEF REQUESTED AND GROUNDS</u>

Defendant Michal Washburn[1] moves to dismiss her ex-husband Plaintiff Michael Robert Tilleman's claims against her.

Mr. Tilleman has filed a vexatious and frivolous RICO lawsuit against his ex-wife, Ms. Washburn, in order to harass and harm her. He continues to push the same allegations that the Utah district court and Utah Court of Appeals found baseless and vexatious in the divorce case, namely that Ms. Washburn abused their minor daughter and that their divorce was caused by her counseling sessions with Co-Defendant Jodi Hildebrandt. This legal harassment appears to be a

---

[1] In his Complaint, Plaintiff Michael Tilleman refers to Ms. Washburn as "Savage," which is her maiden name. Ms. Washburn, however, uses her legal married name in this Motion.

family effort, as Mr. Tilleman's father, Karl, sued Ms. Washburn in Arizona in late 2024,[2] and

Karl has entered an appearance as counsel for Mr. Tilleman in this case.  *See* Dkt. #16.

After a 10-day bench trial in the divorce case, the Utah district court ruled:

**Substantial Emotional Abuse of E.T. Through False Allegations:**

38.    The Court is concerned that Father's use of emotional and sometimes indirect physical abuse of E.T. by claiming Respondent has harmed E.T. without sufficient justification.

39.    Immediately after filing for divorce, Father began making and instigating reports to agencies against Mother alleging potential abuse of E.T. including: (a) Multiple reports to the American Fork Police Department, (b) A report to the Lindon Police Department, (c) Multiple reports to the Division of Child and Family Services, and (d) Multiple reports to medical providers including doctors and hospitals.

40.    Father's complaints to and involvement of the agencies were unnecessary and exposed E.T. to unnecessary emotional trauma and invasive physical examination.

41.    No criminal charges were filed against Mother resulting from Father's many involvements of the Police.  No DCFS investigations found Mother's parenting to need correction and no finding of neglect or abuse was substantiated …

\*\*\*\*\*

51.    **Father's reports of abuse were vexatious and were calculated and designed to harm Mother**.

Amended Findings of Fact and Conclusions of Law and Ruling on Costs and Fees, ¶ 10-51, Case

#164402522, 6.10.21, Exh. 1.[3]  (Emphasis added).

Mr. Tilleman appealed, and although he alleges that he "prevailed on appeal, reversing the

---

[2]  On December 10, 2024, Karl Tilleman sued Michal Washburn in Arizona Superior Court, *see Tilleman v. Washburn*, #CV2024-035525, alleging she abused E.T. based on Hildebrandt's teachings, just as his son has alleged here.  *See* Complaint, Exh. 2.  Mr. Tilleman was represented by his son, Daniel Tilleman, who is Plaintiff Michael Tilleman's brother.  *See Id.*  The parties settled the dispute on January 23, 2025, the day after Plaintiff served the present complaint on Michal.  *See* Settlement Agreement, Exh. 3 and Dkt. #12.

[3]  "[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

trial court's custody, attorneys' fees, and child support awards" (Dkt. #1, ¶15), the Utah Court of Appeals expressly affirmed the trial court's factual findings of abuse and vexatious litigation by Mr. Tilleman:

> [T]he court's finding that his "reports of abuse were vexatious and were calculated and designed to harm Mother" is supported by the sheer number of reports Father made that never resulted in criminal charges being filed against Mother or in DCFS taking enforcement action against her.

*Tilleman v. Tilleman*, 2024 UT App 54, ¶¶ 58-59, 549 P.3d 65 (Utah Ct. App. 2024), Exh. 4.

In light of the above, dismissal is warranted for several reasons. First, this Court does not have jurisdiction under the *Younger* abstention doctrine because Mr. Tilleman has raised the same factual allegations in the ongoing divorce proceeding.

Second, to the extent abstention is not required, Mr. Tilleman's factual allegations have already been decided against him in Utah state court and affirmed by the Utah Court of Appeals and, therefore, they are barred by the *Rooker-Feldman* doctrine and/or issue preclusion.

Third, Mr. Tilleman does not have standing. "[A] plaintiff has standing to bring a RICO claim only if he was injured in his business or property by reason of the defendant's violation of § 1962." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003). Mr. Tilleman's alleged injuries – money spent on counseling with Hildebrandt and subsequent divorce proceedings, and physical injuries to their daughter – are not injuries to "business or property;" therefore, he does not have standing.

Fourth, Mr. Tilleman's claims are barred by the four-year statute of limitations because he does not allege any specific actions by Ms. Washburn since 2020, and he filed suit in 2025.

Fifth, Mr. Tilleman has failed to state a claim for any cause of action against Ms. Washburn.

For these reasons, and others set forth below, the Court should dismiss the claims against Ms. Washburn.

## STATEMENT OF FACTS

**The Divorce Proceedings**

1.    Michael Tilleman and Michal Washburn were married on August 10, 2013.  "The parties' only child, E.T., was born in October 2014.  The parties separated on May 18, 2016 when E.T. was 19 months old.  Father filed for divorce on October 6, 2016."  Complaint, ¶¶ 1-4.

2.    On March 13, 2018, the Utah district court entered a stipulated bifurcated decree ending the marriage and resolving all financial disputes.  *See* Order, Exh. 5.

3.    "Toward the end of 2020, the court held a ten-day bench trial, after which it entered thirty-three pages of findings of fact and conclusions of law."  *Tilleman v. Tilleman*, 2024 UT App 54, ¶ 13, 549 P.3d 65, Exh. 4.

