UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| MICHAEL ROBERT TILLEMAN,<br>Plaintiff,<br>v.<br>JODI HILDEBRANDT, et al.,<br>Defendants. | **MEMORANDUM DECISION AND ORDER REGARDING MOTIONS TO DISMISS**<br>Case No. 2:25-cv-00049-AMA-CMR<br>District Judge Ann Marie McIff Allen<br>Magistrate Judge Cecilia M. Romero |

This matter comes before the Court on the following Motions:

- Motion to Dismiss filed by Defendants Jodi Hildebrandt and ConneXions Classroom, LLC ("ConneXions") (collectively, "Hildebrandt Defendants");[1]
- Motion to Dismiss filed by Defendant Michal Washburn;[2]
- Motion to Dismiss filed by Defendant Ruby Franke.[3]

Oral argument was held on February 26, 2026.[4] For the reasons discussed below, the Court will grant the Motions to Dismiss.

[1] ECF No. 34, filed March 19, 2025.
[2] ECF No. 37, filed March 28, 2025. The Court notes that the Complaint refers to Ms. Washburn as Ms. "Savage," which is her maiden name. She has, however, indicated a preference to be referred to by her legal marital name of Washburn, and the Court will follow that preference.
[3] ECF No. 47, filed April 29, 2025.
[4] ECF No. 70. This hearing was held before District Judge Howard C. Nielson, Jr., the presiding judge over this case prior to its reassignment to the undersigned. ECF No. 71. The Court has reviewed the recording of the hearing and is aware of the arguments made thereat.

## **BACKGROUND**

This background is taken from the allegations made in Mr. Tilleman's Complaint, as well as information contained in certain of the exhibits attached to Ms. Washburn's Motion to Dismiss.[5] Due to the length of the Complaint, the Court gives only a summarized version of the allegations set forth therein. For the purposes of these Motions and pursuant to the Court's obligations under the applicable standards, the Court will assume the truth of the Complaint's well-pleaded allegations. However, the Court makes no findings of fact or assertions regarding the actual reality of the allegations.

In August 2023, it was discovered that Defendant Ruby Franke and her business partner Defendant Jodi Hildebrandt had been torturing two of Ms. Franke's children at Ms. Hildebrandt's residence outside of St. George, Utah.[6] Both women pleaded guilty to four counts of felony aggravated child abuse.[7] Plaintiff Michael Tilleman brings this action alleging that Ms. Franke and Ms. Hildebrandt are part of a larger scheme whereby, over the course of two decades, they and others known and unknown have engaged in a widespread racketeering enterprise in pursuit of power and profit through the advertisement, sale, and provision of fraudulent services and products designed to prey on vulnerable individuals and encourage those individuals to perpetrate illegal acts onto others.[8] Plaintiff purports that Defendant ConneXions Classroom, LLC ("ConneXions"), as well as other of the entities Ms. Hildebrandt has founded, form the business conduit of this scheme.[9] This scheme shall be referred to as the "Enterprise."[10]

[5] ECF Nos. 1, 37.
[6] ECF No. 1 ¶ 1.
[7] *Id.*; ECF No. 37, Exs. 13–14.
[8] ECF No. 1 ¶ 1.
[9] *Id.* ¶ 3.
[10] *See id.* ¶ 1.

Defendant Michal Washburn is Mr. Tilleman's former spouse and the mother of his child.[11] Ms. Washburn became involved with Ms. Hildebrandt in 2015 when Ms. Washburn sought the life coach[12] out for counseling services.[13] While Ms. Washburn initially sought out Ms. Hildebrandt's services simply for personal and marital counseling, she quickly and eagerly accepted Ms. Hildebrandt's methodology and became a member of the Enterprise[14] and a loyal associate of Ms. Hildebrandt's.[15] At all relevant times, Ms. Washburn was, and is, aware of the illegitimacy and fraudulent nature of the Enterprise and of ConneXions' services and products,[16] and Ms. Hildebrandt and Ms. Washburn conspired to create the appearance of marital problems between Ms. Washburn and Mr. Tilleman.[17]

When Ms. Washburn began associating with the Enterprise, the former couple was financially reliant solely on Mr. Tilleman's income.[18] During the course of the marriage, Ms. Washburn spent approximately $5,000 of marital funds on services through ConneXions, including on counseling sessions with Ms. Hildebrandt, which were around $200 per individual session and $100 per month for group sessions.[19] In 2016, Mr. Tilleman objected to the amount of the couple's money Ms. Washburn was spending,[20] but Ms. Washburn indicated that she was willing to spend all of their money on the Enterprise.[21]

Although Ms. Washburn attempted to induce Mr. Tilleman to become involved with

---

[11] *Id.* ¶ 191.
[12] *Id.* ¶ 35.
[13] *Id.* ¶ 192.
[14] *Id.* ¶ 194.
[15] *Id.* ¶ 193.
[16] *Id.* ¶ 209.
[17] *Id.* ¶ 196.
[18] *Id.* ¶ 583.
[19] *Id.* ¶ 203.
[20] *Id.* ¶ 200.
[21] *Id.* ¶ 201.

ConneXions, she was unsuccessful—Mr. Tilleman felt he was being led into a cult and, upon researching ConneXions, discovered Ms. Hildebrandt's prior professional and illegal misconduct.[22] He then repeatedly protested Ms. Washburn's subservience to Ms. Hildebrandt, her membership in the Enterprise, and her attempts to coerce him into accepting the Enterprise's methodology.[23] On numerous occasions, Mr. Tilleman informed Ms. Washburn that Ms. Hildebrandt was destroying their marriage and pleaded with Ms. Washburn to see another counselor.[24] He also expressed fear that Ms. Hildebrandt would destroy his reputation through public, defamatory allegations, as she had done to other victims. [25]

In May of 2016, Ms. Washburn, at the direction of Ms. Hildebrandt, demanded that the couple separate.[26] On September 26, 2016, Mr. Tilleman was scheduled to begin his first full-time employment position; however, Ms. Washburn denied Mr. Tilleman access to their child, and Mr. Tilleman had to travel from Utah to Arizona to receive help from his family.[27] He was thus unable to begin his employment until January 9, 2017, and lost approximately $10,000.[28]

In the midst of this, Mr. Tilleman filed for divorce on October 6, 2016,[29] and while a bifurcated decree of divorce was awarded on March 13, 2018,[30] the couple has been embroiled in the divorce proceedings for many years.[31] Mr. Tilleman alleges various related injuries. He has, for example, had to spend hundreds of thousands of dollars in legal fees on these proceedings.[32]

---

[22] *Id.* ¶ 208.
[23] *Id.* ¶ 218.
[24] *Id.* ¶ 219.
[25] *Id.* ¶ 220.
[26] *Id.* ¶ 233.
[27] *Id.* ¶¶ 569–71.
[28] *Id.* ¶ 572.
[29] *Id.* ¶ 270.
[30] *Id.* ¶ 273.
[31] *See* ECF No. 37, Ex. 10.
[32] ECF No. 1 ¶ 580.

He lost his job in 2020 while the domestic trial was taking place and was forced to take a lower-paying job, resulting in a $90,000 loss.[33] He also lost $3,700 of wages from attending this ten-day trial.[34] And though he had been accepted into multiple prestigious law schools around the time Ms. Washburn began her involvement with the Enterprise, he has been unable to attend law school and has allegedly suffered at least $1,066,866 in lost earning potential.[35]

Furthermore, Mr. Tilleman alleges that after the divorce was finalized, Ms. Washburn has, through her implementation of Ms. Hildebrandt's methodology, engaged in abuse toward their child.[36] Mr. Tilleman claims that he has incurred approximately $2,000 in medical costs for the treatment of injuries his child has sustained.[37]

Mr. Tilleman initiated this action on January 22, 2025.[38] The Hildebrandt Defendants filed their Motion to Dismiss on March 19, 2025.[39] Mr. Tilleman filed his Opposition on May 9, 2025,[40] to which the Hildebrandt Defendants replied on June 4, 2025.[41] Ms. Washburn filed her Motion to Dismiss on March 28, 2025.[42] Mr. Tilleman opposed on May 9, 2025,[43] after which Ms. Washburn replied on May 30, 2025.[44] Ms. Franke filed her Motion to Dismiss on April 29, 2025.[45] Mr. Tilleman's Opposition was filed on May 30, 2025,[46] and Ms. Franke's Reply was

---

[33] *Id.* ¶ 577–79.
[34] *Id.* ¶¶ 590–92.
[35] *Id.* ¶¶ 595–97.
[36] *Id.* ¶¶ 574–75
[37] *Id.* ¶¶ 585–87.
[38] ECF No. 1.
[39] ECF No. 34.
[40] ECF No. 49.
[41] ECF No. 60.
[42] ECF No. 37.
[43] ECF No. 48.
[44] ECF No. 58.
[45] ECF No. 47.
[46] ECF No. 59.

filed on June 27, 2025.[47]

Additionally, on June 17, 2025, Ms. Washburn filed a Notice of Supplemental Authority,[48] to which Mr. Tilleman objected on June 23, 2025.[49]

**LEGAL STANDARD**

Defendants bring their Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "Motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may take one of two forms": a party may make a facial challenge, questioning the sufficiency of the complaint, or a factual challenge, questioning the facts beyond the complaint upon which subject matter jurisdiction depends.[50] "In addressing a facial attack, the district court must accept the allegations in the complaint as true."[51] But "[i]n addressing a factual attack, the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing."[52]

Under Federal Rule of Civil Procedure 12(b)(6), a claim is subject to dismissal if the plaintiff's complaint fails to "state a claim upon which relief can be granted." In construing a plaintiff's complaint, the Court will assume the truth of any well-pleaded facts and draw all reasonable inferences in the light most favorable to the plaintiff.[53] To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"[54] "[F]acts subject to judicial notice may be considered in a

---

[47] ECF No. 66.
[48] ECF No. 63.
[49] ECF No. 65.
[50] *U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).
[51] *Id*.
[52] *Id*. (citation modified).
[53] *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011).
[54] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment."[55] Furthermore, "courts may consider documents that a plaintiff (1) attaches to [his] complaint; (2) incorporates by reference in [his] complaint; or (3) refers to in [his] complaint and that are central to [his] complaint and indisputably authentic."[56]

## DISCUSSION

### A. SCOPE OF MATERIALS ON REVIEW

Before addressing the substance of the instant Motions, the Court finds it necessary to address what material this Court may examine in resolving Ms. Washburn's Motion given the exhibits she has provided and her Notice of Supplemental Authority.