4.    During the trial, Mr. Tilleman testified about the very allegations that are the foundation of his current RICO complaint:

| RICO Allegations (Complaint, Dkt. #1) | Divorce Trial Testimony & Declaration of Mr. Tilleman |
|---|---|
| 198. During the time Hildebrandt was "treating" Savage, in or around July 2016 Plaintiff told Savage that the most important thing to him was to live their religion together.<br><br>199.  Savage immediately responded, "The most important thing to me is to be married to someone who lives Jodi's [Hildebrandt's] principles." | Q: Did the respondent ever tell you that she was willing to spend all of your marital funds on therapists?<br>A: She did.<br>Q: What – did the respondent ever give you any precondition related to reconciling regarding Jodi Hildebrandt's principles?<br>A: Yes.<br>Q: And do you recall what she told you?<br>A: Yeah.  She said the most important thing to her was to be married to someone who lived those principles. Transcript, p. 3626, Exh. 6. |
| 197. Savage's conspiracy with Hildebrandt to manufacture marital problems is demonstrated | "Since our separation the Respondent has repeatedly tried cutting off my relationship |

| | |
|---|---|
| by Savage's sworn testimony that the "most abusive thing" Plaintiff ever did to her was extend a family vacation in Canada by one week in July 2016 because he was too ill to travel (suffering from a respiratory infection)." | with my family.  I had a pre-arranged vacation planned to Canada with my family after my separation which I went on, she informed me upon my return that my going to Canada with my family was the "worst abuse I had ever engaged in." Declaration of Michael Tilleman, ¶ 19, Exh. 7. |
| 243.   On or around September 5, 2016, Plaintiff's mother invited him to Arizona for her birthday and Labor Day.<br><br>244.   Utilizing a tactic of the Hildebrandt methodology, Savage told Plaintiff that seeing his mother "would be abusive" and that he could see EJT if he did not see his mother.<br><br>245. Plaintiff decided to stay in Utah to see EJT, and Savage told Plaintiff that she was proud that Plaintiff did not see his family.<br><br>246. Ultimately, Savage did not allow Plaintiff to see EJT and ignores his communications and requests to see his daughter. | 20.   Over the Labor Day holiday weekend I was invited to go to Arizona with my family to be with my mother for her birthday, the Respondent stated that if I went that she would consider that to be abusive.   I made the decision to stay in Utah in order to spend time with my daughter; the Respondent commended me and said that she was "proud of me for not going to see my family."  Then after I had changed my plans to stay in Utah to spend time with my daughter, the Respondent completely ignored me and did not text me, call me or allow me to spend time with my daughter like previously arranged.    The Respondent continually tries to isolate me and then ignores me and disallows me parent-time. Decl. of Michael Tilleman, ¶20, Exh. 7. |
| 222.   Savage admitted to Plaintiff that Hildebrandt told her that Plaintiff was addicted to pornography, despite Hildebrandt never having met Plaintiff or spoken to him.<br><br>223.   Upon information or belief, Hildebrandt instructed Savage to scan Plaintiff's laptop without his knowledge to find pornography.<br><br>224. Around February 2016, Savage searched Plaintiff's laptop without his knowledge in an effort to interfere and/or interrupt Plaintiff's lawful use of his computer technology, implicating criminal conduct under Utah Code Section 76-6-703.<br><br>***<br><br>228. Even with no evidence Plaintiff had viewed pornography or otherwise had a | "21.    Respondent began seeing various counselors about our relationship and what she perceived as "my behaviors," one of these counselors supposedly convinced her that I had a pornography addiction, which I absolutely do not have and never have had.  Without my knowledge the Respondent took my computer and had it completely scanned by a police scanner, this was done just prior to our separation, the scan revealed nothing, there was absolutely no pornography found as I have not viewed any pornography, despite this Respondent continued to insist that I had a pornography addiction and she demanded that I needed to attend and "pass" a class provided by her counselor or she would divorce me.  She then insisted that if I was not a pornography addict that I had to be some sort of other addict and insisted that I must attend and pass the LDS 12 step addiction course among other |

| | |
|---|---|
| pornography addiction, Savage insisted that Plaintiff pay for and attend Hildebrandt's twelve-step program for addiction through ConneXions, or she would divorce him. Dkt. #1, ¶¶ 222-224, 228. | things." Decl. of Michael Tilleman, ¶ 21, Exh. 7. |
| 240(a). Specifically, Savage made the following demands on Plaintiff, all aimed to either financially benefit the Enterprise or coerce Plaintiff to join the Enterprise: (a) "Attend the ConneXions 101 class to learn principles of Truth in a group setting." Here, Savage attempts to coerce Plaintiff into spending money on the Enterprise's fraudulent services, thereby attempting to financially enrich the Enterprise." | 22. Respondent continued to impose startling and egregious conditions upon me, all while continuing to use our daughter as a pawn by withholding and dictating parent-time. At one point, she gave me a list of demands which she insisted that I comply with or she again threatened me that if I did not do all of them to her satisfaction she would divorce me. The demands included the following: … Attend the ConneXions 101 class to learn principles of truth in a group setting." Decl. of Michael Tilleman, ¶ 22, Exh. 7. |
| 240(b). Specifically, Savage made the following demands on Plaintiff, all aimed to either financially benefit the Enterprise or coerce Plaintiff to join the Enterprise: … (b) "Experience Godly sorrow for every neglecting and abusive behavior. Be able to articulate what godly sorry means and describe what your godly sorry has felt like for every abusive behavior." | 22. Respondent continued to impose startling and egregious conditions upon me, all while continuing to use our daughter as a pawn by withholding and dictating parent-time. At one point, she gave me a list of demands which she insisted that I comply with or she again threatened me that if I did not do all of them to her satisfaction she would divorce me. The demands included the following: … Experience Godly sorrow for every neglecting and abusive behavior. Be able to articulate what godly sorrow means and describe what your godly sorrow has felt like for every abusive behavior. Decl. of Michael Tilleman, ¶ 22, Exh. 7. |
| 248. Specifically, on September 17, 2016, Savage illegally and completely restricted Plaintiff's access to EJT. | 30. On September 17, 2016 I was supposed to have our daughter overnight again, that morning Respondent text me saying she wanted to discuss Emma staying the night with me, I agreed to discuss it when we met to exchange her that day. When we met she said because her and I had gotten into a disagreement when I had her last that she would not allow her stay overnight with me and that I would have to prove to her that Emma would be safe at night. Decl. of Michael Tilleman, ¶ 30, Exh. 7. |

| | |
|---|---|
| 259.    Around this time, Savage had also coerced Plaintiff to meet with a social worker, Ted Gerun, under the threat of divorce. Dkt. #1, ¶ 259. | 39. Respondent then told me that she wanted to hear my side of the story from Mr. Gerun and then she would consider the possibility of allowing me to see my daughter, I told her that I did not have to share anything with her and objected to her withholding a visit with Emma from me as leverage.    Decl. of Michael Tilleman, ¶ 39, Exh. 7. |