#### 1. Supplemental Authorities

Ms. Washburn, citing DUCivR 7-1(c), filed a Notice of Supplemental Authority to draw the Court's attention to a complaint filed by Mr. Tilleman against Ms. Washburn in Utah state district court, as well as that case's docket. Pursuant to DUCivR 7-1(c), "[w]hen pertinent and significant authority comes to the attention of a party before the court has entered a decision on a motion, the party may file a Notice of Supplemental Authority[.]" However, while DUCivR 7-1(c), like Federal Rule of Appellate Procedure 28(j), allows such notices to "bring new *authorities* to the attention of the court; it is not designed to bring new evidence through the back door."[57]

---

[55] *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).
[56] *Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1297 (10th Cir. 2025) (citation modified).
[57] *Kane Cty. (II), Utah v. U.S.*, No. 2:10-cv-1073, 2020 WL 5016890, at *2 (D. Utah Aug. 24, 2020) (emphasis in original) (using cases interpreting Fed. R. App. P. 28(j) to inform the court's decision regarding the local rule due to the rules' similarity).

Neither the complaint nor the docket are "'supplemental authorit[ies]' in the typical sense of that phrase"[58]—neither has "any bearing on the legal standards upon which this [C]ourt should adjudicate" Ms. Washburn's Motion to Dismiss.[59] Rather, Ms. Washburn attempts to use the complaint and docket as evidence that Mr. Tilleman is weaponizing state and federal courts against her. The introduction of new evidence, however, reaches beyond the proper purpose of DUCivR 7-1(c), and the Court will not consider this evidence.

Although Mr. Tilleman asks the Court to strike the Notice, he did so in his Objection to the Notice and did not file a formal Motion to Strike. Therefore, the Court will not strike the Notice but will sustain the Objection and disregard the filing in determining Ms. Washburn's Motion.[60]

**2. Rule 12(b)(1)**

As stated with respect to the legal standard, in a Motion to Dismiss made pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, a party may make a facial challenge, questioning the sufficiency of the complaint, or a factual challenge, questioning the facts beyond the complaint upon which subject matter jurisdiction depends.[61] "When resolving a facial attack on the allegations of subject matter jurisdiction, a court must accept the allegations in the complaint as true."[62] "When the moving party attacks the factual basis for subject matter

---

[58] *Id.*
[59] *Zurich Am. Ins. Co. v. Ascent Constr., Inc.*, No. 1:20-cv-00089-RJS, 2025 WL 562556, at *5 n.67 (D. Utah Feb. 20, 2025).
[60] The Court notes that it could, sua sponte, take judicial notice of this complaint and docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."). However, even were the Court to do so, the consideration of these documents would not impact the determinations made in this Order.
[61] *Rodriguez-Aguirre*, 264 F.3d at 1203.
[62] *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 507 (10th Cir. 2023).

jurisdiction, on the other hand, a court 'may not presume the truthfulness of the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts.'"[63] With a factual attack, "[r]eference to evidence outside the pleadings does not convert the motion to dismiss into a motion for summary judgment[,]" and "a court has discretion to consider affidavits and other documents to resolve the jurisdictional question."[64]

Ms. Washburn brings her Motion, in part, pursuant to Rule 12(b)(1), but it is unclear whether she makes a facial or factual challenge. The Motion does not explicitly indicate that a facial or factual challenge is being asserted, and with respect to the legal standard, the Motion simply states that "motions under [Rule 12(b)(1)] may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends."[65] This is not entirely correct, of course, as it does not acknowledge the distinction between facial and factual challenges. And while it may suggest that Ms. Washburn intends to bring a factual challenge, the exhibits she has included that are meaningful to her jurisdictional arguments are court records subject to judicial notice, which the Court will discuss in further detail below. A motion to dismiss "presents a facial attack" when "its only references outside of the complaint . . . are to court records which are subject to judicial notice."[66]

Furthermore, and perhaps more significantly, it does not seem to the Court that Ms. Washburn is in fact disputing any of the jurisdictionally relevant facts in the Complaint. Although Ms. Washburn appears to dispute the allegations regarding her abusive conduct and

---

[63] *Id.* (quoting *SK Fin. SA v. La Plata Cnty., Bd. of Cnty. Comm'rs*, 126 F.3d 1272, 1275 (10th Cir. 1997)).
[64] *Id.*
[65] ECF No. 37 at 11 (citation modified).
[66] *Daniel v. Higgins*, No. 2:23-cv-00517, 2024 WL 2958724, at *1 (D. Utah Mar. 20, 2024); *see also Patricia H. v. Kijakazi*, No. 2:23-cv-00057, 2023 WL 8455430, at *1 (D. Utah Dec. 6, 2023).

claims that it is Mr. Tilleman who was the abuser, the question of which party abused the other need not be determined for the Court to resolve Ms. Washburn's jurisdictional arguments—as the Court will set out more fully below, these facts do not render *Rooker-Feldman* applicable.[67] These facts are, thus, not "facts upon which subject matter jurisdiction depends."[68]

Overall, the distinction between a facial and factual challenge here is likely more academic than substantive, as the Court may take judicial notice of the material documents and thus could consider them under the standards governing either challenge. Nonetheless, for the sake of clarity, the Court will construe Ms. Washburn's jurisdictional challenge as a facial attack. "When a motion under [Rule 12(b)(1)] presents a facial attack based on the allegations in the complaint, the [C]ourt applies the standards applicable to a Rule 12(b)(6) motion and accepts the allegations in the complaint as true."[69]

**3. Rule 12(b)(6)**

As the Court has determined that it will resolve Ms. Washburn's Rule 12(b)(1) arguments applying the standards applicable to Rule 12(b)(6), it is necessary for the Court to address the

---

[67] *See Graff*, 65 F.4th 509. While Ms. Washburn argues that this Court lacks jurisdiction based on *Younger* abstention, the Tenth Circuit has clarified that "when cases present circumstances implicating [abstention] doctrines, no question is raised as to the court's subject matter jurisdiction." *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 953 F.3d 660, 667–68 (10th Cir. 2020). "Rather, when a federal court may or must abstain from exercising its unquestioned subject matter jurisdiction over a dispute, it does so pursuant to a power derived from the historic discretion exercised by federal courts sitting in equity." *Id*. at 668 (citation modified). Furthermore, to the extent the dispute over these allegations may possibly have bearing on Ms. Washburn's issue preclusion arguments, the Court notes that preclusion doctrines also do not raise questions as to the court's subject matter jurisdiction but provide, rather, "affirmative defenses once a court exercises jurisdiction over a civil action[.]" *Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 708 n.4 (10th Cir. 2004); *see also Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("[I]ssue preclusion[] is an affirmative defense."). The Court also will not reach the issue preclusion arguments in this Order, as the Motions can be resolved on other grounds.

[68] *Holt v. U.S.*, 46 F.3d 1000, 1003 (10th Cir. 1995).

[69] *Daniel*, 2024 WL 2958724, at *1.

question of which of Ms. Washburn's exhibits it may consider under those standards. "Generally, a court may consider only the contents of a complaint when ruling on a motion to dismiss."[70] "When the district court considers documents outside the pleadings without a valid exception, it must convert the motion to dismiss into a motion for summary judgment."[71] In doing so, "[t]he district court must inform the parties of its conversion and give the parties a reasonable opportunity to accumulate and present all relevant evidence."[72] Failure to do so may constitute reversible error.[73]

The Court has, under Rule 12(d), "broad discretion to refuse to accept . . . extra-pleading materials and [to] resolve the motion solely on the basis of the pleading itself."[74] Here, the Court declines to convert the Motion to Dismiss to a motion for summary judgment, as doing so would "require the Court to give notice to the parties and allow [Mr. Tilleman] an opportunity to present [his] own extra-pleading evidence, an inefficient process better left for a motion for summary judgment filed in the normal course of the discovery process."[75] Nonetheless, the law does allow the Court to, without converting the Motion to Dismiss, "consider documents that a plaintiff (1) attaches to h[is] complaint; (2) incorporates by reference in h[is] complaint; or (3) refers to in h[is] complaint and that are central to h[is] complaint and indisputably authentic."[76] Ms. Washburn provides no argument that these exceptions apply to any of her exhibits other than

[70] *Cuervo v. Sorenson*, 112 F.4th 1307, 1312 (10th Cir. 2024).
[71] *Id.* (citing Fed. R. Civ. P. 12(d)).
[72] *Id.*
[73] *Id.*
[74] *Navajo Nation v. Urb. Outfitters, Inc.*, 935 F. Supp. 2d 1147, 1157 (D.N.M. 2013) (citing *Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998)).
[75] *Id.*
[76] *Cuervo*, 112 F.4th at 1312.

Exhibit 1.[77] Exhibit 1 is the Utah state court's Amended Findings of Fact and Conclusions of Law and Ruling on Costs and Fees in Mr. Tilleman and Ms. Washburn's divorce proceedings.[78] Ms. Washburn rather cursorily asserts that this order is referred to in the Complaint, central to Mr. Tilleman's claims, and indisputably authentic. However, although the Complaint discusses the divorce and affiliated proceedings, it does not appear to contain any specific references to this order. The Court will, thus, decline to consider Ms. Washburn's exhibits under any of the three exceptions.

Nevertheless, "[t]he general rule prohibiting courts from considering evidence outside the complaint on a motion to dismiss has another exception: 'matters of which a court may take judicial notice.'"[79] The Court may "take judicial notice of publicly-filed records in . . . certain other courts concerning matters that bear directly upon the disposition of the case at hand."[80] "However, '[t]he documents may only be considered to show their contents, not to prove the truth of matters asserted therein.'"[81] Moreover, the Court "may decline to take judicial notice of irrelevant evidence."[82]

---

[77] Two of Ms. Washburn's exhibits are courtesy copies of case law. *See* ECF No. 37, Exs. 4, 12. The citation for the Utah Court of Appeals decision is *Tilleman v. Tilleman*, 2024 UT App 54, 549 P.3d 65, and the *Snyder v. Bagley* memorandum decision and order can be found on Westlaw at *Snyder v. Bagley*, No. 4:23-cv-00007-DN-PK, 2024 WL 179876 (D. Utah Jan. 17, 2024). In this discussion, the Court will only examine the exhibits that are evidentiary in nature and thus will not reference these two exhibits.

[78] ECF No. 37, Ex. 1.

[79] *Fuqua*, 157 F.4th at 1298 (10th Cir. 2025) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

[80] *U.S. v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

[81] *Tal*, 453 F.3d at 1264 n.24 (alteration in original) (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

[82] *Amann v. Utah Att'y Gen.*, No. 2:18-cv-00341-JNP-DAO, 2025 WL 1348991, at *1 (D. Utah May 8, 2025) (citing *Zabriskie v. Lewis*, 507 F.2d 546, 553 (10th Cir. 1974) ("It is not error for a court to refuse to admit or take judicial notice of irrelevant evidence.")).

Relevant to the Court's ability to take judicial notice here is that Utah Code of Judicial Administration Rule 4-202.02(4)(B) classifies the following as *private*:

> records in the following actions, except that the case history, judgments, orders, decrees, letters of appointment, and the record of public hearings are public records:
>
> > (4)(B)(i) Utah Code, title 81, Utah Domestic Relations Code, including qualified domestic relations orders, except that an action for consortium due to personal injury under Utah Code section 81-3-111 is public[.][83]

To that end, Exhibits 6, 7, 9, and 11 are private records inaccessible to the public on the state court docket for the divorce proceedings. As these records are not publicly filed, the Court's taking judicial notice of them would be improper, and the Court will not take such notice. Accordingly, the Court will not consider these exhibits in resolving Ms. Washburn's Motion.