5.    Following the trial, the court issued findings which included the following:

10. During the parties' marriage Father was hostile and belittling to Mother, treating her with contempt, swearing at her, calling her names, insulting her intelligence, declaring his superiority, attempting to control her, denying her a right to an opinion, and physically intimidating her by towering over her while yelling, cornering her, and damaging property.  Some examples of this behavior during the marriage include:

a.    Father broke phones by throwing them in anger.

b.    Father accused Mother of sabotaging his sleep and undermining his parenting by allowing E.T. to cry.  He also acted out physically by punching a headboard and knocking large objects off his.  Father's physical aggression caused Mother to sleep on the living room floor with E.T., because Mother was afraid of Father's reactions to E.T. waking and crying in the night.

c.    In 2014 Father smashed his own computer with a hammer, leaving pieces strewn throughout the apartment.

d.    In 2015, shortly after an argument with Mother, Father punched his car windshield, cracking it.  Mother was afraid of Father's physical acting out.

e.    In January 2016, E.T. was crying in the night.  Father again was upset and accused Mother of intentionally keeping E.T. awake to sabotage his sleep.  Father punched the parties' headboard.  Mother asked Father to leave because he became physical in the night.  Father refused to leave.  Because of Father's hostility, Mother took E.T. to her parents' house for the night.

f.    Cassandra Hallock, a neighbor, lived directly above the parties beginning in February 2016.  She heard Father yelling at Mother on multiple occasions.

g.    On April 25, 2016, Cassandra heard Father yelling.  Through an air vent, she heard Father scream at Mother that she was a liar and that she was stupid.  Cassandra ran downstairs and knocked on the door.  Father was clearly annoyed and angered when Cassandra recommended he needed counseling.
*****
15.  Mother has been the primary caregiver of E.T. from the time she was born, both during the marriage and after the separation.
*****
17. Father rarely, if ever, held, fed, changed, or played with E.T. until the parties

separated.

\*\*\*\*\*

19.  Father admitted that he took out his anger at god on Mother and E.T.

\*\*\*\*\*

26. Independently, each parent has shown that they have adequate parenting skills to care for E.T. while she is in their care except for Father's inappropriate interactions with E.T. and Mother during pickup and drop off, and his insistence on addressing speculative and false allegations of abuse at the expense of E.T.'s emotional well-being.

Amended Findings of Fact and Conclusions of Law and Ruling on Costs and Fees, ¶ 10, Exh. 1.

6.      The trial court then devoted an entire section of its findings to Mr. Tilleman's

"Substantial Emotional Abuse" of Ms. Washburn:

**Substantial Emotional Abuse of E.T. Through False Allegations:**

38.      The Court is concerned that Father's use of emotional and sometimes indirect physical abuse of E.T. by claiming Respondent has harmed E.T. without sufficient justification.

39.      Immediately after filing for divorce, Father began making and instigating reports to agencies against Mother alleging potential abuse of E.T. including:

      a.      Multiple reports to the American Fork Police Department.

      b.      A report to the Lindon Police Department.

      c.      Multiple reports to the Division of Child and Family Services.

      d.      Multiple reports to medical providers including doctors and hospitals.

40.      Father's complaints to and involvement of the agencies were unnecessary and exposed E.T. to unnecessary emotional trauma and invasive physical examination.

41.      No criminal charges were filed against Mother resulting from Father's many involvements of the Police.  No DCFS investigations found Mother's parenting to need correction and no finding of neglect or abuse was substantiated.  A brief list of some of these involvements include …

42.      Father's many reports to DCFS did not result in DCFS taking any enforcement action against Mother.  Each report required DCFS to investigate, including repeatedly examining and photographing E.T., and repeatedly inspecting Mother's home and interviewing E.T. and Mother.

43.      Father continued this behavior:

      a.      On September 30, 2017, Father took E.T. to the Lone Peak Police Department and made a report there.  Lone Peak referred him to the American Fork Police Department.

          Father alleged abuse and/or neglect by Mother.

     b.     Both September 2017 reports (one from DCFS and one from Father) were investigated by the American Fork Police.

     c.     On September 30, 2013, the same day of his report which alleged "abuse and/or neglect," Father told an officer that Mother has not been abusive but might be negligent.

     d.     Father's additional accusations of neglect or abuse were not supported.

     44.     Father continued to file many additional unsupported reports to the police, hospitals, doctors and DCFS through February 2020. When the agencies did not confirm his opinion, Father became overly focused, argumentative, and belligerent.

     45.     Unsatisfied that DCFS did not agree with him Father confronted the case workers and their supervisor, presented his claims, and purported evidence. Father was unwilling to accept the many conclusions of DCFS. He argued during his conversation with the supervisor and through follow up texts.

     46.     Father was recalcitrant, focused on his concerns and was not aware of, or did not care about the emotional harm he was causing E.T. through the continuous filing of unsupported claims of abuse.

     47.     On January 10, 2019, DCFS closed the investigation a second time as unsupported for physical abuse. The case worker talked to Father about how constantly reporting every scratch that E.T. gets can create trauma over time. Father became agitated, told the case worker not to psychoanalyze him, and said that he would be reporting this case.

     48.     From January 2019 through February 2020, Father made many additional reports to the American Fork police and medical providers that Mother was abusing E.T.

*****

     51.     **Father's reports of abuse were vexatious and were calculated and designed to harm Mother**.

     52.     Father acknowledged that meritless claims of abuse are a form of abuse.

*****

     54.     In November 2019 Father filed a declaration stating, "I do not believe that there is any history of, or potential for child abuse, spouse abuse, or kidnapping by either party.

*Id.*, ¶¶ 38-54 (emphasis added).