The Court will, on the other hand, take judicial notice of Exhibits 1, 5, 8, and 10 because they, though from the divorce proceedings, are public court records. The Court will likewise take judicial notice of Exhibits 2, 13, and 14, as they are public court records. The Court will consider these exhibits only to "show their contents, not to prove the truth of matters asserted therein."[84]

As for Exhibit 3, the Settlement Agreement does not appear to be a publicly-filed court record. However, the Stipulation to Dismiss[85] is such a record. Thus, the Court will take judicial notice of the Stipulation to Dismiss but will not consider the Settlement Agreement itself.

### B. *ROOKER-FELDMAN*

Turning now to the substance of Ms. Washburn's Rule 12(b)(1) challenge, Ms. Washburn argues that *Rooker-Feldman* bars this Court from exercising jurisdiction over this case as a result

---

83 Utah Code of Judicial Admin. R. 4-202.02(4)(B)(i).
84 *Tal*, 453 F.3d at 1264 n.24.
85 ECF No. 37, Ex. 3 at 7.

of its connection to her and Mr. Tilleman's divorce proceedings in Utah state court. The Court disagrees.

The *Rooker-Feldman* doctrine "prevents federal courts, with the notable exception of the United States Supreme Court, from exercising jurisdiction over 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'"[86] This "jurisdictional bar applies when '(1) the plaintiff lost in state court, (2) the state court judgment caused the plaintiff's injuries, (3) the state court rendered judgment before the plaintiff filed the federal claim, and (4) the plaintiff is asking the district court to review and reject the state court judgment.'"[87] Significantly, it is a narrow jurisdictional limitation.[88] "*Rooker-Feldman* does not bar a federal court claim merely because it seeks relief inconsistent with a state court judgment."[89] "If a federal plaintiff presents an independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court."[90] Rather, for the doctrine to apply, "a litigant's claim

---

86 *Graff*, 65 F.4th at 514 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).
87 *Id.* (quoting *Bruce v. City & Cnty. of Denver*, 57 F.4th 738, 746 (10th Cir. 2023)).
88 *Id.* at 515. Ms. Washburn asserts that courts within the Tenth Circuit apply *Rooker-Feldman* "'in a slightly broader fashion' than in other circuits, applying the doctrine in a way that 'mirrors claim and issue preclusion' but that also 'applies to temporary and non-final orders.'" ECF No. 37 at 13–14. Notably, the Court cannot locate the quoted language in the case cited. *See Wideman v. Colorado*, 242 F. App'x 611, 613–14 (10th Cir. 2007) (unpublished). The Court did locate the language in *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1075 (10th Cir. 2004), but, in any event, this approach is not consistent with more recent 10th Circuit decisions such as *Graff*. It is also inconsistent with the guidance of the Supreme Court, which recently discussed its "refus[al] to expand the *Rooker-Feldman* doctrine" and emphasized that the doctrine occupies "narrow ground."[4] *T. M. v. Univ. of Md. Med. Sys. Corp.*, 608 U.S. ----, 146 S. Ct. 1739, 1747–48 (2026).
89 *Graff*, 65 F.4th at 515.
90 *Skinner v. Switzer*, 562 U.S. 521, 532 (2011) (citation modified).

must specifically seek to modify or set aside a state court judgment"[91]—in other words, "an element of the claim must be that the state court wrongfully entered its judgment."[92]

While Mr. Tilleman may seek relief inconsistent with the state court findings in the divorce proceedings, he does not assert that state court orders caused his injuries. Rather, he attempts to assert injury from Defendants' alleged fraudulent conduct. Because Mr. Tilleman's claims "assert injury from a source other than the state court judgments[,]" they "are therefore independent claims outside the scope of the *Rooker-Feldman* doctrine."[93]

The case law Ms. Washburn cites in support of her argument otherwise is distinguishable. Each of these cases challenged state court proceedings and asked the federal district court to review and reject state court decisions.[94] In *Thompson*, the plaintiff asserted various wrongs stemming from the actions of Colorado and New York state courts and sought relief in the form of ordering "the Colorado and New York law and or agreements and the respective courts to conform to Article 4 clause 2 of the U.S. constitution and conform to *Brown v. Board of [E]ducation* and other cases that clarify the meaning of the U.S. constitution."[95] Similarly, in *Purpura*, the plaintiff's complaint sought "redress solely for 'injuries' caused by . . . state court judgments—i.e., the payments and other property distributions that those judgments have required him to make"; the plaintiff expressly asked for "a judgment invalidating" those judgments; and "success on his claims would entail a ruling that the state judgments he

[91] *Graff*, 65 F.4th at 515.
[92] *Id.*
[93] *Id.* at 518.
[94] *See Thompson v. Romeo*, 728 F. App'x 796, 798 (10th Cir. 2018) (unpublished); *Purpura v. Bushkin, Gaimes, Gains, Jonas & Stream*, 317 F. App'x 263, 266 (3d Cir. 2009) (unpublished); *Tso v. Murray*, 760 F. App'x 564, 567–68 (10th Cir. 2019) (unpublished); *Snyder*, 2024 WL 179876, at *1–2; *Farris v. Burton*, 686 F. App'x 590, 592 (10th Cir. 2017) (unpublished).
[95] *Thompson*, 728 F. App'x at 798.

challenges are invalid because they were the product either of fraud, the denial of due process, or both."[96] In *Tso*, the plaintiff also alleged injuries stemming from the actions of state courts—"the harms for which he seeks relief in these claims all result from state-court judgments."[97] And in *Snyder*, the plaintiff specifically alleged that "various state court judges violated his civil rights" and that "the district court, a judge, and attorney colluded to allow an insurance company to breach their contract with Snyder."[98] Lastly, in *Farris*, the plaintiff claimed that "defendants' fraud led the K[ansas Court of Appeals] to make factual and legal errors in affirming the trial court's decision[.]"[99] As such, "a federal court would have to review the appellate state court proceedings to determine if the decision to affirm the trial court's property division was reached as a result of fraud or from a proper assessment of the claims on appeal."[100]

Here, although Mr. Tilleman's theory of causation with respect to his claims is convoluted—and the Court will discuss the impact this has on his claims below—he does not challenge the state court litigation itself or assert that the state court made any error in those proceedings. Despite that his allegations may be inconsistent with the state court's findings, he does not ask this Court to review, vacate, or effectively overturn any of the state court orders. He does not, for example, challenge the distribution of marital assets or the child custody arrangement, and he does not claim that Defendants' alleged fraudulent scheme caused the state court to err in its legal and factual analyses. Instead, his claims attempt to "assert injury from a

---

[96] *Purpura*, 317 F. App'x at 266.
[97] *Tso*, 760 F. App'x at 567.
[98] *Snyder*, 2024 WL 179876, at *2.
[99] *Farris*, 686 F. App'x at 592.
[100] *Id*.

source other than the state court judgments[.]"[101] As such, *Rooker-Feldman* does not prevent this Court from exercising jurisdiction over this action.

**C. *YOUNGER* ABSTENTION**

Ms. Washburn argues that this Court must abstain under the *Younger* abstention doctrine due to Mr. Tilleman and Ms. Washburn's ongoing divorce proceeding in Utah state court. The Court disagrees.

"[T]he Supreme Court has repeatedly held that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction."[102] "Nevertheless, the Supreme Court has counseled that a district court may, and sometimes must, abstain from hearing a matter that otherwise finds a statutory basis for subject matter jurisdiction."[103] "One such circumstance is set out in *Younger*: a federal court must abstain from deciding a case otherwise within the scope of its jurisdiction in certain instances in which the prospect of undue interference with state proceedings counsels against federal relief."[104] "*Younger* abstention applies to three categories of state cases: (1) state criminal prosecutions, (2) civil enforcement proceedings, and (3) civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."[105] If the state case falls within one of these three categories, *Younger* abstention is required when three conditions, often referred to as the *Middlesex* conditions, are satisfied:[106] (1)

---

[101] *Graff*, 65 F.4th at 518.
[102] *Elna Sefcovic*, 953 F.3d at 667 (citation modified).
[103] *Id*.
[104] *Graff*, 65 F.4th at 522 (citation modified).
[105] *Id*. (citation modified).
[106] *Id*. at 523; *see also Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

"the relevant state court proceeding must be ongoing[,]"[107] (2) "the state forum must provide an adequate opportunity to raise the relevant federal claims[,]"[108] and (3) "an important state interest must be present."[109] Significantly, "[o]nly exceptional circumstances merit *Younger* abstention."[110] The Supreme Court has "cautioned . . . that federal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not refuse to decide a case in deference to the States."[111]

It is undisputed that the state court divorce proceeding is neither a state criminal prosecution nor a civil enforcement proceeding. Instead, Ms. Washburn asserts that the divorce litigation "falls squarely" in the third category: "a civil proceeding involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."[112] Ms. Washburn does not, however, cite to any case law supporting this assertion or even describing the parameters of the third category.[113] Although Ms. Washburn asserts that the Tenth Circuit affirmed, in an unpublished decision, abstention under *Younger* in similar circumstances[114] and that judges in this district have similarly abstained in the face of ongoing divorce disputes,[115] none of the cases cited clearly discuss whether the state case fell within the three categories that present circumstances the Supreme Court has ranked as exceptional[116] and instead discuss only

---

107 *Id.*
108 *Id.*
109 *Id.*
110 *Id.* at 522 (alteration in original).
111 *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (citation modified).
112 *Graff*, 65 F.4th at 522.
113 *See* ECF No. 58 at 3–4.
114 *See Thompson*, 728 F. App'x at 798.
115 *See Klock v. State of Utah*, No. 1:24-cv-00031, 2024 WL 3510516, at *4 (D. Utah July 23, 2024); *Snyder*, 2024 WL 179876, at *2.
116 *See Sprint Commc'ns, Inc.*, 571 U.S. at 73 ("Circumstances fitting within the *Younger* doctrine, we have stressed, are 'exceptional'; they include . . . state criminal prosecutions, civil enforcement proceedings, and civil proceedings involving certain orders that are uniquely in

the *Middlesex* conditions. As the Supreme Court has stated, "[d]ivorced from their quasi-criminal context, the three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest."[117] Such a "result is irreconcilable with [the Supreme Court's] dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the exception, not the rule."[118] The cases cited thus do not persuade the Court that it must abstain under the circumstances presented here.

Instead, to determine whether the divorce proceeding falls under the third category, the Court looks to cases "exhibiting this class's paradigm characteristics."[119] "The prototypical examples of situations falling within this third category are *Juidice v. Vail*, 430 U.S. 327 (1977), and *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1 (1987)."[120]

In *Juidice*, a state court judge entered orders holding Vail in contempt and ordering his arrest after default judgment had been entered against Vail, Vail had failed to satisfy the judgment, and Vail had failed to appear at a hearing to "show cause why he should not be punished for contempt."[121] Vail and others then brought suit in federal district court "to enjoin . . . the use of the statutory contempt procedures authorized by New York law and employed by [the state court judges]."[122] The federal district court enjoined the contempt procedures,[123] but

furtherance of the state courts' ability to perform their judicial functions. . . . Because this case presents none of the circumstances the Court has ranked as 'exceptional,' the general rule governs: the pendency of an action in a state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." (citation modified)).