     7.     The court entered a Supplemental Decree of Divorce and Judgment on August 21, 2021. *See* Exh. 8.

8.      Mr. Tilleman appealed the trial court's ruling and on April 11, 2024, the Utah Court of Appeals issued an opinion in which it expressly affirmed the trial court's factual findings of abuse and vexatious litigation by Mr. Tilleman in Paragraphs 41-59 of its opinion, holding:

> With this limited view in mind, <u>we conclude that the court's findings were sufficiently supported by the evidence</u>.  Even in light of all the evidence Father presented at trial supporting the various cuts, bumps, and bruises that prompted him to alert authorities, <u>the court's finding that his "reports of abuse were vexatious and were calculated and designed to harm Mother" is supported by the sheer number of reports Father made that never resulted in criminal charges being filed against Mother or in DCFS taking enforcement action against her</u>.  Several different agencies all investigated Mother and each investigation produced the same result.  Although, as Father points out, they could not conclusively rule out the possibility that Mother abused Child, the many investigations did not produce sufficient evidence of abuse to cause intervention by authorities.  After multiple reports of such injuries to various authorities and medical professionals did not produce the desired intervention, it was not unreasonable for the court to find that Father's primary motivation in continuing to file such reports was his desire to harm Mother.
>
> For these reasons, and given the limited role the courts' findings related to "emotional abuse" served in the legal custody analysis, <u>we do not disturb those findings</u>.

*Tilleman v. Tilleman*, 2024 UT App 54, ¶¶ 58-59 (emphasis added), Exh. 4.

9.      Mr. Tilleman petitioned the Utah Supreme Court to review the Utah Court of Appeals' opinion.  His petition was denied on September 12, 2024.  *See Tilleman v. Tilleman*, 558 P.3d 85 (Utah 2024), Exh. 9.

10.     The divorce case is ongoing.  On February 24, 2025, the Utah district court held a Scheduling Conference, and "schedule[d] oral argument on the matters at issue on remand" for April 22, 2025.  *Tilleman v. Tilleman*, Case #164402522, Docket, p. 64, Exh. 10.  Among other issues, oral argument will address whether to dismiss a petition to modify filed by Mr. Tilleman that again raises allegations of child abuse by Ms. Washburn. *See* Verified Pet. to Amend Divorce Decree at 14-15, Ex. 11.

**Mr. Tilleman's Civil RICO Claims against his ex-wife.**

11.    Despite the Trial Court's extensive factual findings and the Utah Court of Appeals' opinion affirming these findings, Mr. Tilleman filed the present complaint alleging Ms. Washburn "masterfully implemented the Enterprise's dark teachings to physically abuse and endanger the minor child of Savage and Plaintiff and destroy Plaintiff's life … Savage continues to engage in criminal and tortious behavior against her minor daughter and Plaintiff, demonstrating through her words and actions that she willfully does so under the dark delusion, falsehoods, and dangerous and false methodologies promulgated by Hildebrandt."  Complaint, Dkt. #1, ¶¶ 13-14.

## STANDARD

Ms. Washburn moves to dismiss the claims against her under Fed. R. Civ. P. 12(b)(1) based on *Younger* abstention and the *Rooker-Feldman* doctrine.  "Rule 12(b)(1) provides for challenges to the court's subject-matter jurisdiction," and motions under this rule "may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1294-1295 (10th Cir. 2003).  Ms. Washburn also moves to dismiss the claims against her under Rule 12(b)(6) for failure to state a claim. "To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Brown v. City of Tulsa*, 124 F.4th 1251, 1263 (10th Cir. 2025) (citations omitted).

## ARGUMENT

## I.    THIS COURT MUST ABSTAIN UNDER *YOUNGER*.

This Court lacks jurisdiction based on the abstention doctrine announced by the Supreme Court in *Younger v. Harris*, 401 U.S. 37 (1971).  In determining whether abstention applies, the

Court must consider whether:

> (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests which traditionally look to state law for their resolution or implicate separately articulated state policies.

*Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1215 (10th Cir. 2003). "Once these three conditions are met, *Younger* abstention is non-discretionary and, absent extraordinary circumstances, a district court is required to abstain." *Id.; see also D.L. v. Unified School Dist. No. 497*, 392 F.3d 1223, 1228 (10th Cir. 2004) ("*Younger* abstention is jurisdictional."). When the related state court case involves family law issues, federal courts have routinely abstained. *See, e.g., Hunt v. Lamb*, 220 F. App'x 887, 889 (10th Cir. 2007) ("[T]he claims . . . arising from the state divorce and custody proceedings were barred by the Younger abstention doctrine because there are pending matters relating to child custody and support.").

*Younger* abstention applies here. First, there is no dispute that Mr. Tilleman and Ms. Washburn continue to address pending issues in their divorce case. After remand on the limited issue of attorneys' fees, Mr. Tilleman filed a petition to modify the decree, again accusing Ms. Washburn of child abuse. *See* Verified Pet. to Amend Divorce Decree at 14-15, Exh. 11. Mr. Tilleman renewed his allegations based on Ms. Hildebrandt's criminal convictions and Ms. Washburn's previous communications with Ms. Hildebrandt. *See id.* This petition remains pending before the state court. Second, Mr. Tilleman's ongoing pursuit of his claims in the divorce case confirms he has an adequate forum to have the issues decided there. "Finally, the third condition is satisfied because states have an important interest in divorce proceedings since divorce proceedings belong to the laws of the States and not to the laws of the United States." *Klock v.*

*State of Utah*, 2024 WL 3510516, *4 (D. Utah 2024) (unpublished) (internal quotation marks omitted); *see also Thompson v. Romeo*, 728 F. App'x 796, 798 (10th Cir. 2018) (same)..

This court recently applied abstention in a similar case, *Snyder v. Bagley, et. al*, 4:23-CV-007. Like here, the *Snyder* "cases present a continuation of litigation between Snyder and now ex-wife. Snyder brought these proceedings in federal court because he was dissatisfied with the divorce proceedings …" Dkt. #80, Exh. 12. This court found *Younger* abstention applied:

> Snyder's claims all arise from his divorce proceedings, civil proceedings that arise from his divorce, and criminal charges in the state of Utah … [T]he state proceedings involve important state interests related to family and criminal law, and there are no extraordinary circumstances that would allow a federal court to decline to exercise the *Younger* abstention doctrine.

*Id.*, p. 4. Like *Snyder*, Mr. Tilleman's claims are based on his ongoing divorce proceeding, which is being adequately addressed in state court, and no extraordinary circumstances exist. With all three conditions met, *Younger* abstention applies.