117 *Sprint Commc'ns, Inc.*, 571 U.S. at 81.
118 *Id*. at 81–82 (citation modified).
119 *Elna Sefcovic*, 953 F.3d at 670.
120 *Id*. (citation modified).
121 *Juidice*, 430 U.S. at 329–30.
122 *Id*. at 330.
123 *Id*. at 331.

the Supreme Court held that the district court should have abstained under *Younger* due to the "State's interest in the contempt process, through which it vindicates the regular operation of its judicial system"[124] and because "federal-court interference with the State's contempt process" would be "an offense to the State's interest . . . likely to be every bit as great as it would be were this a criminal proceeding."[125] "The contempt power lies at the core of the administration of a State's judicial system[.]"[126]

In *Pennzoil*, Texaco, after receiving an adverse judgment in state court, filed suit in federal district court "alleg[ing] that the Texas proceedings violated rights secured to Texaco by the Constitution and various federal statutes."[127] The federal district court "issued a preliminary injunction barring Pennzoil from attempting to collect its judgment through state court enforcement processes."[128] The Supreme Court, however, "held that the reasoning of *Juidice* required the district court to abstain under *Younger*."[129] "Both *Juidice* and this case involve challenges to the processes by which the State compels compliance with the judgments of its courts."[130] "Not only would federal injunctions in such cases interfere with the execution of state judgments, but they would do so on grounds that challenge the very process by which those judgments were obtained."[131]

As the Tenth Circuit has described, "both *Juidice* and *Pennzoil* involved requests to directly or indirectly thwart state court compliance processes."[132] The instant matter, however,

---

[124] *Id*. at 335.
[125] *Id*. at 336 (citation modified).
[126] *Id*. at 335.
[127] *Pennzoil Co.*, 481 U.S. at 6.
[128] *Elna Sefcovic*, 953 F.3d at 671 (citing *Pennzoil Co.*, 481 U.S. at 8).
[129] *Id*. (citing *Pennzoil Co.*, 481 U.S. at 13).
[130] *Pennzoil Co.*, 481 U.S. at 13–14.
[131] *Id*. at 14.
[132] *Elna Sefcovic*, 953 F.3d at 671.

involves no such interference. Mr. Tilleman does not ask this Court to enjoin the divorce proceedings in an attempt to avoid or thwart efforts in state court to enforce Mr. Tilleman's compliance with state court orders. Indeed, there is no indication that Mr. Tilleman is not in compliance with any state court order. As such, this case does not present an exceptional circumstance that falls within the third category. Abstention under *Younger* is, therefore, improper, and the Court will decline to abstain from hearing this case.

### D. RICO CLAIMS (COUNTS 1–4)

"RICO vests a private citizen with substantive rights to avoid 'injur[ies]' to 'his business or property' caused by a pattern of racketeering activity, and it explicitly creates a federal cause of action to vindicate those federal rights."[133] "To maintain a cause of action under § 1964(c), a plaintiff must plead and ultimately prove: (1) that the defendant violated § 1962; (2) that the plaintiff's business or property was injured; and (3) that the defendant's violation is the cause of that injury."[134]

As to the first element, "[a] defendant violates [§ 1962] when the defendant (1) invests in, controls, or participates in the conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity."[135] "'Racketeering activity' is defined by statute to include indictable acts of . . . wire fraud as prohibited under 18 U.S.C. § . . . 1343[.]"[136] "These underlying acts are 'referred to as predicate acts, because they form the basis for liability under RICO.'"[137] Here,

---

133 *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017) (alteration in original) (quoting 18 U.S.C. § 1964(c)).
134 *Id.*
135 *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1210 (10th Cir. 2025) (citing *Tal*, 453 F.3d at 1261 (citing 18 U.S.C. § 1962(a), (b), & (c))).
136 *Id.* (citing 18 U.S.C. § 1961(1)(B)).
137 *Tal*, 453 F.3d at 1261 (quoting *BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1102 (10th Cir. 1999)).

Mr. Tilleman alleges that Defendants engaged in the predicate act of wire fraud.[138] "To sufficiently state a RICO claim based on . . . wire fraud, a plaintiff must plausibly allege [1] the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and [2] that the defendant communicated, or caused communications to occur, through . . . interstate wires to execute that fraudulent scheme."[139] Additionally, "[p]ursuant to § 1962(d), conspiracy to commit a RICO violation also constitutes a violation of the Act when a conspirator adopts the goal of furthering the enterprise, even if the conspirator does not commit a predicate act."[140]

Mr. Tilleman asserts that Defendants' alleged wire fraud constitutes a pattern of racketeering activity such that Defendants have violated 18 U.S.C. § 1962(b) and (c). The Complaint also asserts claims for conspiracy associated with these violations. All Defendants argue that Mr. Tilleman has failed to sufficiently state his RICO claims for various reasons. For the purposes of this Motion, the Court will assume without deciding that Mr. Tilleman has sufficiently alleged that Defendants have violated § 1962 so as to meet the first element of a cause of action under § 1964(c). The Court does so because it concludes that Mr. Tilleman's failures with respect to the second and third elements—that his business or property was injured and that Defendants' alleged violations were the cause of that injury—necessitate dismissal. The Court now turns to those issues.

---

[138] ECF No. 1 ¶ 604.
[139] *Gaddy*, 148 F.4th at 1210–11 (citation modified).
[140] *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014).

**1. Injury to Business or Property and Causation**

Again, "RICO provides a cause of action for those injured in business or property by reason of prohibited racketeering activities."[141] This concept has in the past been referred to as "RICO standing"; however, the Tenth Circuit has clarified that what was "once called 'RICO standing' or 'statutory standing'" is more properly characterized "as the usual pleading-stage inquiry: whether the plaintiff has plausibly pled a cause of action under RICO."[142] This is so because the elements are not an issue of "standing" that would implicate the Court's subject matter jurisdiction.[143]

With respect to the "business or property" requirement, "[a] plaintiff has been 'injured in his business or property' if his business or property has been harmed or damaged."[144] "[B]y explicitly permitting recovery for harms to business and property, [§ 1964(c)] implicitly excludes recovery for harm to one's person."[145] The requirement, however, "operates with respect to the *kinds* of harm for which the plaintiff can recover, not the *cause* of the harm for which he seeks relief."[146] The Supreme Court gave the following example: "if the owner of a gas station is beaten in a robbery, he cannot recover for his pain and suffering. But if his injuries force him to shut his doors, he can recover for the loss of his business."[147] "In short, a plaintiff can seek

[141] *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (citing 18 U.S.C. § 1964(c)).
[142] *Safe Streets All.*, 859 F.3d at 887.
[143] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 571 U.S. 118, 128 n.4 (2014) (explaining that "statutory standing" and "prudential standing" are "misleading" terms because "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." (emphasis in original)).
[144] *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025).
[145] *Id.*
[146] *Id.* (emphasis in original).
[147] *Id.*

damages for business or property loss regardless of whether the loss resulted from a personal injury."[148]

Nonetheless, while the Supreme Court did not determine the issue in *Horn*,[149] it emphasized that "the reach of § 1964(c) turns on more than the meaning of 'injured.'"[150] To that end, "'business' may not encompass every aspect of employment, and 'property' may not include every penny in the plaintiff 's pocketbook."[151] Thus, "not every monetary harm—be it lost wages, medical expenses, or otherwise—necessarily implicates RICO."[152]

With respect to causation, "[n]ot only must the injury be cognizable, but there must be a causal relationship between it and the RICO violations"[153]—a plaintiff must be injured "by reason of" the defendant's violation of § 1962.[154] RICO's "by reason of requirement" requires a plaintiff to, in stating a claim, "show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'"[155] "Sufficiently establishing the element of causation—both actual and proximate—is crucial to proving any violation of RICO."[156]

"Proximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations[.]"[157] However, while "[t]he concepts of direct relationship and foreseeability are . . .

---

[148] *Id*.
[149] *Id*. at 600 ("[W]e do not opine on what it means for plaintiff to be 'injured in his . . . property' under § 1964(c).").
[150] *Id*. at 613.
[151] *Id*.
[152] *Id*.
[153] *Sensoria, LLC v. Kaweske*, 581 F. Supp. 3d 1243, 1267 (D. Colo. 2022).
[154] 18 U.S.C. § 1964(c)
[155] *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).
[156] *CGC Holding Co.*, 773 F.3d at 1088.
[157] *Hemi Grp.*, 559 U.S. at 9.

two of the many shapes proximate cause took at common law," Supreme Court "precedent make[s] clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm."[158] "The key word is 'direct'; foreseeability does not cut it."[159] Moreover, the "general tendency of the law, in regard to damages at least, . . . to [not] go beyond the first step" of the causal chain "applies with full force to proximate cause inquiries under RICO."[160] "[W]henever the plaintiff's theory of causation requires moving 'well beyond the first step,' it 'cannot meet RICO's direct relationship requirement.'"[161] "One motivating principle" for this "is the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action[,]"[162] as "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."[163] And the Supreme Court has instructed that "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly."[164] Thus, in sum, "[w]hen a court evaluates a RICO claim for proximate

---

[158] *Hemi Grp.*, 559 U.S. at 12 (citation modified).
[159] *Horn*, 604 U.S. at 612. Mr. Tilleman argues that his injuries were foreseeable results of Defendants' conduct. Notably, in doing so, Mr. Tilleman relies on the Second Circuit's decision in *Horn* rather than the Supreme Court's decision. *See, e.g.*, ECF No. 49 at 11. The Supreme Court reiterated in *Horn* that, contrary to Mr. Tilleman's assertions, "foreseeability does not cut it" in the context of civil RICO. *Horn*, 604 U.S. at 612. This Court follows the guidance of the Supreme Court, as it is not bound by the Second Circuit. Furthermore, *Hemi Group* also does not support Mr. Tilleman's foreseeability arguments. There, the Supreme Court explicitly stated that "[o]ur precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm." *Hemi Grp.*, 559 U.S. at 12. The Court is, thus, unpersuaded by Mr. Tilleman's foreseeability arguments.
[160] *Hemi Grp.*, 559 U.S. at 10.
[161] *Horn*, 604 U.S. at 612 (quoting *Hemi Grp.*, 559 U.S. at 10).
[162] *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).
[163] *Holmes v. Secs. Inv. Protection Corp.*, 503 U.S. 258, 269 (1992).
[164] *Anza*, 547 U.S. at 460.

causation, the central question it must ask is whether the alleged violation led *directly* to the plaintiff's injuries."[165]