## II. MR. TILLEMAN'S CLAIMS ARE ALSO BARRED BY THE *ROOKER-FELDMAN* DOCTRINE.

To the extent the divorce proceedings may be considered complete such that *Younger* would not apply, jurisdiction still fails under the *Rooker-Feldman* doctrine, which "prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced." *Wideman v. Colorado*, 242 F. App'x 611, 613 (10th Cir. 2007) (*quoting Lance v. Dennis*, 546 U.S. 459, 460 (2006)). "It also bars any action in federal court that alleges an injury inextricably intertwined with a state court decision, such that success in the federal court would require overturning the state court decision." *Id.* at 613-14 (internal quotation marks omitted). In the Tenth Circuit, courts apply *Rooker-Feldman* "in a slightly broader fashion" than in other circuits,

applying the doctrine in a way that "mirrors claim and issue preclusion" but that also "applies to temporary and non-final orders." *Id.*

Applying these principles in a similar case, the Tenth Circuit affirmed application of *Rooker-Feldman* where the plaintiff alleged constitutional violations stemming from his divorce and custody case. *See Thompson v. Romeo*, 728 F. App'x 796 (10th Cir. 2018). The court explained that, for the plaintiff to prevail in his federal case, the federal district court "would have to review, and ultimately reject, the state determinations." *Id.* at 799. But any such review "should be pursued through the appellate courts of the involved state," and not in federal court. *See id.*

Likewise, Mr. Tilleman essentially asks this Court to review and disregard determinations already made in state court and affirmed on appeal. Although Mr. Tilleman is currently seeking modification of the divorce court's final decision, *Rooker-Feldman* would still apply even if the decree could be considered "temporary or non-final." *See Merrill Lynch Business Financial Svcs., Inc. v. Nudell*, 363 F.3d 1072, 1075 (10th Cir. 2004). For Mr. Tilleman to prevail on his RICO claims, this Court would have to find that Ms. Washburn abused E.T. as part of a scheme with the codefendants. Such a determination would directly contradict the state court findings (which were affirmed on appeal) that (1) Ms. Washburn did not abuse E.T., and instead (2) Mr. Tilleman abused E.T. and Ms. Washburn. In short, to find for Mr. Tilleman, this Court would effectively function as an appellate court for the state divorce and custody proceedings.

This Court and the Tenth Circuit have frequently applied *Rooker-Feldman* to preclude federal relitigation of divorce and custody proceedings. In *Snyder*, discussed above, this court ruled, "[T]o the extent that any of Snyder's cases are not ongoing, Snyder's claims would be barred by the Rooker-Feldman doctrine." 4:23CV7, Dkt. #80, p. 4, Exh. 12. In *Farris v. Burton*, 686

Fed.Appx. 590 (10th Cir. 2017) (unpublished), the Tenth Circuit affirmed dismissal of plaintiff's § 1983 complaint that her ex-husband "devised a scheme to fraudulently influence the Kansas Court of Appeal" who reviewed her divorce. *Id.* at 591. And in *Tso v. Murray*, 822 Fed. App'x 697 (10th Cir. 2020) and *Tso v. Murray*, 849 Fed. App'x 715 (10th Cir. 2021), the Tenth Circuit affirmed dismissal of civil RICO claims brought by an ex-husband against his ex-wife—exactly like we have here—ruling:

> [W]e conclude that the district court did not err in holding the Rooker-Feldman doctrine precluded those claims. Though he complains of various acts taken by the defendants, whether through a RICO conspiracy or denial of just compensation, the only harms alleged involved deprivations that resulted from the state courts' orders.

*Id.* at 700. Thus, the Tenth Circuit has made it clear—a disgruntled ex-spouse cannot bring a RICO claim in federal court to subvert a state divorce proceeding. In affirming dismissal of a RICO complaint that arose from a divorce, the Third Circuit summarized, "[plaintiff's] complaint is precisely the kind of action that the Rooker-Feldman doctrine is designed to preclude." *Purpura v. Bushkin, Gaimes, Gains, Jonas & Stream*, 317 Fed. App'x 263, 266 (10th Cir. 2009).

### III.    MR. TILLEMAN'S CLAIMS ARE BARRED BY THE TRIAL AND APPEAL RESULTS IN HIS DIVORCE/CUSTODY PROCEEDING.

Even if jurisdiction lies despite *Younger* and *Rooker-Feldman*, Plaintiff's claims should be barred by issue preclusion, which is "governed by the state's preclusion rules." *Cook v. Aagard*, 547 Fed. App'x 857, 859 (10th Cir. 2013) (unpublished). The court in *Cook* explained:

> Under Utah law, issue preclusion "prevents parties or their privies from relitigating facts and issues in the second suit that were fully litigated in the first suit," provided the following four elements are met: (i) the party against whom issue preclusion is asserted must have been a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication must be identical to the one presented in the instant action; (iii) the issue in the first action must have been completely, fully and fairly litigated; and (iv) the first suit must have resulted in a final judgment on the merits.

*Id.* (citations omitted).  Each of these elements is satisfied here.

### A.  Mr. Tilleman was a party in his divorce/custody proceeding.

Both Mr. Tilleman and Ms. Washburn were and are parties to the divorce proceedings and the present case.  The parties are identical.

### B.  The issues were decided after the divorce/custody trial and affirmed on appeal.

The court in *Cook* concluded the second element was met because "[i]n both proceedings, the claims [were] based on the same facts and the same dispositive constitutional issues." *Id.* Similarly, Mr. Tilleman asserted in his custody trial that Ms. Washburn misused marital funds for counseling provided by Jodi Hildebrandt, and that the counseling led to the parties' divorce. Mr. Tilleman also tried repeatedly to prove child abuse by Ms. Washburn. Mr. Tilleman not only failed; the state court concluded his "reports of abuse were vexatious and were calculated and designed to harm" Ms. Washburn.  Despite this finding, Mr. Tilleman reiterates identical allegations here. He even uses the same language he did in the divorce proceedings. *See* Statement of Facts, above. A finding of child abuse and improper involvement with the other defendants will be essential to prevail on the RICO claims in this case. Because the same finding was essential to Mr. Tilleman's claims in the divorce proceeding, the second preclusion element is satisfied.