With these principles in mind, the Court will turn to examine whether Mr. Tilleman has sufficiently alleged injuries cognizable under RICO that were both actually and proximately caused by Defendants' alleged RICO violations. Mr. Tilleman's theory appears to be that Ms. Hildebrandt, ConneXions, and Ms. Franke "used interstate wires to lure in vulnerable individuals," including Ms. Washburn, "with promises of personal and relational improvement, only to indoctrinate them . . . and instruct them to manipulate and harm others."[166] Ms. Washburn's involvement then, according to Mr. Tilleman, caused him harm in various ways. It appears to the Court that Mr. Tilleman's Complaint alleges seven distinct injuries:[167]

(1) He alleges that he "has suffered at least $1,066,856 in lost earning potential" because, at the time Ms. Washburn became involved in the Enterprise, he "had been accepted to multiple prestigious law schools" but "has been unable to attend law school as a direct result of the time and money he has been forced to spend both defending himself in domestic proceedings and protecting his daughter from" Ms. Washburn's "implementation of [Ms.] Hildebrandt's methodology and furtherance of the Enterprise."[168]

(2) He alleges that he "incurred approximately $2,000 in medical costs for treatment" of his child's injuries "sustained as a direct result of" Ms. Washburn's alleged abusive conduct.[169]

(3) He alleges that he "has been forced to spend hundreds of thousands of dollars in legal fees to protect himself, his reputation, and his relationship to" his child.[170]

---

[165] *Id*. at 461 (emphasis added).
[166] ECF No. 49 at 12.
[167] *See* ECF No. 1 ¶ 613 ("As set forth in paragraphs 568 through 597 herein, Defendants' pattern of racketeering activity has proximately caused Plaintiff substantial injury to his business and property."); *see also id*. ¶¶ 568–97. The Court lists these injuries in the order in which it will address them.
[168] *Id*. ¶¶ 595–97.
[169] *Id*. ¶¶ 586–87.
[170] *Id*. ¶ 580.

(4) He alleges that he suffered "$3,770 in lost wages" from "attending [the] custody trial" for ten days.[171]

(5) He alleges that, because of the Enterprise's tactics in separating him from his child, he was, in 2016, forced to travel "to Arizona to receive help from his family to regain access to" his child and was unable to begin his new employment as scheduled. As a result, he allegedly lost approximately three months of income, totaling $10,000.[172]

(6) He alleges that the Enterprise's conduct caused and prolonged the parties' divorce and custody proceedings and that, during those proceedings, he lost his job and was forced to accept lower-paying employment for around three years, resulting in approximately $90,000 of lost income.[173]

(7) He alleges that, while he and Ms. Washburn were married, Ms. Washburn "spent approximately $5,000 of [his] income on services through ConneXions . . . directly benefit[ing] the Enterprise," despite his repeated objections.[174]

The Court will address these injuries in turn.

*a. Injury #1*

Mr. Tilleman claims that he "has suffered at least $1,066,856 in lost earning potential" from his alleged inability to attend a prestigious law school.[175] But Mr. Tilleman does not explain to the Court how this constitutes a cognizable injury under RICO other than perhaps to say that it is economic in nature. But merely being economic in nature does not mean an injury is an injury to business or property as the statute contemplates. As the Supreme Court has stated, "not every monetary harm—be it lost wages, medical expenses, or otherwise—necessarily implicates RICO."[176] Furthermore, "RICO requires . . . an actual, concrete monetary loss (i.e., an

[171] *Id.* ¶¶ 588–92.
[172] *Id.* ¶¶ 569–73.
[173] *Id.* ¶¶ 574–79.
[174] *Id.* ¶¶ 581–84.
[175] *Id.* ¶¶ 595–97.
[176] *Horn*, 604 U.S. at 613.

'out-of-pocket' loss)."[177] "In other words, the injury must be tangible, quantified, realized (that is, actual and not hypothetical), non-speculative, and non-contingent."[178]

Here, Mr. Tilleman's lost professional earnings from the legal career he might have had "are too speculative to constitute injury to business or property within the meaning of § 1964(c)."[179] At best, Mr. Tilleman had "a mere expectation of (and not an entitlement to) a lucrative professional career[,]"[180] and "courts have generally held that damages theories premised on the expectation of future value or profits are too speculative and contingent to establish injury for purposes of RICO."[181] Thus, Mr. Tilleman's "expectation—no matter its likelihood—is not a cognizable business or property interest under RICO."[182] It is, rather, "an unrecoverable expectancy interest."[183]

The speculative nature of this injury also undermines Mr. Tilleman's ability to plausibly allege causation between the predicate acts and this injury. "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient" to establish proximate cause,[184] and Mr. Tilleman's $1,066,856 in lost earning potential is contingent on numerous external forces entirely separate from the alleged wire fraud. For example, it would depend on Mr. Tilleman's performance in and

---

[177] *Sensoria*, 581 F. Supp. 3d at 1267 (citation modified).
[178] *Id.*
[179] *Doe 9 v. Varsity Brands, LLC*, 679 F. Supp. 3d 464, 483 (D.S.C. 2023).
[180] *Bowen v. Adidas Am., Inc.*, 541 F. Supp. 3d 670, 679–80 (D.S.C. 2021).
[181] *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1070 (E.D. Mich. 2018); *see, e.g., Bowen*, 541 F. Supp. 3d at 679–80; *Doe 9*, 679 F. Supp. 3d at 483; *Strates Shows, Inc. v. Amusements of Am., Inc.*, 379 F. Supp. 2d 817, 828 (E.D.N.C. 2005) ("[S]uch an expectancy interest, even if highly certain, is not a recognizable property interest."); *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995) ("Anderson's suit shows only a lost opportunity to obtain a . . . loan. Such lost opportunity by itself does not constitute an injury that confers standing to bring a RICO cause of action.").
[182] *Bowen*, 541 F. Supp. 3d at 680.
[183] *Id.* at 679.
[184] *Hemi Grp.*, 559 U.S. at 9 (quoting *Holmes*, 503 U.S. at 271, 274).

graduation from law school; it would depend on his obtaining a license to practice law; it would depend on his being hired for employment, which in and of itself would depend on numerous factors such as the job market at the time of hiring. Thus, there are numerous steps between the alleged wire fraud and Mr. Tilleman's hypothetical lost earning potential, many of which may or may not have occurred even in the absence of the fraud. In sum, this injury cannot provide the basis for Mr. Tilleman's RICO claims.

*b. Injury #2*

The next injury consists of "$2,000 in medical costs for treatment" of his child's injuries allegedly "sustained as a direct result of" Ms. Washburn's abusive conduct.[185] Again, Mr. Tilleman does very little to explain why this constitutes injury to business or property as contemplated under RICO. He simply states that, according to the Second Circuit in *Horn*, it is "irrelevant" whether his injuries may have flowed from personal injuries to the child so long as they resulted in economic injuries to him.[186] This does not, however, comport with the Supreme Court's decision wherein it stated that "not every monetary harm—be it lost wages, *medical expenses*, or otherwise—necessarily implicates RICO."[187] Indeed, it seems to the Court that allowing recovery for medical expenses resulting from personal injury would allow a plaintiff to recover for harm to one's person, which the statute does not authorize, simply by characterizing these damages as economic.

In any event, this injury suffers from fatal deficiencies with respect to causation. "[T]he direct-relation test bars RICO claims when the plaintiff's losses are 'purely derivative of

[185] ECF No. 1 ¶¶ 586–87.
[186] ECF No. 48 at 21.
[187] *Horn*, 604 U.S. at 613 (emphasis added).

misfortunes visited upon a third person by the defendant's acts.'"[188] Here, even assuming that the alleged wire fraud induced Ms. Washburn to visit harm upon the child, the direct injury is to the child. Mr. Tilleman's having to pay medical expenses is then derivative of the child's injury—without any injury to the child, Mr. Tilleman "would not have incurred the additional expenses in paying for the medical expenses of" the child.[189] In other words, Mr. Tilleman attempts to recover for harms to a third party, and as such, an "intermediary breaks the causal chain[.]"[190] "Thus, there is no 'direct' link between the alleged misconduct of [D]efendants and the alleged damage to" Mr. Tilleman, and he cannot establish proximate causation.[191] As with the injury above, this injury cannot provide the basis for Mr. Tilleman's RICO claims.

*c. Injury #3*

Mr. Tilleman's third injury involves legal fees that he has spent in his domestic proceedings.[192] Yet again, Mr. Tilleman fails to provide the Court with meaningful argument that these legal fees could constitute a cognizable injury under RICO but simply asserts that they are economic in nature. Nonetheless, even assuming that legal fees can be recovered under RICO as an injury to business or property, Mr. Tilleman must sufficiently establish causation, and the Court is persuaded by the reasoning of other courts that have found that "legal fees and costs that a plaintiff chose to incur are an indirect injury from a defendant's conduct."[193] In *Strates Shows*,

---

[188] *San Miguel Hosp. Corp. v. Publix Supermarket, Inc.*, No. 1:23-cv-00903 KWR/JFR, 2025 WL 872972, at *9 (D.N.M. Mar. 19, 2025) (quoting *Lexmark Int'l*, 572 U.S. at 133 (citation modified)).
[189] *Id.*
[190] *Safe Streets All.*, 859 F.3d at 890.
[191] *San Miguel Hosp. Corp.*, 2025 WL 872972, at *9.
[192] ECF No. 1 ¶ 580.
[193] *Bowen*, 541 F. Supp. 3d at 679; *see also, e.g., Strates Shows*, 379 F. Supp. 2d at 833; *Azima v. Dechert LLP*, No. 22-cv-8728 (PGG) (JW), 2024 WL 4665106, at *36 (S.D.N.Y. Sept. 26, 2024) ("[W]here Plaintiffs' legal fees were incurred in *offensive* litigation, the legal fees are not RICO injuries." (emphasis in original)).

for example, the district court held that the legal fees and costs incurred in the plaintiff's pursuing a bid protest were "not 'direct' injury flowing from defendants' illegal conduct, but rather, at best, 'indirect' injury which plaintiff did not automatically incur, but chose to incur, in mitigating the effect of defendants' conduct."[194] "Stated differently, plaintiff's choice to pursue a bid protest, however justified, was an 'independent cause' which required the payment of legal fees and costs."[195]

Here, Mr. Tilleman alleges that *he* filed for divorce on October 6, 2016.[196] Thus, he chose to initiate the divorce proceedings and thereby incur the legal fees, and they were not automatically incurred as such fees may be where a RICO plaintiff is forced "to expend legal fees *defensively*" in, for instance, "pursuit of lifting default judgments that had been part of the underlying RICO schemes."[197] As such, Mr. Tilleman's legal fees are, at most, an indirect injury of the alleged wire fraud, and the alleged wire fraud "by defendants . . . was not the 'proximate cause' of [Mr. Tilleman's legal] fees[.]"[198] Mr. Tilleman cannot therefore state a RICO claim on the basis of the claimed legal fees.