This is true even if the Court ignores the evidence Mr. Tilleman presented about Ms. Hildebrandt in the divorce case and accepts Mr. Tilleman's argument that he has learned new facts stemming from the criminal convictions of Ms. Hildebrandt and Ms. Franke.  "Utah broadly defines the issue precluded: "[t]he *minimum* reach of issue preclusion beyond precise repetition of the first action is to prevent relitigation by mere introduction of cumulative evidence bearing on a

simple historical fact that has once been decided." *Cook*, 547 Fed. App'x at 859 (quoting *Harline v. Barker*, 912 P.2d 433, 443 (Utah 1996) (emphasis in original)). Here, the Utah district court ruled (and the Utah Court of Appeals affirmed) that Ms. Washburn did not abuse their child, Ms. Hildebrandt did not cause the divorce, and Mr. Tilleman's repeated reports of abuse were abusive, unfounded, and vexatious. The criminal convictions of Ms. Hildebrandt and Ms. Franke do not change these findings. In fact, their criminal convictions preceded the Utah Court of Appeals' opinion by several months. Ms. Hildebrandt was convicted of Aggravated Child Abuse on December 27, 2023 (Case #231501763, Exh. 13), Ms. Franke was convicted of Aggravated Child Abuse on December 18, 2023 (Case #231501764, Exh. 14), and the Utah Court of Appeals issued its opinion four months later, on April 11, 2024. Thus, Mr. Tilleman could have raised these convictions with the Utah Court of Appeals, and the Utah Court of Appeals could have taken judicial notice of the convictions, if they had impacted the factual findings in any way. They did not, because the trial court and Utah Court of Appeals found there was substantial evidence that Mr. Tilleman, not Ms. Washburn, engaged in abuse. These findings cannot be relitigated here.

### C. The issue was completely, fully, and fairly litigated.

The Tenth Circuit has held that under Utah law, "the 'completely, fully, fairly' element is met if the party against whom preclusion is sought had adequate notice and an opportunity to be heard on the issue." *Cook*, 547 Fed. App'x at 860.

There is no doubt that the issues related to divorce, including how funds were spent during the marriage, and alleged abuse of their child were completely, fully, and fairly litigated. Mr. Tilleman participated in a ten-day trial that resulted in findings that he abused the legal process by repeatedly making false reports of abuse. He appealed, and the Utah Court of Appeals affirmed

all factual findings. He then petitioned the Utah Supreme Court to review the opinion by the Utah Court of Appeals, and this was denied. Thus, all issues related to the divorce and alleged abuse of the child were completely, fully, and fairly litigated.

### D. The divorce/custody proceeding resulted in a final judgment on this issue.

"Under Utah law, a judgment does not have to proceed to trial" to be "on the merits" for issue preclusion." *Cook*, 547 Fed. App'x at 860 (citations omitted). Here, the state court held a ten-day trial. Following the trial, Mr. Tilleman appealed, and the Utah Court of Appeals affirmed the trial court's factual findings. These two rulings constitute final judgments on the merits, which are "rendered only after a court has evaluated the relevant evidence and the parties' substantive arguments." Because this element and all other elements for issue preclusion are satisfied, this doctrine bars Mr. Tilleman's claims.

## IV.   MR. TILLEMAN DOES NOT HAVE STANDING TO PURSUE CIVIL RICO CLAIMS AGAINST HIS EX-WIFE.

"[A] plaintiff has standing to bring a RICO claim only if he was injured in his business or property by reason of the defendant's violation of § 1962." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003). Mr. Tilleman has alleged two distinct injuries in his complaint: (1) money lost due to the divorce, and (2) physical injuries to their daughter. Neither of these injuries constitutes an injury to "business or property."

### A. Money lost due to the Divorce.

Mr. Tilleman alleges his divorce was a direct result of Hildebrandt's influence and cites a variety of monetary losses associated with the divorce:

- "Plaintiff has been forced to spend hundreds of thousands of dollars in legal fees to protect himself, his reputation, and his relationship to EJT. Since 2022 alone, Plaintiff has incurred at least $105,000 in domestic attorney's fees." (¶ 580)

- "As detailed in paragraph 203 herein, Savage spent approximately $5,000 of Plaintiff's income on services through ConneXions, which directly benefitted the Enterprise, while the parties were married." (¶ 584)
- "Plaintiff repeatedly objected to Savage's contribution of funds to the Enterprise through ConneXions." (¶ 584)
- "Plaintiff has also incurred monetary damages in the form of lost wages resultant from attending his custody trial." (¶ 588)
- "At or around the time Savage began her involvement with the Enterprise, Plaintiff had been accepted to multiple prestigious law schools, including the University of Chicago, the University of Michigan and the University of Virginia.  To date, Plaintiff has been unable to attend law school as a direct result of the time and money he has been forced to spend both defending himself in domestic proceedings and protecting his daughter from Savage's implementation of Hildebrandt's methodology and furtherance of the Enterprise. Accounting for the wages Plaintiff already has earned, the time it would have taken Plaintiff to complete law school, and assuming the median wage of University of Chicago Law School graduates, Plaintiff has suffered at least $1,066,856 in lost earning potential as a result of the unlawful acts and fraudulent scheme of the Enterprise." (¶¶ 595-597)

Payment for counseling, legal fees for the divorce case, delays in pursuing education, and wages lost while attending your divorce trial do not constitute an injury to business or property as required under RICO.

Even if the Court believes the monies spent on counseling and legal fees for his divorce case could be an injury to business or property, or if related lost opportunities could qualify, this issue was conclusively resolved in the divorce case.  On March 13, 2018, the Utah district court entered a **Stipulated** Bifurcated Decree of Divorce, which states, in part:

> 5. There are no issues as to real property, marital debt, retirement, and alimony. The personal property has already been divided equitably between the parties.

3.13.18 Order, Exh. 5 (emphasis added).  Because Mr. Tilleman stipulated to this order, he agreed that the very monetary issues he now raises were resolved to his satisfaction.  On August 21, 2021, the Utah district court entered a Supplemental Decree of Divorce and Judgment:

> 10. The parties were previously divorced pursuant to a stipulated, bifurcated decree of divorce was filed on March 13, 2018.
> 11. This matter came on for trial over ten days beginning August 28, 2020 and

concluding on September 18, 2020.