*d. Injury #4*

Mr. Tilleman's fourth injury involves "$3,770 in lost wages" from "attending [the] custody trial" for ten days.[199] The Court reiterates the Supreme Court's statement that "not every monetary harm—be it *lost wages*, medical expenses, or otherwise—necessarily implicates RICO."[200] Nonetheless, even assuming these lost wages constitute injury to business or property

---

194 *Strates Shows*, 379 F. Supp. 2d at 833.
195 *Id*.
196 ECF No. 1 ¶ 270.
197 *Azima*, 2024 WL 4665106, at *35 (emphasis in original).
198 *Strates Shows*, 379 F. Supp. 2d at 833.
199 ECF No. 1 ¶¶ 588–92.
200 *Horn*, 604 U.S. at 613 (emphasis added).

under RICO, Mr. Tilleman has failed to plausibly allege proximate causation. As discussed above, it was Mr. Tilleman who chose to initiate the divorce proceeding,[201] and there would be many other external factors at play that resulted in the ten-day trial, such as the decisions of the attorneys and the state court itself. Thus, Mr. Tilleman's $3,770 in lost wages is only, at best, indirectly caused by the alleged wire fraud. Mr. Tilleman cannot state a RICO claim on the basis of this injury.

*e. Injuries #5–6*

The fourth and fifth injuries involve Mr. Tilleman's losing approximately three months of income totaling $10,000 when, in 2016, he traveled "to Arizona to receive help from his family to regain access to" his child and was unable to begin his new employment as scheduled,[202] as well as his losing his job and having to accept lower-paying employment for around three years, resulting in approximately $90,000 in lost income.[203] Even assuming these harms constitute injuries to business as contemplated under RICO, as the Supreme Court has cautioned, "[t]ime and again, we have reiterated that § 1964(c)'s 'by reason of' language demands 'some direct relation between the injury asserted and the injurious conduct alleged.'"[204] "[W]henever the plaintiff 's theory of causation requires moving 'well beyond the first step,' it 'cannot meet RICO's direct relationship requirement.'"[205]

Mr. Tilleman's theory of causation with respect to these injuries "is anything but straightforward: Multiple steps . . . separate the alleged fraud from the asserted injury."[206] With

---

[201] ECF No. 1 ¶ 270.
[202] *Id.* ¶¶ 569–73.
[203] *Id.* ¶¶ 574–79.
[204] *Horn*, 604 U.S. at 612 (quoting *Holmes*, 503 U.S. at 268).
[205] *Id.* (quoting *Hemi Group*, 559 U.S. at 10).
[206] *Hemi Group*, 559 U.S. at 15.

respect to the injury involving Mr. Tilleman's having to delay his start-date, the alleged causal chain would proceed from the Enterprise's purported use of wire fraud to indoctrinate Ms. Washburn, to Ms. Washburn's alleged adoption of Ms. Hildebrandt's methodology to restrict Mr. Tilleman's access to their child, to Mr. Tilleman's own choice to travel to Arizona to seek assistance from family members, to his inability to return in time for his scheduled employment start date, and finally, to his employer's decision to delay his start-date by approximately three months. And with respect to the injury involving Mr. Tilleman's job loss, the alleged chain would proceed from the Enterprise's purported use of wire fraud to indoctrinate Ms. Washburn, to Ms. Washburn's alleged adoption of Ms. Hildebrandt's methodology to create marital problems between herself and Mr. Tilleman, to Mr. Tilleman's own choice to initiate the divorce proceedings, to Ms. Washburn's alleged delay tactics during those proceedings, to Mr. Tilleman's employers' apparent decision to release Mr. Tilleman from employment, and to Mr. Tilleman's inability to find equal-paying employment, which could have been influenced by numerous external factors.

As this shows, "complex, external factors are at play" here,[207] and it would be very difficult for the Court "to ascertain the amount of [Mr. Tilleman's] damages attributable to the violation, as distinct from other, independent, factors."[208] Significantly, these injuries rest on the *independent* actions of Mr. Tilleman's employers. His employer pushed his start date back by three months, and his employer terminated his employment. Therefore, Mr. Tilleman has failed to plausibly allege causation with respect to these injuries. These injuries cannot provide the basis for Mr. Tilleman's RICO claims.

---

[207] *Safe Streets All.*, 859 F.3d at 891.
[208] *Holmes*, 503 U.S. at 269.

*f. Injury #7*

The seventh injury involves Ms. Washburn spending, while she and Mr. Tilleman were married, "approximately $5,000 of [Mr. Tilleman's] income on services through ConneXions . . . directly benefit[ing] the Enterprise," despite his repeated objections.[209] Mr. Tilleman alleges that when Ms. Washburn "began associating with the Enterprise," they "were financially reliant solely on [Mr. Tilleman's] income."[210] He also alleges that "[d]uring the course of their marriage, [Ms. Washburn] spent approximately $5,000 of marital funds through ConneXions, including without limitation counseling sessions with [Ms.] Hildebrandt, which were around $200 per individual session and $100 per month for group sessions."[211] Based on these allegations and drawing reasonable inferences in Mr. Tilleman's favor, it appears that he has sufficiently alleged an injury to property cognizable under RICO with respect to the loss of these funds.[212]

As for causation, Mr. Tilleman's theory of wire fraud appears to be that the Enterprise "used interstate wires to lure in vulnerable individuals with promises of personal relationship improvement, only to indoctrinate them in the Enterprise's twisted teachings and instruct them how to manipulate and harm others."[213] Mr. Tilleman concedes that he himself did not personally embrace the Enterprise's teachings or, in other words, rely on the alleged misrepresentations.[214]

---

[209] ECF No. 1 ¶¶ 581–84.
[210] ECF No. 1 ¶ 582.
[211] ECF No. ¶ 203.
[212] The Hildebrandt Defendants assert, by way of footnote, that this "$5,000 was resolved in the divorce decree and thus that damage is no longer a viable claim." *See* ECF No. 34 at 12 n.9. No support is provided for this assertion, and it is not clear to the Court that the assertion is sound. Thus, the Court finds this argument unpersuasive.
[213] ECF No. 49 at 12.
[214] *Id*. at 14–15.

Rather, he felt the Enterprise was "a cult."[215] Nevertheless, "[a] plaintiff's personal—or, first-party—reliance on a defendant's fraudulent misrepresentation is not an indispensable component of every predicate–act–fraud RICO claim."[216] The Supreme Court held in *Bridge v. Phoenix Bond & Indemnity Company*, 553 U.S. 639, 661 (2008), that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." In that case, the Supreme Court "recognized a civil RICO claim where the defendants had submitted fraudulent documents to Cook County, Illinois, which was conducting property auctions, thereby giving the defendants an unfair advantage over the plaintiffs in securing property at those auctions"[217] and "ruled that the plaintiffs could proceed with the lawsuit even though it was Cook County, and not the plaintiffs, that had relied on the misrepresentations."[218]

This is not to say, however, "that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail [or, similarly, wire] fraud can prevail without showing that *someone* relied on the defendant's misrepresentations."[219] "In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."[220] "In addition, the complete absence of reliance may prevent the plaintiff from establishing proximate cause."[221] For example, if, in *Bridge*, "the county knew petitioners' attestations were false but nonetheless permitted them to participate in the auction, then arguably the county's actions would constitute

[215] ECF No. 1 ¶ 208.
[216] *Gaddy*, 148 F.4th at 1218.
[217] *Id.* (citing *Bridge*, 553 U.S. at 642–44).
[218] *Id.*
[219] *Bridge*, 553 U.S. at 658 (emphasis in original).
[220] *Id.*
[221] *Id.* at 658–59.

an intervening cause breaking the chain of causation between petitioners' misrepresentations and respondents' injury."[222]

Mr. Tilleman's causation theory appears to hinge on Ms. Washburn's reliance on the alleged misrepresentations—Mr. Tilleman argues that interstate wires were used to successfully lure Ms. Washburn into the Enterprise. This, however, has not been sufficiently alleged in the Complaint. The Complaint alleges that Ms. Washburn "became involved with [Ms.] Hildebrandt in 2015 when she sought [Ms.] Hildebrandt out for counseling services."[223] "Shortly thereafter, [Ms. Washburn] became a loyal associate of [Ms.] Hildebrandt."[224] The Complaint also alleges that Ms. Washburn "initially sought [Ms.] Hildebrandt's services simply for personal and marital counseling[,]"[225] thereafter "quickly and eagerly accept[ing] [Ms.] Hildebrandt's methodology and becom[ing] a member of the Enterprise."[226] Notably absent from these allegations is anything connecting Ms. Washburn's recruitment to any communications, misrepresentations or otherwise, made via interstate wires. Thus, while Ms. Washburn may have sought Ms. Hildebrandt out for counseling services, it is not clear that she did so as a result of any reliance on any fraudulent promises Ms. Hildebrandt, Ms. Franke, or ConneXions made. It is also not clear that any fraudulent promises induced Ms. Washburn to join the Enterprise. Moreover, the Complaint alleges that Ms. Washburn, at all relevant times, was and is "aware of the illegitimacy and fraudulent nature of the Enterprise and of ConneXions' services and products."[227] This undermines any inference that Ms. Washburn relied on any alleged misrepresentations.

---

[222] *Id.* at 659.
[223] ECF No. 1 ¶ 192.
[224] *Id.* ¶ 193.
[225] *Id.* ¶ 194.
[226] *Id.*
[227] *Id.* ¶ 209.

Accordingly, based on these allegations, the Court cannot conclude that Mr. Tilleman has plausibly alleged that Ms. Washburn relied on any alleged misrepresentations.

Because it has not been plausibly alleged that Ms. Washburn relied on any alleged misrepresentations and Mr. Tilleman concedes that he did not, Mr. Tilleman cannot establish causation between the misrepresentations and the injury to his property in the form of the $5,000 Ms. Washburn spent on ConneXions' services and products. According to the Complaint, Ms. Washburn knew the services and products were illegitimate and fraudulent yet spent the $5,000 regardless. Her actions thus "constitute an intervening cause breaking the chain of causation between [the] misrepresentations and [the] injury."[228] Proximate causation cannot, therefore, be established.

In sum, as Mr. Tilleman has failed to plausibly allege causation with respect to this final injury, his RICO claims fail. Nonetheless, even were the Court to assume that Ms. Washburn relied on the alleged wire fraud such that Mr. Tilleman could establish causation and sufficiently state his RICO claims on the basis of this injury, those claims would be barred by the statute of limitations, which the Court will discuss below.

**3. Statute of Limitations**

"Although a statute of limitations bar is an affirmative defense, it may be resolved on a Rule 12(b)(6) motion to dismiss 'when the dates given in the complaint make clear that the right sued upon has been extinguished.'"[229] "The statute of limitations for a civil RICO claim is four years from the time the cause of action accrued."[230] "For civil RICO claims, the statute of

---

[228] *Bridge*, 553 U.S. at 659.
[229] *Torrez v. Eley*, 378 F. App'x 770, 772 (10th Cir. 2010) (unpublished) (quoting *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)).
[230] *Series 17-03-615 v. Teva Pharms. USA, Inc.*, 785 F. Supp. 3d 904, 955 (D. Kan. 2025) (citing *Rotella v. Wood*, 528 U.S. 549, 552 (2000)).

limitations runs from either the discovery of the injury (the injury-discovery rule) or the date when the injury occurred, even if plaintiffs were unaware of the injury (the injury-occurrence rule)."[231] While "[t]he Tenth Circuit has not adopted either rule[,]"[232] Mr. Tilleman's claims are untimely under both.