12. The parties' amended pleadings and stipulation state that there are no issues to be addressed by the Court regarding real property, marital debt, retirement, income tax filings, and alimony and that personal property was already divided equitably between the parties.

8.21.21 Order, Exh. 8. Mr. Tilleman is barred by *Younger* abstention, *Rooker-Feldman*, and issue preclusion from relitigating these financial matters.

### B. Personal Injuries to Daughter.

Mr. Tilleman alleges:

> 585.   As detailed in paragraphs 277 through 322 herein, Savage committed aggravated child abuse numerous times against EJT, as a direct result of Savage's implementation of Hildebrandt's methodology of physical abuse and torture of children to bring them into Hildebrandt's "truth."
>
> 586.   Plaintiff incurred damage to his property as a direct result of the Enterprise's implementation of its fraudulent scheme and Hildebrandt's methodology through the payment for emergency medical services to treat physical injuries caused by Savage's implementation of the Hildebrandt methodology of abuse against EJT.
>
> 587.   Plaintiff has incurred approximately $2,000 in medical costs for treatment of injuries EJT sustained as a direct result of Savage's abuse of EJT and implementation of the Hildebrandt methodology.

Complaint, Dkt. #1. The Supreme Court has stated, "[t]he phrase "business or property" … retains restrictive significance. It would, for example, exclude personal injuries suffered." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *see also Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 885 (10th Cir. 2017). Because personal injuries are not recoverable under RICO, Mr. Tilleman does not have standing, and his claims should be dismissed.

### V.    MR. TILLEMAN'S CLAIMS ARE TIME BARRED.

"Civil RICO damages claims are subject to a four-year statute of limitations." *Robert L. Kroenlein Trust v. Kirchheffer*, 764 F.3d 1268, 1274 (10th Cir. 2014) (citations omitted). Mr. Tilleman filed suit on January 22, 2025; therefore, claims arising from acts that occurred before

20

January 22, 2021, are barred by the statute of limitations. Mr. Tilleman does not allege any specific actions by Ms. Washburn since 2021 except that she did not respond when he texted her about Ms. Franke's and Ms. Hildebrandt's criminal cases. *See* Dkt. #1, ¶¶ 349-461.

Mr. Tilleman clearly foresaw a statute of limitations problem, and therefore alleged, "Plaintiff did not become aware of the illegitimacy or fraudulent nature of the Enterprise until the arrests and subsequent sentencing of Hildebrandt and Franke in August 2023 and February 2024, respectively." Dkt. #1, ¶ 215; *see also* ¶ 323. The Tenth Circuit has held, "We apply the injury-discovery rule only in the exceptional case where a reasonably diligent plaintiff could not immediately know of the injury and its cause." *Robert L. Kroenlein Trust v. Kirchheffer*, 764 F.3d 1268, 1276 (10th Cir. 2014) (citations omitted). "And in applying the injury-discovery rule to these exceptional cases, we have consistently emphasized that the rule only protects plaintiffs who are blamelessly unaware of their claim because the injury has not yet manifested itself or because the facts establishing a causal-link between the injury and the cause of the injury are in the control of the tortfeasor or otherwise not evident." *Id.* at 1277 (citations omitted).

Mr. Tilleman cannot invoke the injury-discovery rule here because he accused Ms. Hildebrandt of causing his divorce in the divorce case, which was finalized in 2018. Mr. Tilleman testified in his divorce case that Ms. Washburn "said the most important thing to her was to be married to someone who lived [Hildebrandt's] principles." Trial Transcript, p. 3626, Exh. 6. Mr. Tilleman also alleged that, among other things, Ms. Washburn demanded he "[a]ttend Ms. Washburn's the ConneXions 101 class to learn principles of truth in a group setting." Decl. of Michael Tilleman, ¶22, Exh. 7. Thus, Mr. Tilleman's own testimony in the divorce case contradicts his assertion that he did not discover his concerns about Ms. Hildebrandt and her

teachings until 2023. Because Mr. Tilleman knew of the alleged affiliation and harm at least six years ago, he cannot invoke the injury-discovery rule, and his claims are barred.

## VI.    MR. TILLEMAN HAS NOT ALLEGED SUFFICIENT FACTS AGAINST MS. WASHBURN TO SUSTAIN HIS CLAIMS UNDER RULE 12(b)(6).

"[A] plaintiff asserting a § 1964(c) claim for a violation of § 1962(c) must plausibly allege that the defendants each (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017) (cleaned up). "To maintain a § 1964(c) claim against any particular defendant, [plaintiff] need only to have alleged facts plausibly demonstrating that the defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs." *Id.* at 883 (cleaned up). "This, in turn, requires a showing that the defendant participated in the operation or management of the enterprise itself. Under *Reves'* operation or management test, the defendant must have some part in directing the enterprise's affairs." *Id.* (cleaned up). This court confirmed that "to state a RICO claim against a person under § 1962(c), the plaintiff[] must allege that each defendant conducted the affairs of an enterprise through the defendant's own pattern of racketeering activity." *ZibalStar, L.C. v. Conte*, No. 2:17-CV-563, 2018 WL 1578019, at *4 (D. Utah Mar. 27, 2018) (unpublished). Plaintiffs cannot simply "allege that a RICO enterprise conducted its affairs through a pattern of unlawful activity and that the several defendants are part of the enterprise." *Id.*

Mr. Tilleman states that Ms. Washburn "engaged in at least 334 acts of wire fraud," Compl. ¶ 608, but he does not identify the acts, explain how he reached this number, or describe how each act qualifies as wire fraud. To the extent Mr. Tilleman seeks to tie Ms. Washburn to the overall enterprise, he does not allege that Ms. Washburn played any specific part in directing Ms. Hildebrandt's and/or Ms. Franke's affairs. Mr. Tilleman instead alleges generally that Ms.

Washburn obtained counseling from Ms. Hildebrandt and encouraged others to pursue counseling as well.  Neither allegation is sufficient to prove wire fraud. If simply obtaining counseling, attempting to implement what is learned, and inviting others, could lead to liability, every person who obtains counseling could potentially be a RICO defendant.