As discussed above, Mr. Tilleman has only identified a single injury that could possibly plausibly provide a basis for his RICO claims: Ms. Washburn's spending, while she and Mr. Tilleman were married, "approximately $5,000 of [Mr. Tilleman's] income on services through ConneXions . . . directly benefit[ing] the Enterprise," despite his repeated objections.[233] Ms. Washburn allegedly became involved with Ms. Hildebrandt in 2015.[234] Mr. Tilleman filed for divorce on October 6, 2016,[235] and Mr. Tilleman and Ms. Washburn "were awarded a bifurcated decree of divorce on March 13, 2018."[236] While the exact dates upon which Ms. Washburn made each purchase is unclear, the Complaint alleges that the money was spent "while the parties were married."[237] Giving this phrase a generous interpretation, this cumulative $5,000 must have been spent before March 13, 2018, as, on that date, the marriage was ended. Thus, the latest date this injury could have occurred was March 13, 2018, and the statute of limitations for Mr. Tilleman's RICO claims would, under the injury-occurrence rule, begin running on that date.

Mr. Tilleman argues that, under the injury-discovery rule, the limitations period began in August 2023 when Defendants' fraud could have been discovered. The Court disagrees. The injury-discovery rule provides that "the injury is deemed to be discovered when, in the exercise

---

[231] *Id*. (citing *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008)).
[232] *Id*.
[233] ECF No. 1 ¶¶ 581–84.
[234] *Id*. ¶ 192.
[235] *Id*. ¶ 270.
[236] *Id*. ¶ 273.
[237] *Id*. ¶ 583.

of reasonable diligence, it could have been discovered."[238] This "rule applies only in the exceptional case where reasonably diligent plaintiffs could not immediately know of the injury and the cause."[239] "The clock starts when plaintiffs either have actual or inquiry notice of the injury[,]" and "[t]he inquiry notice standard is an objective one."[240] A plaintiff is on "inquiry notice whenever circumstances exist that would lead reasonable plaintiffs of ordinary intelligence, through the exercise of reasonable due diligence, to discover their injury."[241]

Notably, "[t]o be on notice of injury from potential RICO fraud, plaintiffs need not discover all elements of defendants' scheme."[242] "For purposes of the injury-discovery rule, discovery of an injury requires only 'knowledge of the harm resulting from the [RICO] predicate act . . . not who has committed the harm.'"[243] Additionally, a plaintiff "need not have discovered a pattern of racketeering activity."[244] "Once plaintiffs have inquiry notice of facts that would suggest to reasonable person that they have been injured, plaintiffs have a duty to commence diligent investigation concerning that injury."[245]

Here, although Mr. Tilleman alleges that he "did not become aware of the illegitimacy or fraudulent nature of the Enterprise until the arrests and subsequent searching of [Ms.] Hildebrandt and [Ms.] Franke in August 2023 and February 2024, respectively,"[246] the factual allegations show otherwise. Thus, this is a naked assertion unsupported by factual enhancement.

---

[238] *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1279 (10th Cir. 2014) (citation modified).
[239] *Teva Pharms. USA*, 785 F. Supp. 3d at 955.
[240] *Id.*
[241] *Id.*
[242] *Id.*
[243] *Id.* (quoting *Kirchhefer*, 764 F.3d at 1278).
[244] *San Miguel Hosp. Corp.*, 2025 WL 872972, at *16.
[245] *Teva Pharms. USA*, 785 F. Supp. 3d at 955.
[246] ECF No. 1 ¶ 215.

"Labels, conclusions, formulaic recitations of elements, and naked assertions"[247] are insufficient to "nudge [a] claim across the line from conceivable or speculative to plausible."[248] Such conclusory allegations—meaning that they state "an inference without stating underlying facts or [are] devoid of any factual enhancement"[249]—"are not entitled to the assumption of truth."[250]

According to the factual allegations, Mr. Tilleman "objected to the amount of the couple's money [Ms. Washburn] was spending on the Enterprise's service and products[,]"[251] "felt he was being led into a cult, and upon researching ConneXions, discovered [Ms.] Hildebrandt's prior professional and illegal misconduct."[252] Further, "[o]n numerous occasions, including in writing, [he] informed [Ms. Washburn] that [Ms.] Hildebrandt was destroying their marriage and pleaded . . . that she see any other counselor besides [Ms.] Hildebrandt[,]"[253] and he "expressed his fear that [Ms.] Hildebrandt would destroy his reputation through public, defamatory allegations, as she had done to" another alleged victim.[254] These actions appear to have occurred before May 2016 when the couple separated.[255]

The reasonable inference that arises from these allegations is that Mr. Tilleman was, while perhaps not aware of the full extent of the alleged scheme, aware of the illegitimate nature of the Enterprise as early as 2016. He was likewise aware as early as 2016 that money he had an interest in was being spent on the illegitimate Enterprise despite his objections. Again, "[f]or purposes of the injury-discovery rule, discovery of an injury requires only 'knowledge of the

---

[247] *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).
[248] *Id.*
[249] *Id.*
[250] *Id.* (citation modified).
[251] ECF No. 1 ¶ 200.
[252] *Id.* ¶ 208.
[253] *Id.* ¶ 219.
[254] *Id.* ¶ 220.
[255] *See id.* ¶ 233.

harm resulting from the [RICO] predicate act.'"[256] And here, the allegations show that Mr. Tilleman was aware as early as 2016 that Ms. Washburn had become involved in and was spending his income on what he himself described as "a cult."[257] Indeed, the allegations even show that Mr. Tilleman exercised reasonable diligence around 2016 and uncovered Ms. "Hildebrandt's prior . . . illegal misconduct."[258] In other words, the allegations establish that Mr. Tilleman had actual notice of the injury in 2016. Thus, under the injury-discovery rule, the statute of limitations would begin running in 2016.

Overall, given the allegations of the Complaint, the injury-occurrence rule is more favorable to Mr. Tilleman, and the Court will thus view the statute of limitations as beginning to run on March 13, 2018. As such, Mr. Tilleman's suit would need to be filed by March 13, 2022 for his RICO claims to be timely. He did not, however, initiate this action until January 22, 2025.[259] It is, therefore, clear from the dates given in the Complaint that Mr. Tilleman's RICO claims are time-barred.

*a. Continuing Violation*

It seems, however, that Mr. Tilleman may argue that his RICO claims can be saved under a "continuing violation" theory. Mr. Tilleman cites to *Klehr v. A.O. Smith Corporation*, 521 U.S. 179, 189 (1997), but the language cited—"each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times"—does not refer to civil RICO claims. Rather, the Supreme Court was discussing "continuing violations" under antitrust law.[260] In any

---

[256] *Teva Pharms. USA*, 785 F. Supp. 3d at 955 (quoting *Kirchhefer*, 764 F.3d at 1278).
[257] ECF No. 1 ¶ 208.
[258] *Id.*
[259] ECF No. 1.
[260] *Klehr*, 521 U.S. at 189.

event, even in the antitrust context, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."[261] The Supreme Court did explain that some circuits have adopted a "separate accrual" rule in civil RICO cases whereby "the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that act."[262] "But, as in the antitrust cases, the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."[263]

In *Teva Pharmaceuticals USA*, the district court described that "[u]nder the continuing violation doctrine, the limitations period does not begin to run until the latest in a series of acts, when combined with prior acts, matures into a legal injury."[264] It noted, however, "that most courts have refused to apply the continuing violation doctrine to RICO cases."[265] *Klehr* supports this refusal. In *Klehr*, the Supreme Court rejected the "last predicate act" rule whereby

> [If], as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, . . . the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same pattern.[266]

According to the Supreme Court, "the last predicate act rule creates a limitations period that is longer than Congress could have contemplated."[267] "Because a series of predicate acts (including acts occurring at up to 10–year intervals) can continue indefinitely, such an interpretation, in

---

[261] *Id*.
[262] *Id*. at 190.
[263] *Id*.
[264] *Teva Pharms. USA*, 785 F. Supp. 3d at 960.
[265] *Id*. at 960 n.47 (collecting cases).
[266] *Klehr*, 521 U.S. at 186.
[267] *Id*. at 187.

principle, lengthens the limitations period dramatically[,]"[268] and "[i]t thereby conflicts with a basic objective—repose—that underlies limitations periods."[269] The Supreme Court could not "find in civil RICO a compensatory objective that would warrant so significant an extension of the limitations period, and civil RICO's further purpose—encouraging potential private plaintiffs diligently to investigate . . .—suggests the contrary."[270]

This Court is unpersuaded that the continuing violation doctrine is applicable here but rather follows the Supreme Court's guidance that "the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."[271] Even assuming Mr. Tilleman has sufficiently alleged that the $5,000 is injury to business or property that occurred by reason of Defendants' violations, that injury occurred on March 13, 2018 at the latest. He has not sufficiently alleged any other injuries. Thus, as in *Klehr*, while Mr. Tilleman "may point to new predicate acts that took place after" March 13, 2018, "that fact does not help [him], for . . . [he has] not shown how any new act . . . caused [him] harm over and above the harm that the earlier acts caused."[272]

*b. Equitable Tolling*

Mr. Tilleman also argues that the statute of limitations should be equitably tolled due to fraudulent concealment. "[E]quitable tolling for fraudulent concealment requires (1) the use of fraudulent means by the party who raises the ban of the statute; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the

[268] *Id.*
[269] *Id.*
[270] *Id.*
[271] *Id.* at 190.
[272] *Id.*

exercise of due diligence could not have known that he might have a cause of action."[273] Although a plaintiff generally "has no burden to plead allegations rebutting affirmative defenses, such as statute of limitations defenses[,]"[274] "when the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute."[275]

Here, the dates given in the Complaint make clear that the rights under RICO upon which Mr. Tilleman has sued have been extinguished. And Mr. Tilleman has not alleged facts plausibly showing that equitable tolling for fraudulent concealment would be appropriate here. Even assuming that Mr. Tilleman has sufficiently alleged Defendants' use of fraudulent means by holding themselves out as life coaches, he has failed to plausibly allege successful concealment. Again, although Mr. Tilleman alleges that he "did not become aware of the illegitimacy or fraudulent nature of the Enterprise until the arrests and subsequent searching of [Ms.] Hildebrandt and [Ms.] Franke in August 2023 and February 2024, respectively,"[276] this is a naked assertion unsupported by factual enhancement. Instead, to reiterate, the factual allegations show that while Ms. Washburn was spending the marital funds on services through ConneXions, Mr. Tilleman "objected to the amount of the couple's money [Ms. Washburn] was spending[,]"[277] "felt he was being led into a cult, and upon researching ConneXions, discovered [Ms.] Hildebrandt's prior professional and illegal misconduct."[278] Additionally, "[o]n numerous occasions, including in writing, [he] informed [Ms. Washburn] that [Ms.] Hildebrandt was

[273] *Kirchhefer*, 764 F.3d at 1281–82 (citation modified).
[274] *San Miguel Hosp. Corp.*, 2025 WL 872972, at *21.
[275] *Aldrich*, 627 F.2d at 1041 n.4.
[276] ECF No. 1 ¶ 215.
[277] *Id.* ¶ 200.
[278] *Id.* ¶ 208.

destroying their marriage"[279] and "expressed his fear that [Ms.] Hildebrandt would destroy his reputation through public, defamatory allegations, as she had done to" another alleged victim.[280] As stated earlier, the reasonable inference that arises from these allegations is that Mr. Tilleman was, while perhaps not aware of the full extent of the alleged scheme, aware of the illegitimate nature of the Enterprise as early as 2016. And the allegations even provide that Mr. Tilleman exercised reasonable diligence around 2016 to uncover Ms. "Hildebrandt's prior . . . illegal misconduct."[281] In short, the allegations in the Complaint do not plausibly show either successful concealment from the injured party or that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action. Mr. Tilleman has, therefore, failed to establish that equitable tolling for fraudulent concealment would be appropriate.