Mr. Tilleman's conclusory allegations are especially insufficient under Rule 9(b)'s particularity requirement, which "is applicable to RICO predicate acts based on fraud." *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir. 1989). Although Mr. Tilleman has included hundreds of paragraphs of allegations, he has not described specific acts or "wires" by Ms. Washburn, and he has not provided any level of detail that would satisfy the requirement that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

For similar reasons, Mr. Tilleman has also failed to adequately plead a RICO conspiracy. "By its terms, § 1962(d) requires that a plaintiff must first allege an independent violation of subsections (a), (b), or (c), in order to plead a conspiracy claim under subsection (d)." *Tal v. Hogan*, 453 F.3d 1244, 1270 (10th Cir. 2006). Because Mr. Tilleman has not sufficiently stated an independent violation by Ms. Washburn, his "conspiracy claim fails as a matter of law." *Id.*

In addition to his RICO claims, Mr. Tilleman asserts two nondisclosure claims against Ms. Washburn, one for fraudulent nondisclosure and one based in negligence, but he fails to adequately plead both. For the former, "a plaintiff must prove by clear and convincing evidence that (1) the defendant had a legal duty to communicate information, (2) the defendant knew of the information he failed to disclose, and (3) the nondisclosed information was material." *Anderson v. Kriser*, 2011 UT 66, ¶ 22, 266 P.3d 819. Negligent disclosure requires similar proof, except "a plaintiff is not

required to demonstrate any wrongful intent on the part of the defendant." *Id.* ¶ 25. The issue is instead whether a defendant should have known the information at issue and failed to disclose. *See id.* For either claim, however, a plaintiff must prove "actual, justifiable reliance resulting in damage to that party." *Taylor v. Gasor, Inc.*, 607 P.2d 293, 294 (Utah 1980).

Mr. Tilleman has not included facts that could prove a material nondisclosure on which he relied. Mr. Tilleman alleges only that Ms. Washburn "fail[ed] to disclose the material fact of the illegitimacy and fraudulent nature of the Enterprise and ConneXions' services and products." Compl. ¶ 217. But Mr. Tilleman does not identify any specific date(s) when such failure to disclose occurred, the circumstances of any such communications, or any other relevant details. Mr. Tilleman also does not allege that he relied on any alleged nondisclosure of illegal activity. To the contrary, he confirms that he refused to adopt Defendants' suggestions and in fact "pleaded multiple times" to stop using Hildebrandt's methods. *Id.* ¶ 14. He further explains, "On numerous occasions, including in writing, Plaintiff informed Savage that Hildebrandt was destroying their marriage and pleaded with Savage that she see any other counselor besides Hildebrandt." *Id.* ¶ 219. With these allegations, Mr. Tilleman cannot proceed on either of his nondisclosure claims.

### VII.    THE COURT SHOULD AWARD MS. WASHBURN HER ATTORNEYS' FEES BECAUSE THE COMPLAINT IS VEXATIOUS AND ABUSIVE.

"Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *O'Rourke v. Dominion Voting Systems, Inc.*, 2022 WL 17588344, *2 (10th Cir. 2022) (unpublished) (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101- (2017)). "[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for

oppressive reasons." *Id.* (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)).

Mr. Tilleman's lawsuit satisfies this standard. He has acted in bad faith, vexatiously, and for oppressive reasons in pursuing these claims against his ex-wife. In his divorce trial, the Utah district court found, "Father's reports of abuse were vexatious and were calculated and designed to harm Mother." Amended Findings of Fact and Conclusions of Law and Ruling on Costs and Fees, ¶ 51, Exh. 1. The Utah Court of Appeals affirmed:

> [T]he court's finding that [Mr. Tilleman's] reports of abuse were vexatious and were calculated and designed to harm Mother is supported by the sheer number of reports Father made that never resulted in criminal charges being filed against Mother or in DCFS taking enforcement action against her.

*Tilleman v. Tilleman*, 2024 UT App 54, ¶¶ 58-59. Ignoring these rulings, Mr. Tilleman now wants to rehash the same baseless factual allegations in this lawsuit. This is the definition of acting "in bad faith, vexatiously, wantonly, or for oppressive reasons." Therefore, the Court should award Ms. Washburn the attorneys' fees and costs she has incurred defending against this lawsuit.[4]

## CONCLUSION

For the reasons set forth above, the Court should dismiss the claims against Ms. Washburn.

DATED this 28th day of March, 2025.

SPENCER FANE LLP
*/s/ R. Scott Young*
Richard A. Van Wagoner
R. Scott Young
Melinda K. Bowen
*Attorneys for Defendant Michal Washburn*

---

[4] The Court should also sanction Mr. Tilleman's father, Karl Tilleman, under 28 U.S.C. § 1927 for his role in advancing this baseless lawsuit against his former daughter-in-law. In his Arizona lawsuit, which was dismissed with prejudice, Mr. Tilleman asserted the same baseless allegations that Ms. Washburn abused his granddaughter based on Ms. Hildebrandt's teachings, the same allegations that the Utah courts have rejected and his son has asserted in this case.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2025, I caused a true and correct copy of the foregoing

**DEFENDANT MICHAL WASHBURN'S MOTION TO DISMISS** to be electronically filed

via the court's CM/ECF system, which will send notification to the following:

Jonathan O. Hafen
Victoria R. Luman
Daniel J. Nelson
PARR BROWN GEE & LOVELESS
101 South, 200 East, Suite 700
Salt Lake City, Utah 84111
jhafen@parrbrown.com
vluman@parrbrown.com
dnelson@parrbrown.com
*Attorneys for Plaintiff*

Adam C. Dunn
DUNN LAW FIRM
110 West Tabernacle
St. George, UT  84770
acdunn@dunnfirm.com
*Attorneys for Defendants Jodi Hildebrandt and Connexions Classroom, LLC*

LaShel Shaw
Caroline A. Olsen
ZIMMERMAN BOOHER
Felt Building
341 South Main Street
Salt Lake City, Utah 84111
lshaw@zbappeals.com
colsen@zbappeals.com
*Attorneys for Plaintiff*

**<u>Via U.S. Mail</u>**
Ruby Franke
262747
UTAH STATE CORRECTIONAL FACILITY
P.O. Box 165300
Salt Lake City, UT  84116
*Pro Se*

  */s/ Annette Gamero*