In sum, even assuming that the Complaint sufficiently stated RICO claims on the basis of the $5,000 lost to ConneXions' products and services, Mr. Tilleman's RICO claims would be time-barred and could not be saved by a continuing violations theory or equitable tolling. The Court will dismiss these claims with prejudice.[282]

**E. STATE LAW CLAIMS (COUNTS 5–6)**

The Complaint bases this Court's jurisdiction in federal question, 28 U.S.C. § 1331,[283] and asserts that this Court has supplemental jurisdiction over Mr. Tilleman's state law claims

---

[279] *Id.* ¶ 219.
[280] *Id.* ¶ 200.
[281] *Id.* ¶ 208.

[282] *See, e.g.*, *McGowan v. Wal-Mart Stores*, 757 F. App'x 786, 788 n.3 (10th Cir. 2019) (unpublished) ("A dismissal based on timeliness would ordinarily be with prejudice."); *Gee v. Pacheco*, 627 F.3d 1178, 1181 (10th Cir. 2010) (affirming dismissal with prejudice of claims barred by the statute of limitations).
[283] ECF No. 1 ¶ 24.

pursuant to 28 U.S.C. § 1367(a).[284] "Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if 'the district court has dismissed all claims over which it has original jurisdiction.'"[285] "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[286] Here, as the Court has dismissed the federal causes of action, it will decline to exercise supplemental jurisdiction over the remaining state claims. These claims are dismissed without prejudice.[287]

### F. PUNITIVE DAMAGES AND INJUNCTIVE RELIEF (COUNTS 7–8)

Mr. Tilleman's seventh claim for exemplary punitive damages and eighth claim for injunctive relief are not independent causes of action but are, rather, remedies that must be requested in conjunction with a cognizable cause of action.[288] Because the Court has dismissed Mr. Tilleman's substantive claims, there are no remaining claims upon which the imposition of punitive damages or injunctive relief can be based. These requests are dismissed accordingly.

### G. LEAVE TO AMEND

In each of Mr. Tilleman's Oppositions, he requests leave to amend his Complaint. Pursuant to the local rules, "[a] party may not make a motion . . . in a response or reply. A motion must be separately filed."[289] Additionally, the Tenth Circuit has "long held that bare

[284] *Id.* ¶ 25.
[285] *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).
[286] *Id.*
[287] *Birdwell v. Glanz*, 790 F. App'x 962, 964 (10th Cir. 2020) (unpublished) (indicating that where a court declines to exercise supplemental jurisdiction over state law claims, those claims should be dismissed without prejudice).
[288] *See Mason v. Texaco, Inc.*, 948 F.2d 1546, 1554 (10th Cir. 1991) ("A punitive damage claim is not an independent cause of action or issue separate from the balance of a plaintiff's case."); *Romstad v. City of Colo. Springs*, 650 F. App'x 576, 585 n.7 (10th Cir. 2016) (unpublished) ("An injunction is not an independent cause of action; it is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed[.]" (citation modified)).
[289] DUCivR 7-1(a)(3).

requests for leave to amend do not rise to the status of a motion and do not put the issue before the district court."[290] "A court need not grant leave to amend when a party fails to file a formal motion."[291]

Here, Mr. Tilleman has failed to file a formal motion. He has, rather, raised this request in his Oppositions, which is in contravention to the requirements of the local rules. Furthermore, he merely suggests, in a cursory fashion, that leave to amend should be granted and does not state with sufficient particularity the grounds for such an order.[292] Therefore, to the extent this request is properly before the Court, it declines to exercise its discretion to grant Mr. Tilleman leave to amend.

**H. SANCTIONS**

Ms. Washburn argues that the Court should award her attorneys' fees pursuant to its inherent authority to sanction and that the Court should sanction Attorney Karl Tilleman ("Attorney Tilleman"), Mr. Tilleman's father and an attorney on this case, under 28 U.S.C. § 1927. The Court does not find that any such sanctions would be appropriate here.

**1. Inherent Authority**

Federal courts possess certain "inherent powers" "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[293] Among these inherent powers is the "ability to fashion an appropriate sanction for conduct which abuses the judicial process."[294] A court may, for example, "assess attorney's fees when a party has 'acted in bad faith, vexatiously,

---

[290] *Brooks*, 985 F.3d at 1283.
[291] *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999) (also recognizing the importance of compliance with local rules).
[292] *Brooks*, 985 F.3d at 1283 ("[A]ny request for a court order, such as a request for leave to amend, must state with particularity the grounds for the order.").
[293] *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962).
[294] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991).

wantonly, or for oppressive reasons.'"[295] However, "[t]he award of attorneys fees as sanctions is rare, and is found to be warranted only in the most extreme of circumstances."[296] "Because of their very potency, inherent powers must be exercised with restraint and discretion[,]"[297] and "[l]ike all applications of inherent power, the authority to sanction bad-faith litigation practices can be exercised only when necessary to preserve the authority of the court."[298]

Ms. Washburn asserts that Mr. Tilleman has acted in bad faith, vexatiously, and for oppressive reasons in pursuing these claims against her. In support, she points to the Utah district court's finding that "Father's reports of abuse were vexatious and were calculated and designed to harm Mother[,]"[299] a finding that the Utah Court of Appeals affirmed.[300] This finding is indeed troubling to the Court, and the Court acknowledges that the relationship between Ms. Washburn and Mr. Tilleman appears fraught and litigious. But this alone is insufficient to establish that this is an extreme circumstance in which the Court's exercise of its inherent authority to sanction would be appropriate. Given the conduct of the other Defendants involved in this action, some of which having resulted in criminal convictions against them,[301] the Court cannot conclude that this RICO-based lawsuit has been filed and pursued solely in bad faith, vexatiously, wantonly, or for oppressive reasons. As such, the Court declines to impose sanctions in the form of an award of attorneys' fees to Ms. Washburn.

---

[295] *Id.* at 45–46 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975)).
[296] *Ass'n of Cmty. Orgs. for Reform Now, Inc. v. N.M. Mountain Props., LLC*, No. CIV 97-1396 LH/RLP, 1999 WL 35809658, at *3 (D.N.M. Apr. 30, 1999).
[297] *Chambers*, 501 U.S. at 44.
[298] *N.M. Mountain Props., LLC*, 1999 WL 35809658, at *2 (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980)).
[299] ECF No. 37, Ex. 1 ¶ 51.
[300] *Tilleman*, 2024 UT App 54, ¶¶ 58–59.
[301] ECF No. 37, Exs. 13–14.

**2. 28 U.S.C. § 1927**

Ms. Washburn asks the Court to impose sanctions on Attorney Tilleman by way of a cursory footnote.[302] Such perfunctory treatment of this issue is not well taken, and the Court could disregard the request on this basis alone.[303] Nonetheless, even if the Court considers the request, it cannot find such sanctions appropriate on the minimal argument before it.

Pursuant to 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." "Sanctions under § 1927 are appropriate when an attorney acts recklessly or with indifference to the law."[304] "They may also be awarded when an attorney is cavalier or bent on misleading the court; intentionally acts without a plausible basis; or when the entire course of the proceedings was unwarranted."[305] Significantly, "in the Tenth Circuit, the standard for imposing sanctions for unreasonably and vexatiously multiplying proceedings is an 'extreme standard,' and fees should be awarded as a sanction 'only in instances evidencing a serious and standard disregard for the orderly process of justice.'"[306] "[C]ourts must 'strictly construe[ ]' the statute to guard against 'dampen[ing] the legitimate zeal of an attorney in representing his client.'"[307]

---

[302] *See id*. at 25 n.4.
[303] *See Crystal Lagoons U.S. Corp. v. Cloward H20 LLC*, No. 2:19-cv-00796-BSJ, 2023 WL 11829723, at *2 (D. Utah June 1, 2023) (disregarding request sought in footnotes); *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").
[304] *Dominion Video Satellite, Inc. v. Echostar Satellite LLC*, 430 F.3d 1269, 1278 (10th Cir. 2005) (citation modified).
[305] *Id*. (citation modified).
[306] *O'Rourke v. Dominion Voting Sys. Inc.*, 552 F. Supp. 3d 1168, 1188 (D. Colo. 2021) (quoting *Baca v. Berry*, 806 F.3d 1262, 1268 (10th Cir. 2015)).
[307] *Id*. (quoting *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987)).

Ms. Washburn urges the Court to sanction Attorney Tilleman because he, on behalf of himself and his spouse, previously filed suit against Ms. Washburn in Arizona state court.[308] The Arizona suit alleged claims against Ms. Washburn and her husband for invasion of privacy by intrusion upon seclusion, intentional infliction of emotional distress, and civil conspiracy due to the alleged unlawful use of the Tilleman's Wi-Fi network.[309] It appears that the parties in this action reached a settlement, and that the case was subsequently dismissed with prejudice.[310]

As above, while the Court acknowledges that the relationship between Ms. Washburn and the family of her former spouse appears fraught and litigious, this alone is insufficient to justify the imposition of sanctions. Ms. Washburn has not demonstrated that Attorney Tilleman's conduct "manifests either intentional or reckless disregard of [his] duties to the court."[311] The Court thus declines to award sanctions against Attorney Tilleman.

## **ORDER**

For the reasons discussed above, it is HEREBY ORDERED that the Motions to Dismiss (ECF Nos. 34, 37, and 47) are GRANTED as follows:.

1. Mr. Tilleman's RICO claims are DISMISSED WITH PREJUDICE.
2. Mr. Tilleman's state-law claims are DISMISSED WITHOUT PREJUDICE.

DATED this 20th day of August 2026.

BY THE COURT:

Ann Marie McIff Allen
United States District Judge

---

[308] ECF No. 37, Ex. 2.
[309] *Id.*
[310] *Id.* Ex. 3 at 7.
[311] *Braley*, 832 F.2d at 1512.